## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NETRATINGS, INC.,

                  Plaintiff,

          vs.

COREMETRICS, INC.,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 05-cv-314-GMS

 

**NETRATINGS, INC.'S OPENING BRIEF ON CLAIM CONSTRUCTION**

 

John W. Shaw (#3362)
**YOUNG CONAWAY STARGATT**
**& TAYLOR, LLP**
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899
(302) 571-6600

Frederick L. Whitmer
Seth H. Ostrow
Arianna Frankl
**BROWN RAYSMAN MILLSTEIN**
**FELDER & STEINER LLP**
900 Third Avenue
New York, New York 10022
(212) 895-2000

Dated: April 17, 2006

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ......................................................................................... 1

A.     NATURE AND STAGE OF THE PROCEEDINGS ......................................... 1

B.     SUMMARY OF THE ARGUMENT ................................................................. 2

POINT II BACKGROUND ................................................................................................ 2

A.     CASE HISTORY ............................................................................................... 2

     1.     Procedural Background ........................................................................... 2

B.     THE PARTIES ................................................................................................... 3

     1.     Plaintiff NetRatings, Inc. ......................................................................... 3

     2.     Defendant Coremetrics, Inc. ................................................................... 4

C.     NETRATINGS' PATENTED INVENTIONS .................................................. 5

     1.     Technology Background ........................................................................... 5

     2.     The '510 and '680 Patent Family ............................................................ 7

     3.     The '637 Patent ........................................................................................ 9

     4.     The '386 and '155 Patent Family ........................................................... 11

POINT III LEGAL STANDARDS FOR CLAIM CONSTRUCTION .......................... 12

POINT IV NETRATINGS' PROPOSED CONSTRUCTIONS ..................................... 14

A.     TERMS FROM THE '510 AND '680 PATENTS ........................................... 14

     1.     local computer use meter/user meter .................................................... 14

     2.     log of predetermined [machine operation] events ['510 and '680 patents];
           log/logging ['680 patent only] ............................................................... 15

     3.     dictionary ['510 patent only] ................................................................. 17

     4.     installed ................................................................................................... 17

     5.     identify titles of open windows; reflects a log of titles of world wide web pages
           ['510 patent only] .................................................................................. 18

     6.     identifies character strings reflecting on-line activity ['680 patent only] .............. 19

B.     TERMS FROM THE '155 AND '386 PATENTS ........................................... 20

     1.     resource ['155 and '386 patents]; resource use data ['386 patent only];
           tracking program ['386 patent only]; embedded ['386 patent only];
           executable program ['155 patent only]; executable program not being
           part of the resource ['155 patent only]; Java programming language
           ['155 patent only] .................................................................................. 20

2.    client identifying indicia ['155 patent only] ........................................22

3.    user action(s) ['155 patent only]; does not require the active
participation of a user ['155 patent only]; monitoring
input device events ['386 patent only].................................................23

4.    data representative of a plurality of preferences of a user;
data representative of a plurality of interests of a user ['155 patent only]..............24

5.    monitor interaction through the client computer with at least
one of the first resource and one or more second resources;
choices being associated with at least one of the first resource
and the one or more second resources ['386 patent only].....................................25

6.    monitoring details of choices made by a user......................................26

C.    TERMS FROM THE '637 PATENT .........................................................26

1.    characteristic of a content display; content display; display of content .................26

2.    begin executing when the beginning of a display of the content is ascertained;
stop executing when the end of a display of the content is ascertained................28

D.    TERMS APPEARING IN CLAIMS ACROSS THE PATENT FAMILIES ...................29

1.    Stored/Stores/Storing; Generate/Generates/Generating;
Encrypt/Encrypted/Encrypting.............................................................29

2.    computer usable medium/computer readable medium ['386 and '637 patents];
program code which, when executed on a computerized device, causes the
computerized device to execute, in a computer network comprising one or more
servers and one or more clients, a method ['386 patent only] ...............................30

E.    APPLICATION OF 35 U.S.C. § 112 (6) TO THE '637 AND '510 PATENTS .............31

1.    Means Plus Function Terms.................................................................32

2.    "Instructions" Terms ........................................................................36

CONCLUSION................................................................................................38

ii

# TABLE OF AUTHORITIES

## CASES

*Advanced Med. Optics, Inc. v. Alcon Inc.*,
 361 F. Supp. 2d 370 (D. Del. 2005)..................................................................12

*Affymetrix, Inc. v. Hyseq, Inc.*,
 132 F. Supp. 2d 1212 (N.D. Cal. 2001) .............................................................37

*Bayer Healthcare LLC v. Abbotts Labs.*,
 C.A. No. 03-189-GMS,
 2005 U.S. Dist. LEXIS 21042 (D. Del. Sept. 26, 2005) (Sleet, J.) .........................12

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
 418 F.3d 1225 (Fed. Cir. 2005).................................................................30, 31

*CollegeNet, Inc. v. XAP Corp.*,
 No. CV-03-1229,
 2004 U.S.Dist. LEXIS 22370 (D. Or. Oct. 29, 2004)......................................30, 31

*Creo Products, Inc. v. Presstek, Inc.*,
 166 F. Supp. 2d 944 (D. Del. 2001)...................................................................32

*Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*,
 Civ. Action No. 04-1278-KAJ,
 2006 U.S. Dist. LEXIS 19100 (D. Del. Apr. 13, 2006)...........................................12

*Free Motion Fitness, Inc. v. Cybex Int'l*,
 423 F.3d 1343 (Fed. Cir. 2005)........................................................................30

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
 382 F.3d 1354 (Fed. Cir. 2005).........................................................................36

*Markman v. Westview Instruments, Inc.*,
 52 F.3d 967 (Fed. Cir. 1995).............................................................................12

*Pfizer Inc. v. Ranbaxy Labs. Ltd.*,
 405 F. Supp. 2d 495 (D. Del. 2005)...............................................................12, 13

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005).................................................................12, 13, 36

*PHT Corp. v. Invivodata, Inc.*,
 Civ. A. Nos. 04-60 GMS, Civ. A. 04-61 GMS, Civ. A. 04-821 GMS,
 2005 U.S. Dist. LEXIS 9577 (D. Del. May 19, 2005) (Sleet, J.)............................13

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
    C.A. No. 04-1371 JJF,
    2006 U.S. Dist. LEXIS 14291 (D. Del. Mar. 31, 2006). ........................................................12

*Universal City Studios, Inc. v. Reimerdes,*
    82 F.Supp.2d 211 (S.D.N.Y. 2000) ....................................................................................37

*WMS Gaming Inc. v. Int'l Game Tech.,*
    184 F.3d 1339 (Fed. Cir. 1999)..........................................................................................32

## FEDERAL STATUTES

35 U.S.C. § 112............................................................................................................... *passim*

## PRELIMINARY STATEMENT

### A.    Nature and Stage of the Proceedings

Plaintiff NetRatings, Inc. ("NetRatings") submits this opening brief in support of its construction of terms from claims of the asserted patents in this action,[1] as fully set forth in the Joint Claim Construction Statement filed on April 3, 2006.

This case is a dispute between competitors in the growing field referred to as Web analytics, in which companies track and report on how people use various resources on the Web. NetRatings, in this business since 1997, controls a portfolio of fundamental patents in the field, five of which are asserted in this case. Coremetrics is one of several competitors being sued by NetRatings for infringing these patents. While to date, three companies have recognized the fundamental nature of NetRatings' patents and purchased licenses, Coremetrics opts instead to continue to fight. Judging by its claim construction positions, however, Coremetrics' defense relies on a baselessly narrow reading of the patents in ways supported by neither the law nor the patents themselves.

Even though the terms in the claims of the asserted patents are largely common, readily understood words which should have obviated the need for the Court to undertake an extensive definitional exercise in this case, Coremetrics initially proposed over *three-hundred* terms for construction by the Court (to be contrasted with NetRatings' identification of *nine* terms). After substantial negotiation, Coremetrics' list was reduced to twenty-six terms but still includes many terms for which NetRatings believes the ordinary meaning is apparent. Indeed, but for the strained, constricted definitions proposed by Coremetrics, the Court's involvement would not be needed.

---

[1] The asserted patents are U.S. Patent Nos: 5,675,510 (the "'510 patent"); 6,115,680 (the "'680 patent"); 6,138,155 (the "'155 patent"); 6,763,386 (the "'386 patent"); and 6,108,637 (the "'637 patent"). Each asserted patent is annexed as Exhibits A-E, to the Joint Appendix to be filed with the parties' responsive briefs (hereinafter references to the Joint Appendix will follow the form: "JA Ex. __, p. __").

**B.    Summary of the Argument**

1.         NetRatings' constructions should be adopted for a simple reason – they

accurately relay the meanings of the terms of the patents.  Where NetRatings follows the mandate of

the Federal Circuit, relying on the intrinsic evidence, affirmed by relevant dictionary and treatise

definitions, Coremetrics repeatedly endeavors to impose arbitrary and unduly narrow definitions on

claim terms that have no basis in the claims, the specification or the prosecution histories of the

asserted patents.  Coremetrics' approach goes far beyond the common error of importing limitations

from the specification onto the claims – Coremetrics pulls limitations out of thin air.  Coremetrics'

tactics – from requiring that common computer terms such as "store" be construed to making

arguments that were specifically considered and then *rejected* during prosecution – can only be

viewed as desperate attempts to avoid the inevitable conclusion that Coremetrics is infringing the

asserted patents.  Such tactics must be rejected.  Contrary to Coremetrics' litigation-inspired

proposals, NetRatings' constructions satisfy the prevailing standards for claim construction, focusing

primarily on the intrinsic evidence, without importing extraneous limitations.  Accordingly,

NetRatings' constructions should be the Order of this Court.

**POINT II**

**BACKGROUND**

**A.    Case History**

**1.    Procedural Background**

NetRatings filed its complaint on or about May 19, 2005.  *See* Docket Entry 1.[2]  The parties

have been engaged in discovery since September 14, 2005, with fact discovery set to close on May

---

[2] NetRatings also filed a companion case against Omniture, Inc., captioned *NetRatings, Inc. v. Omniture, Inc.*,
Civ. No. 05-313, on or about May 19, 2005 that was dismissed pursuant to the parties' negotiations of a
settlement agreement finalized on or about February 28, 2006.

26, 2006. In January 2006, NetRatings amended the complaint to include an additional patent. *See* Docket Entry 28.

Pursuant to the Court's Scheduling Order entered on October 12, 2005, the parties exchanged their lists of proposed terms for construction on February 6, 2006. NetRatings, viewing the patents as largely straightforward and clear, identified nine terms for construction in the preliminary exchange. Coremetrics, on the other hand, proposed over 300 terms. After initially insisting that NetRatings provide definitions for all of their proposed terms, NetRatings eventually convinced Coremetrics to narrow its list to some lesser number, which resulted in Coremetrics shortening its list to a total of thirty-six terms. NetRatings' list was reduced to eight terms. After further meet and confers, Coremetrics' list was reduced to twenty-six. The final list of terms proposed by the parties for construction – NetRatings' eight, and Coremetrics' twenty-six - are listed in Table 1 of the Joint Claim Construction Chart filed with the Court on April 3, 2006, along with proposed definitions and citations to intrinsic evidence.[3]

**B.    The Parties**

    **1.    Plaintiff NetRatings, Inc.**

NetRatings, founded in 1997, is based in New York City and Milpitas, California, and has offices in those cities as well as in Oxford, UK and Sydney, Australia. NetRatings provides Internet and digital media measurement and analysis to clients world-wide in the media, technology, advertising, financial services, consumer products, retail and travel industries. NetRatings offers a broad range of technology-driven Internet information products and services that enable customers to make informed decisions regarding their Internet strategies. For example, NetRatings' products provide the ability to learn what Web sites users are visiting, details regarding Internet user

---

[3] Table 2 of the Joint Claim Construction Chart contains (1) claim elements that both NetRatings and Coremetrics agree are governed by 35 U.S.C. §112(6) (numbers 1, 3, 5, 7, 9-11, 13, 15, 17, 19-20, 22-28 on Table 2), and (2) claim elements or terms that only Coremetrics contends should be governed by 35 U.S.C. §112(6) (numbers 2, 4, 6, 8, 12, 14, 16, 18, 21, 29-33 on Table 2).

preferences and advertising campaign effectiveness. NetRatings' products provide browser-based measurement information on individual sites, such as finding out where customers enter a Web site and how they navigate through the content.

### 2.    Defendant Coremetrics, Inc.

Defendant Coremetrics, a competitor of NetRatings, touts itself as "the leading provider of on-demand web analytics and precision marketing solutions." According to its Web site, Coremetrics' products "capture[] and store[] all customer and visitor clickstream activity" to build user profiles with an "accurate and comprehensive source of online customer data." NetRatings, Inc.'s Appendix of Exhibits, Coremetrics Overview, A001 (App. Ex. 1).[4] Coremetrics provides the results of its data collection efforts to its clients using reporting tools for "identifying patterns in customer behavior and understanding site performance." Coremetrics Solutions page for Online Analytics, Inc., A003 (App. Ex. 2). How does Coremetrics accomplish this? Among other things, "Coremetrics SmartTags capture visitor behavior data directly from each user's Web browser to ensure that every action is recorded." Coremetrics Technology Page for SmartTags, A006 (App. Ex. 3).

Coremetrics recognizes the significance of the technology covered by the NetRatings' patents, explaining: "[t]he Web today represents the single richest source of customer behavior data for multi-channel marketers, but collecting and organizing billions of customer page views has made analyzing this information a challenge." Coremetrics states that its products provide "the single most accurate and comprehensive source of online data available today, representing a complete record of all individual visitor interactions with client web sites." Coremetrics Technology page for Coremetrics LIVE Profiles, A008 (App. Ex. 4).

---

[4] Hereinafter references to NetRatings, Inc.'s Appendix of Exhibits, submitted herewith, will follow the form: "A___ (App. Ex. ___)."

## C.  NetRatings' Patented Inventions

### 1.  Technology Background

In computer networks, such as the Internet, individual computer users use their computers (which may also be referred to as "client" computers) to access various types of resources on the network.  These resources, examples of which are commonly known (such as Web pages, games, ad banners, *etc.*), are sometimes also referred to as "content."  In the context of the Web, resources generally consist of HTML documents.  An HTML document is stored on a server located at a content provider site (*e.g.,* servers operated for a retail store like Sears) and is made up of text and references to other resources, or content, from different locations on the Web.  *See, e.g.,* '637 patent, col. 2, ll. 24-29; '155 patent, col. 5, ll. 17-27.

Client computers use a computer program such as a browser (*e.g.,* Microsoft's Internet Explorer) to select and display Web pages stored at different content provider sites.  *See* '637 patent, col. 2, ll. 6-12.  Generally, a client computer makes a "request" to a server computer at a content provider site to obtain the content and, upon receipt of the request, the server computer at the content provider site transfers the content, such as an HTML document for a Web page, to the client computer.  *See, e.g.,* '637 patent, col. 2, ll. 11-24.  The browser at the client computer uses the HTML document to generate a display of the Web page or other resource on the client computer.  '637 patent, col. 2, ll. 28-36.

With the rapid expansion of the use of personal computers during the early 1990s, the desire to measure the use of computer related resources and the dissemination of electronic information increased significantly.  '510 patent, col. 1, ll. 10-33.  However, until the inventions described in the asserted patents, information regarding such use was only collected at the server side, that is, the location of the server computer which received the requests for content.  The server computer would log every request for content that was received by it, creating a record that is often referred to as a

"log file." *See, e.g.,* '637 patent, col. 1, l. 65 – col. 2, ll. 36. This server side data collection method had a serious disadvantage however. Specifically, it did not (and still cannot) provide information about what was occurring at the client computer (or "client side") after the content has left the server. For instance, the server computer, while capable of recording every request that is received by it from multiple client computers, cannot record requests made by the same client computers to other server computers. Thus, a company like Sears can determine, using its server computer, how many requests were made for content at its own Web site, but Sears cannot determine how many requests were made at JC Penney's Web site. Similarly, Sears cannot tell whether the same Internet user that made a request at its Web site, also made a request at the JC Penney Web site. Nor can Sears determine, using its server computer, what an Internet user did with the content Sears provided in response to the request. In other words, the server computer cannot capture what is occurring at the client computer or monitor the user's display, use or interaction with the content it provides.[5]

The numerous, significant inventions claimed in NetRatings' asserted patents solved these and other problems associated with the prior art. The inventions of the '510 and '680 patents provided the breakthrough technology of putting software on the client computer to monitor what Internet users were doing on the Web. Through the inventions of the '510 and '680 patents, it is now possible to determine what Web sites multiple Internet users are going to, and what Web sites individual Internet users have been to.[6] The inventions of the '637 patent took this technology a step further in delineating that the software used to monitor what was occurring at the client computer be

---

[5] There are other deficiencies with server side data collection, including, for example, that the log file may not accurately represent unique requests for a single Web page, may be subject to manipulation, or may not accurately reflect the requestor, *etc.* '637 patent, col. 2, l. 62 – col. 4, l. 31.

[6] Thus, where software on the server side can log how many requests for content were made at *one specific* Web site, software on the client side can log how many requests for content were made by each client computer to *any* Web site. The software used at the client side may be written in many computer programming languages, such as C++, Java or Javascript, to name just a few examples. A preferred language is one which is platform independent – and therefore can be implemented on most client computers, regardless of the specific configurations of such computers. *See, e.g.,* '637 patent, col. 11, ll. 42-52.

downloaded from content provider sites, and using such software to monitor the display of content that was downloaded to the client computer. Finally, with the inventions of the '155 and '386 patents, additional ways of obtaining the monitoring software were identified and the collection of specific details regarding Internet users' use and interaction with resources, such as Web pages, was enabled. Collectively, all of this technology now forms the basis for the Web analytics industry.

### 2.    The '510 and '680 Patent Family

The '510 and '680 patents relate to monitoring – using software located on individual client computers – what individuals are doing on their computers and analyzing and reporting on the collected data. *See* '510 patent, col. 1, ll. 5-8; col. 2, ll. 12-50. This is accomplished by capturing data at the client computer that identifies what software applications and resources, such as Web pages, the user is accessing. *See, e.g.,* '510 patent, col. 1, ll. 22-23, 36-44; col. 2, ll. 21-50. Collected information is transmitted from the individual computers to a central processing location, where the information from many individual computers may be assimilated, translated, evaluated and reported on. *See, e.g.,* '510 patent, col. 2, ll. 62-67. The data collected, for example, identifies or describes open windows on a client computer (as in one example of the '510 patent, identifying an e-mail window from America Online) or strings of characters reflecting on-line activity (as in an example from the '680 patent, a URL which specifies a location on the Web).[7] *See, e.g.,* '510 patent, col. 4, ll. 12-24; col. 2, ll. 35-50.

In one embodiment, as shown in Figure 1 from the '510 and '680 patents reproduced below, a meter 1 installed on a personal computer logs events occurring at that computer, such as a user's accessing a Web page, and transmits at 2 the data 11 to a central processing station. The central processing station collects data from multiple separate personal computers and loads the data into a

---

[7] URLs, or Uniform Resource Locators, identify locations on the Web from which data or a computer program may be downloaded.

database 13. A data dictionary 14 interprets the data and the interpreted data is used to generate reports at 6 showing information derived from the data. Accordingly, the Web usage activity from multiple individual users is collected and reports can be provided that show information such as how many different people went to a particular Web site, or what different Web sites a specific person visited.



FIG. 1

Fig. 1, '510 and '680 patents.

### 3.    The '637 Patent

The '637 patent describes improved ways of delivering computer code to user computers over a network and for monitoring the display and observation of content provided to such users over the network. *See* '637 patent, col. 1, ll. 5-12. In particular, the '637 patent describes programs that enable monitoring at user computers details associated with the display of content in a particular Web page to produce monitoring information from which conclusions regarding the observation of the display may be deduced. '637 patent, col. 6, ll. 44-48.

In one embodiment, as shown in Figures 3A, 3B and 3C of the '637 patent, reproduced below, a request for a Web page is made to a content provider such as a Web site. *See* Fig. 3A. The computer code for monitoring the display of the Web page is transferred to a user computer with the Web page. *See* Fig. 3B. *See also* '637 patent, col. 11, ll. 57-63. In various embodiments of the '637 invention, the computer code detects details regarding the display of the Web page, such as how long the Web page was displayed, whether it was displayed at the same time as another Web page and the size or position of the display. *See, e.g.,* '637 patent, col. 13, ll. 30-67. The collected information is then transferred back to the content provider, as shown in the example of Fig. 3C or to a third party that collects and reports on such information on behalf of many content providers.



Figs. 3A-3C, '637 patent.

### 4.    The '386 and '155 Patent Family

The '386 and '155 patents build on the core data collection mechanisms provided in the '510, '680 and '637 patents by describing techniques for alternative delivery of monitoring programs to users and for monitoring details of individuals' use of and interaction with resources such as Web pages. *See, e.g.,* '155 patent, col. 1, ll. 12-17. In some embodiments, a tracking program for collecting data regarding the use of the resource is downloaded from a server on the network that is different from the server that provided the resource. *See, e.g.,* '155 patent, claim 1. The server that provides the computer tracking program in this latter example can be dedicated to providing the program to multiple client computers, which may be beneficial in the event a change to the program were desired, in which case the change can then be made at the one server rather than at all the different client computers.

As described in the '386 and '155 patents, the type of data collected might include data regarding an individual's interaction with a resource such as an interactive ad banner or game and indicate, for instance, what features of a game were played. *See, e.g.,* '386 patent, col. 13, ll. 56-65. The patent also makes possible, among other things, the collecting of data about the use of a resource, as well as data that may enable an association to be made between the use data and the client computer (or user computer) on which the use occurred. *See, e.g.,* '155 patent, col. 5, ll. 1-7; '386 patent, col. 4, ll. 29-42. For example, a database of information can be created using collected data that includes information about users who have visited a Web site and includes information about such users' use of the site, such as what different pages on the site the user went to and in what order. The information in the database can be analyzed to facilitate the determination of individual user interests and also regarding user preferences. *See* '386 patent, col. 12, l. 61 – col. 13, l. 26.

## POINT III

## LEGAL STANDARDS FOR CLAIM CONSTRUCTION

The basic standards for construing patent claims are well known.  The Court determines the meaning of pertinent claim language to establish the scope of the patent's claims for purposes of determining questions of infringement and validity.  *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 978-79 (Fed. Cir. 1995) (*en banc*), *aff'd,* 517 U.S. 370 (1996).  In its most recent *en banc* pronouncement concerning claim construction, *Phillips v. AWH Corporation,* 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit reaffirmed and clarified the basic rules of claim construction.

"[T]he words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question "as of the effective filing date of the patent application."  *Phillips,* 415 F.3d at 1312-13.  *See Pfizer Inc. v. Ranbaxy Labs. Ltd.*, 405 F. Supp. 2d 495, 502 (D. Del. 2005); *Advanced Med. Optics, Inc. v. Alcon Inc.*, 361 F. Supp. 2d 370, 375-76 (D. Del. 2005).  The person of skill in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Phillips*, 415 F.3d at 1313.  *See Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, Civ. Action No. 04-1278-KAJ, 2006 U.S. Dist. LEXIS 19100, at *5 (D. Del. Apr. 13, 2006); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, C.A. No. 04-1371 JJF, 2006 U.S. Dist. LEXIS 14291, at *4 (D. Del. Mar. 31, 2006).

Where the ordinary meaning of claim language is readily apparent, as it is here in the overwhelming number of claim elements, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words."  *Phillips,* 415 F.3d at 1314.  In such a case, as is presented here, "general purpose dictionaries may be helpful."  *Id. See Bayer Healthcare LLC v. Abbotts Labs.*, C.A. No. 03-189-GMS, 2005 U.S. Dist. LEXIS 21042, at *12 (D. Del. Sept. 26, 2005) (Sleet, J.).  Where the meaning of terms is not clear, Courts may look to

sources available to the public that will help determine how a person of skill in the art would understand the disputed claim language. *Phillips,* 415 F.3d at 1314.

The Court should look to the claim language in which the disputed term appears, and may also consider other claims of the patent in question (whether asserted or not). Similarities and differences among claims may be instructive. *Id.* at 1314-15. For example, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315.

The claims should be read in view of and so as to be consistent with the specification of the patent. If the patentee provided a special definition for a term in the specification, that construction should govern. *Id.* at 1316; *Pfizer Inc.*, 405 F. Supp. 2d at 502. However, as *Phillips* reiterated, courts must avoid reading limitations from the specification into the claims. Although a specification often describes very specific embodiments of the invention, or only one embodiment, claims are not to be construed as being limited to the described embodiments. *Phillips,* 415 F.3d at 1323.

The Court may also consider the prosecution history of the patent, if in evidence, which it is here. Because the prosecution history reflects an "ongoing negotiation" between the applicant and the patent office, the prosecution history is often "less useful for claim construction purposes." *Id.* at 1317.

The Court may also consider extrinsic evidence (all evidence other than the patent and prosecution history) but such evidence is less significant in determining the meaning of claims and should be considered in view of the intrinsic evidence. *Id.* at 1317-18; *PHT Corp. v. Invivodata, Inc.*, Civ. A. Nos.04-60 GMS, Civ. A. 04-61 GMS, Civ. A. 04-821 GMS, 2005 U.S. Dist. LEXIS 9577, at *5 (D. Del. May 19, 2005) (Sleet, J.). NetRatings applies these principles in the following points.

## POINT IV

## NETRATINGS' PROPOSED CONSTRUCTIONS

The terms in the NetRatings Patents are largely straightforward and easily understood by one of ordinary skill in the art based on their common, ordinary meanings and intrinsic evidence. NetRatings identified only nine terms from the five asserted patents that it believed were appropriate for construction by the Court. While NetRatings believes Coremetrics' identification of terms is unduly burdensome and unnecessary, because of the convoluted nature of Coremetrics' proposed "definitions," NetRatings supplies the Court with constructions for the terms identified by Coremetrics as well. NetRatings' constructions are based on the sources of construction endorsed by the Federal Circuit, primarily the patents themselves and other intrinsic evidence, and are consistent with the ordinary meaning of the terms construed.

A.     **Terms From the '510 and '680 Patents**

1.     *local computer use meter/user meter*

Consistent with the manner in which this term is used in the patents, a local computer use meter/user meter should be defined as "a software program designed to collect information regarding the use of other software programs on a computer on which the software program is installed." The intrinsic evidence clearly indicates that the 'meter' is software (*e.g.,* a software application). *See, e.g.,* '510 patent, col. 2, ll. 21-22, 36-38; '680 patent, col. 2, ll. 28-30, 42-44 (referring to a "meter application").[8] *See also* JA Ex. F, at JA00088 ('510 Patent, Response Under 37 C.F.R. §1.111 dated Dec. 26, 1996, at 3) (explaining that a "computer use meter in the form of a software module is installed on personal computers"). This intrinsic evidence, including the use of the term "local," further indicates that the meter is designed to collect information regarding the use of software on a

---

[8] The patents repeatedly refer to applications and programs as software types. *See, e.g.,* '510 patent, col. 1, ll. 57-64 (different applications tracked), col. 2, ll. 5-6 (executable programs identified), col. 3, ll. 6-16 (meter software upgraded), col. 3, ll. 44-47 (use of "software product or application program" recorded).

computer on which the software is installed. *See, e.g.,* '510 patent, col. 1, ll. 36-38; col. 2, ll. 21-23, '680 patent, col. 1, ll. 44-46; col. 2, ll. 28-30 ("object of the invention to facilitate . . . collection of reliable information regarding the use of personal computer software;" "meter application installed in a personal computer may log events for top-level Windows for any given application"). *See also* '510 patent, col. 5, ll. 6-8; '680 Patent, col. 5, ll. 44-46 ("system is provided to collect, process and deliver information regarding use of personal computer resources").[9]

Coremetrics' proposed construction, requiring, among other things, that the meter be a "device," directly contradicts the express language of the patents which describe the meter as being an application or program. *See, e.g.,* '510 patent, col. 2, ll. 21-22; '680 patent, col. 2, ll. 28-30 (referring to a "meter application"). Moreover, Coremetrics' definition is inappropriately narrow in limiting the construction to the monitoring of only one, very specific example of operating system events. *See Phillips,* 415 F.3d at 1323 (claims are not to be construed as being limited to the described embodiments).

2.    *log of predetermined [machine operation] events* ['510 and '680 patents];[10] *log/logging* ['680 patent only]

In accordance with the ordinary meaning and the patents, the term "log of predetermined [machine operation] events" should be defined as "a record of data regarding the occurrence of pre-selected potential events [related to machine operations]." As described in the specifications, the meters record data regarding events relating to the "use of personal computer software" and on-line services, for example. *See, e.g.,* '510 patent, col. 1, ll. 36-44. The types of events for which data is collected are selected in advance to facilitate the collection – in other words, the software meter is

---

[9] NetRatings addresses only certain blatant errors with respect to Coremetrics' constructions in this brief, and reserves further response for its reply.

[10] The phrase "log of predetermined machine operation events" appears in claim 1 of the '510 patent. The phrase "log of predetermined events" (without being limited to *machine operation* events) appears in claims 1, 4, 10-12, 15, 21 and 22 of the '680 patent.

programmed to collect data on selected events, if and when they occur, in which case it operates to collect that type of data.

Data regarding events that may be recorded include, by way of example, "message types such as launch, terminate, switch, minimize, restore," and "date, time, household ID number, individual within the household using the computer," among others. '510 patent, col. 2, ll. 1-7, 28-33; '680 patent, col. 2, ll. 9-15, 35-40. *See also* JA Ex. F, at JA00088 ('510 Patent, Response Under 37 C.F.R. §1.111 dated 12/26/96, at 3 (explaining that "the computer use meter captures and identifies any world wide web pages which are being used by the user")). NetRatings' proposed definition is fully in accord with the ordinary meaning of the words "log" (a record) and "predetermined" (decide/determine beforehand). *See IBM Dictionary of Computing* (George McDaniel ed., 10th Ed. 1993) ("*IBM*") at A017 [log], (App. Ex. 5); *McGraw-Hill Dictionary of Scientific and Technical Terms* (Sybil P. Parker ed., 5th Ed. 1994) ("*McGraw-Hill*") at A026 [log], (App. Ex. 6); *Webster's II New College Dictionary* (1995) ("*Webster's II*") at A035 [log], at A036 [predetermine], (App. Ex. 7); *The Merriam-Webster Dictionary* (1997) ("*MW*") at A045 [log], A046 [predetermine], (App. Ex. 8). With respect to the terms log/logging, those terms mean "record/recording," consistent with the patent and the ordinary meaning of the words. *See, e.g.,* '680 patent, col. 2, ll. 28-56; col. 4, ll. 6-31; col. 5, ll. 24-32; Fig 1. *See also McGraw-Hill* at A026 (multiple definitions in different contexts, all a "record" of various items); *MW* at A045 ("regularly kept record"); *Webster's II* at A035 (a "record" of "events").

Coremetrics' proposed constructions improperly import limitations from the specification in some instances and in other cases are simply fabricating limitations out of whole cloth. Among other things, Coremetrics' construction of "log of predetermined events" requires that the log be stored,

specifically, on a "hard drive of the computer." There is certainly nothing in the patents which requires (or even suggests) this arbitrary limitation.[11]

3.    *dictionary* ['510 patent only]

The appropriate construction of "dictionary" in the context of the patent is "a database or file containing entries used to interpret or correlate data." NetRatings' construction is fully supported by the '510 patent and the ordinary meaning of the word in the computer science context, and is helpful to clarify the meaning of the term in this context as distinct from the traditional meaning, in other contexts, of a book of definitions. *See, e.g.,* '510 patent, col. 5, ll. 27-40 (dictionary is provided to "interpret" data from logs); Fig. 1 (dictionary shown as a database); JA Ex. F, at JA00089 ('510 patent, Response Under 37 C.F.R. §1.111 to Office Action, 12/26/96, p. 4 (dictionary assists in "interpretation of the event logs")). *See also The New IEEE Standard Dictionary of Electrical and Electronics Terms* (Christopher J. Booth ed., 5th Ed. 1993) ("*IEEE*") at A055 (dictionary defined as a "list of data items and information about those items, used both to describe and to reference the items").

4.    *installed*

The proper construction of "installed," based on the patents and ordinary meaning, is "placed on and ready for use by a computer." In the context of the patents, the meter application is "installed in user computer machines." *See* '510 patent, claim 1; '680 patent, claims 1, 12. *See also* '510 patent, col. 2, ll. 21-23; '680 patent, col. 2, ll. 28-30 (meter application is "installed in a personal computer"). The purpose of installing the meter on client computers is to permit the meter to run on the client computer and collect data about locally occurring events, as opposed to being installed on server computers. *See supra* pp. 15-16.

---

[11]  *See infra n.* 12.

Nothing in the patents requires or provides that the meter be installed in any particular part of a computer.[12] To the contrary, the patents state that installation would ideally be that which does not require the user to have "to take any additional action for the system to operate effectively," and "will reduce the interference with the use of the computer by the user and minimize the impact on any particular user." '510 patent, col. 3, ll. 41-44; col. 4, ll. 60-64; '680 patent, col. 4, ll. 7-10; col. 5, ll. 28-31. NetRatings' definition is therefore consistent with the patents as well as the ordinary meaning of the word "install," which focuses on something being set in place and made ready for use. *See MW* at A044 (to set up for use or service); *Webster's II* at A034 (to set in position or adjust for use). *See also McGraw-Hill* at A025 (installation: "procedures for setting up equipment for use or service"); *IBM* at A015 ("(1) to add a program, program option, or software to a system in such a manner that it is runnable and interacts properly with all affected programs in the system.")

5. ***identify titles of open windows; reflects a log of titles of world wide web pages*** ['510 patent only]

NetRatings' proposed constructions of the foregoing terms are, respectively, "contains characters identifying open windows" and "reflects a record of characters useful in identifying world wide web pages." NetRatings' constructions are consistent with the patent, and with the ordinary meaning of the words in the phrases. For the word "titles," NetRatings' constructions rely on the

---

[12] Coremetrics' proposed definition of "installed" is unduly restrictive in requiring that installation be on a hard drive. The patent claims specify only that installation be on a computer, and the ordinary meaning of the word "computer" is not limited to a hard drive. Indeed, computers have different memory and storage devices, among other things, and Coremetrics just arbitrarily picks one. *See, e.g., IBM* at A018 (defining personal computer as "(2) A desk-top, floor-standing, or portable microcomputer that usually consists of a system unit, a display monitor, a keyboard, one or more diskette drives, internal fixed-disk storage, and an optional printer."). *See also* A066 (App. Ex. 11) *Webopedia Computer Dictionary* at http://www.webopedia.com/TERM/C/computer.html ("[a]ll general-purpose computers require the following hardware components: memory: Enables a computer to store, at least temporarily, data and programs; mass storage: Allows a computer to permanently retain large amounts of data. Common mass storage devices include disk drives and tape drives; input device: Usually keyboard and mouse, the input device is the conduit through which data and instructions enter a computer; output device: A display screen, printer, or other device that lets you see what the computer has accomplished; central processing unit (CPU): The heart of the computer, this is the component that actually executes instructions."). It would be error to constrict the definition as Coremetrics urges.

patent and the descriptions of the function of the titles therein, which is to know what Web pages users access. *See, e.g.,* '510 patent, col. 4, ll. 11-63 ("[w]indow titles" of applications "generally hold useful descriptions of the activity at that moment"). *See also* '510 patent, Response to Office Action, 12/26/96, pp. 3-4, JA Ex. F, at JA 00088-89 (the object of the logging of titles is to *identify what the user is doing on the computer* by identifying, *for example,* "any world wide web pages which are being used by the user") (emphasis supplied). NetRatings' constructions are also supported by the ordinary meaning of the word title as reflected in regular dictionaries. *See, e.g., MW* at A049 (a "distinguishing name"); *Webster's II* at A038 ("an identifying name" or a "general or descriptive heading"). Coremetrics' improper construction would have the Court constrict the claims to a single example provided in the specification in defiance of settled rules of claim construction. *Phillips,* 415 F.3d at 1323 (claims are not to be construed as being limited to the described embodiments).

> **6.** *identifies character strings reflecting on-line activity* ['680 patent only]

NetRatings' construction of this term reflects its straightforward, ordinary meaning. A character string is a group of characters. *See McGraw-Hill* at A024 (character string is "a sequence of characters"). The remainder of the term explains what the character string does – the characters reflect on-line activity, or, activity performed online. For instance, the patent discusses how the meter monitors character strings which together indicate a Universal Resource Locators (or URLs), and identifies the location of a particular resource, such as a web page, on the Internet. '680 patent, col. 2, ll. 41-50.[13]

---

[13] Coremetrics' proposed "definition" not only improperly attempts to limit the claim to a single embodiment, but introduces numerous details on how the character strings are obtained.

**B.     Terms From the '155 and '386 Patents**

1.     *resource* ['155 and '386 patents]; *resource use data* ['386 patent only]; *tracking program* ['386 patent only]; *embedded* ['386 patent only]; *executable program* ['155 patent only]; *executable program not being part of the resource* ['155 patent only]; *Java programming language* ['155 patent only]

With respect to the terms "resource" and "resource use data," the ordinary meaning of the word resource covers a broad range of meanings that may be boiled down to 'things that can be used.'[14] Accordingly, NetRatings focuses on the computer context and the patents in defining "resource" in a more useful way as "computer data or program," and adding to that core definition just a few examples from the patents to illustrate the types of resources that might be involved: "such as in the form of a Web page or part of a Web page, images, an ad banner, or an interactive game." *See, e.g.,* '386 patent, col. 5, ll. 15-21; col. 7, ll. 6-12; col. 8, ll. 16-22; col. 13, ll. 54-61; '155 patent, col. 5, ll. 11-17; col. 7, ll. 10-16; col. 8, ll. 12-18; col. 13, ll. 58-65.[15] "Resource use data" is simply "information describing or derived from use of a resource." *See, e.g.*, '386 patent, col. 1, ll. 15-22; col. 4, l. 47- col. 5, l. 11; col. 8, ll. 16-31; col. 9, ll. 6-26; col.11, ll. 23-43; col. 12, l. 61 - col. 13, l. 26; col. 14, l. 31 - col. 14, l. 14.

---

[14] *See, e.g., Microsoft Press Computer Dictionary* (3rd Ed. 1997) ("*Microsoft*") at A064 ("1. Any part of a computer system or a network, such as a disk drive, printer, or memory, that can be allotted to a program or a process while it is running. 2. An item of data or code that can be used by more than one program or in more than one place in a program, such as a dialog box, a sound effect, or a font in a windowing environment."); *IBM* at A019 ("(1) Any of the data processing system elements needed to perform required operations, including storage, input/output units, one or more processing units, data, files, and programs." and "(2) Any facility of a computing system or operating system required by a job or task, and including main storage, input/output devices, processing unit, data sets, and control or processing programs."); *Webster's II* at A037 (resource: "1. Something that can be looked to for support or aid.  2. An accessible supply that can be withdrawn from when necessary."); *MW* at A048 (resource: "1: a source of supply or support").

[15] Coremetrics' construction improperly limits a resource to a "file," "located on a server" and "distinct from a tracking program or an executable program." There is no support for these limitations. Indeed, Coremetrics' position is directly contradicted by the patents, including the specification and the claims. For instance, while some claims specify that an executable program is not "part of the resource" (*see, e.g.,* '155 patent, claim 1), other claims do not (*see, e.g.,* '386 patent, claim 1). It would be inappropriate to import limitations from one claim into another.

A "tracking program" is properly construed as "computer readable code that monitors use of a computer." This construction is supported by the patent and by the ordinary meaning of what a program is.[16]  See, e.g., '155 patent, col. 8, ll. 13-59 (the "tracking program" "monitor[s] various indicia, such as time, mouse events, keyboard events . . . details of choices (such as links) made by individual users within a particular Web page"); col. 10, ll. 58-65.  The tracking program may, but does not have to be, "embedded" in a resource.  In the context of the patent, embedded means "contained within or incorporated by reference."  See, e.g., '386 patent, col. 3, ll. 42-55; col. 5, ll. 22-41; col. 8, ll. 49-63.  For example, a tracking program may be "embedded in a file which is downloaded from a server to a client.  The tracking program need not originate from the same server that sent the file, and may be obtained, for example, via an embedded URL that points to a different server."  '386 patent, col. 4, ll. 47-52.  Thus, the tracking program is not contained within the Web page, but is embedded where it is obtained by a link and thus incorporated by reference.[17]  For this reason, Coremetrics' construction (stating that embedded means "*entirely* contained or encapsulated within") is erroneous as it specifically precludes one embodiment of the invention described in the patent.  This is but one example of Coremetrics' effort to impose an absolute limitation on the meaning of terms despite there being no support for such construction in the patent.

The term "executable program" means a "computer program that can be run on a computer." This construction is consistent with the patent and with the ordinary meaning of the term.  See, e.g.,

---

[16]  See, e.g., IBM at A014 ("computer program A sequence of instructions suitable for processing by a computer."); IEEE at A053 ("computer program . . . (3) (software). A sequence of instructions suitable for processing by a computer."); McGraw-Hill at A027 (program: "[COMPUT SCI] A detailed and explicit set of directions for accomplishing some purpose, the set being expressed in some language suitable for input to a computer, or in machine language."); Microsoft at A061 (computer program: "A set of instructions in some computer language intended to be executed on a computer so as to perform some task.").

[17]  See also '386 patent, col. 5, ll. 31-37 ("The HTML document [Web page] also contains a second embedded URL for pointing to a first executable program . . . the first executable program being embedded inside the HTML document using [a tag] to specify the source URL for the program") and JA Ex. L, at JA00135-36 ('952 patent, Attorney's Statement in Support of Petition to Make Special Under 37 CFR §1.102(d), pp. 10-11 (where the "URL (i.e., the address) of a tracking program is embedded in a resource, such as a Web page," the tracking program is considered to be embedded in the resource)).

'155 patent, col. 5, ll. 27-48 (executable program "runs" on clients or servers). *See also Microsoft* at A063 (executable program is a "program that can be run"). The term "executable program not being part of the resource" simply refers to an "executable program not contained within the resource." The executable program may, however, be embedded in the resource (as discussed above). *See, e.g.,* '155 patent, col. 8, ll. 13-59; col. 9, ll. 9-16; col. 10, ll. 27-67; col. 11, ll. 2-19. *See also* '952 patent, Attorney's Statement in Support of Petition to Make Special Under 37 CFR §1.102(d), p. 11, JA Ex. L, at JA00136 (program is "linked to an HTML document and is downloaded and executed on a client when the HTML document is served to the client"). For this reason, Coremetrics' construction, which precludes this explicit embodiment of the invention described in the patent, should be rejected.

The patent discusses how executable and tracking programs may be, but are not necessarily, written in the Java programming language.[18] The term "Java programming language" means "one of the Java family of languages originally developed by Sun Microsystems used to create computer programs, and other companies' versions thereof." *See, e.g.,* '155 patent, col. 9, l. 53 – col. 10, l. 64. Java may be thought of as a brand name for Sun Microsystems' version of a specific type of programming language. The same type of programming language has been developed by other companies, such as Microsoft (which calls their version C#).[19] In this way, Coremetrics' proposed construction is improper because it does not account for the other versions of Java developed by companies other than Sun Microsystems.

## 2.    *client identifying indicia* ['155 patent only]

The term "client identifying indicia" means "any information that can be used to associate data with a client." This construction follows the patent's description. For example, the patent discusses

---

[18]  As discussed *supra* n.6, the ideal computer language for use in monitoring activities at client computers is one which is largely platform independent, such as Java, and therefore capable of being used on many different client computers.

[19]  *See, e.g.,* A069-82 (App. Ex. 12) (http://www.javaworld.com/javaworld/jw-11-2000/jw-1122-csharp1_p.html).

one object of the invention as creating a database of details of user interaction with network resources.

Such a database might include resource information, such as "IP address[es]"combined with client

information, such as "client IDs" or "cookies." '155 patent, col. 4, ll. 29-37. Examples of client

identifying indicia include "a user's network ID (IP) and client ID numbers (cookies)." '155 patent,

col. 11, ll. 20-24.

### 3.    *user action(s)* ['155 patent only]; *does not require the active participation of a user* ['155 patent only]; *monitoring input device events* ['386 patent only]

The proper construction of "user action(s)" in view of the patents and the ordinary meaning

of the words in the term is "performance of an action by a user." As discussed in the '155 patent, the

executable program monitors use of resources such as Web pages. *See, e.g.,* '155 patent, col. 4, ll. 7-

14, 39. The claims, and the specification, identify different types of user action that may be

monitored. *See, e.g.,* '155 patent, claim 2 (program monitors "one or more user actions taken during

use of the resource," user action is not limited to any particular type); claims 6 [and 7] (program

monitors "one or more user actions taken through a keyboard [mouse]").[20] *See also* col. 8, ll. 25-27

(program "may monitor details of choices (such as links) made by individual users within a

particular Web page"); ll. 42-43 (program "may monitor the length of time the user has displayed the

Web page").

The '155 patent specifies in claim 1 the generation of resource use data by the executable

program. Claim 21, which is dependent from claim 1, specifies an instance of generating resource

use data where the generating "does not require the active participation of a user." In the context of

the patent, and consistent with its ordinary meaning, this phrase means "does not require a user to

specifically enter resource use data." As described in the '155 patent, prior methods of collecting

---

[20]  For this reason, Coremetrics' construction, which includes reference to an input device, is improper. In some claims, an input device (*e.g.,* a mouse) is identified as being involved in the user action, but in other claims no input device is specified. The claim term being construed, user action, should be construed in a manner that is consistent with all of the claims in which the term appears.

data regarding user preferences and user interests involved, for example, a user filling out a form and specifically entering his or her preferences (such as favorite Web sites). *See, e.g.,* '155 patent, col. 2, ll. 1-55. Contrasted from these methods, claim 21 specifies that resource use data, such as data indicative of a user's favorite Web site, can be generated entirely without requiring a user to specifically enter the data. *See* '155 patent, col. 2, ll. 51-55. Rather, in one embodiment of the invention, resource use data is collected by monitoring what the user does – the user's use of a resource (*e.g.,* how much time was spent on a Web page, where the user clicked on a Web page, *etc.*). *See, e.g.,* '155 patent, col. 12, l. 58 - col. 13; l. 24.[21]

The '386 patent contains two dependent claims wherein monitoring user interaction comprises "monitoring input device events." '386 patent, claims 6 and 18. This term means "monitoring operations performed using an input device." *See, e.g.,* '386 patent, col. 4, ll. 55-61; col. 8, ll. 27-30 and 43-49; col. 9, ll. 8-13. The only meaningful difference between NetRatings' construction of this term and Coremetrics' is that Coremetrics endeavors to impose a further limitation on timing – not present in the claim or supported by the patent – that the operations must be monitored *as they are performed.* Coremetrics' proposed additional limitation is simply not supported or required by the claims, and should therefore be rejected.

4.    *data representative of a plurality of preferences of a user; data representative of a plurality of interests of a user* ['155 patent only]

NetRatings' proposed constructions of the foregoing terms (which appear in claims 18 and 19 of the '155 patent) are: "information from which a user's preferences can be determined" and "information from which a user's interests can be determined," respectively. As discussed above at p. 11, the patent describes certain prior methods of collecting information regarding user preferences

---

[21] *See also* '155 patent, col. 13, l. 62 - col. 14, l. 26; col. 14, l. 52 – col. 15, l. 10; col. 17, ll. 15-33. *See also* JA Ex. L, at JA00133-134 ('952 patent, Attorney's Statement in Support of Petition to Make Special Under 37 CFR § 1.102(d), p. 8-9).

and/or interests whereby a user specifically enters his or her preferences and interests. In some

embodiments of the invention of the '155 patent, however, information regarding user preferences

and/or interests is collected by monitoring, for example, the user's use of a resource. From the

collected data, a user's preferences and/or interests may be determined. *See, e.g.,* '155 patent, col.

13, ll. 2-11 ("An analysis of the data on a user-indexed basis would facilitate the determination of

individual user interests and the like. On the other hand, analysis of the data on a resource-indexed

basis would allow the determination of, for example, which Web pages are viewed the longest and/or

most often either by users in general, or by specific users. Thus, it would be possible to determine if

there were different types of users that preferred different sections of the Web site (because, for

example, they spent more time browsing different sections of the Web site).")[22] *See also* '155

patent, col. 2, ll. 1-55; col. 12, l. 58 - col. 13, l. 24; col. 13, l. 62 - col. 14, l. 26; col. 14, l. 52 – col.

15, l. 10.[23]

> **5.    *monitor interaction through the client computer with at least one of the first resource and one or more second resources; choices being associated with at least one of the first resource and the one or more second resources*** ['386 patent only]

Claims 1, 10, 13 and 22 of the '386 patent contain the phrase "at least one of the first

resource and one or more second resources" (claims 10 and 22 refer to "the one or more second

resources," the "one or more second resources" having already been identified in preceding claims).

NetRatings' construction of this phrase is "a first or second resource." NetRatings' construction is

based on the claim language itself, which should be read as follows: at least one of [A] the first

resource and [B] one or more second resources. Thus, properly viewed, the claim specifies that there

---

[22] Thus, Coremetrics' proposed construction, which requires that the information specifically describe the preferences and/or interests is not accurate. The data may, but does not need to, specifically describe the preferences and/or interests. Rather, the data may be used to determine the preferences and/or interests.

[23] The collected data need not actually *constitute* user preferences and/or interests, but rather, as claimed, the data is "representative" of such things. *See, e.g., MW* at A047 (representative: "1: serving to represent"; represent: "2: to serve as a sign or symbol of").

is "at least one of" item A (the first resource) and item B (the one or more second resources). Coremetrics' proposed construction, however, would require that there be ***both*** A and B. According to Coremetrics, the language "at least one of" means "both;" a construction clearly at odds with the plain meaning of the phrase. The claim as written allows for two possibilities: only one of A or B, **or** both A and B. This is consistent with the claim language as well as the examples from the specification where what is being monitored are multiple resources or a single resource. *See, e.g.,* '386 patent, col. 2, l. 61 – col. 3, l. 22 (monitor how many times a resource is accessed when a second resource is accessed or clicked to from a first resource); col. 8, ll. 16-64 (monitor links, clicks, or interactions in a Web page); col. 13, l. 56 – col. 14, l. 55; col. 17, ll. 19-37 (tracking program monitors interaction with ad banner, track time user spends interacting with a portion of Web page).

### 6.    *monitoring details of choices made by a user*

NetRatings' proposed construction of this term is "monitoring details of two or more choices made by a user." The critical distinction between NetRatings' correct construction and Coremetrics' constricted and unsupported construction is that Coremetrics would require that there be *more* than one detail monitored for each choice made, and precludes the possibility that there could be just one detail monitored for each of two choices (which would then leave two details – one for each choice). Coremetrics' construction would place an unsupported limitation on the claim.[24]

## C.    **Terms From the '637 Patent**

### 1.    *characteristic of a content display; content display; display of content*

The proper construction of the term "characteristic of a content display" (and the "content display" portion of such term) is "a characteristic of any sensory image produced by a device or a

---

[24] Examples of this portion of claims 10 and 22 of the '386 patent may be found at '386 patent, col. 4, ll. 33-64; col. 8, ll. 16-64. *See also* JA Ex. L, at JA00136 ('952 patent, Attorney's Statement in Support of Petition to Make Special Under 37 CFR §1.102(d), p. 11).

characteristic of data used to produce a sensory image on a device." This construction is based on the patent's specific definition of "content" and the ordinary meaning of the words "characteristic" and "display," as supported by the intrinsic evidence. The '637 patent generally defines the word "content," stating: "Herein, 'content' refers generally to any sensory images (or data used to produce those sensory images) displayed by a device with which the invention is used." '637 patent, col. 10, ll. 15-17. The ordinary meaning of the word "characteristic" is: "a distinguishing trait, quality, or property." *See MW* at A042; *Webster's II* at A032 ("characteristic" is:"1. a distinguishing attribute or element."). There is nothing unusual about the word "characteristic" in the context of the '637 patent, though there are specific types of characteristics that one might expect to be associated with a content display. *See, e.g.,* '637 patent, col. 7, ll. 4-30 ("position," "fully hidden," "partially hidden"), col. 13, l. 59 - col. 15, l. 63 ("duration," "position," states of being hidden/obstructed/occluded, "discrete elements" of the display, such as "pixels," "corners," "edges"). *See also* '637 patent, col. 16, l. 5 – col. 17, l. 6; col. 17, l. 59 - col. 18, l. 10; col. 18, l. 50 - col. 19, l. 24; Figs. 4A, 4B, 4C, and JA Ex. M, at JA00144 (Office Action, 3/3/99, p. 2, ¶ 6 (Examiner indicating examples of specific types of characteristics as position, shape, color)).[25]

---

[25] Coremetrics' has not provided a construction for the term "characteristic of a content display," arguing that the term "characteristic" is indefinite, but has construed the terms "content display" and "display of content." Coremetrics' argument that the word "characteristic" is indefinite is not only belied by the patent specification, but it was expressly considered and overcome during examination. Indeed, during prosecution of the '637 patent, the Examiner rejected then claim 11 (incorrectly identified by the Examiner as 12) as being indefinite and stating that the applicant should define the "characteristic" in "characteristic of the content display should be defined (e.g. position, or shape, or color ...)." JA Ex. M, at JA00144 ('637 patent, Office Action, 3/3/99, p. 2, ¶ 6). In the applicant's response, however, applicant argued – and did not amend the claim – that the "language is not indefinite, as the Examiner is apparently contending, simply because Applicant has not recited in Claim 11 a list of characteristics that can be monitored (which list may unduly limit the scope of claim)." JA Ex. N, at JA00160 (Response to Office Action, 6/3/99, p. 6). The Examiner was persuaded by this argument and accordingly withdrew the objection in the next Office Action. JA Ex. O, at JA00190 (Office Action, 8/17/99, p. 3, ¶ 3). As with other of Coremetrics' proposed constructions, NetRatings reserves further argument for reply.

As for the term "display of content," NetRatings' definition, unlike Coremetrics', accounts for the situation where the term is used as a verb. Thus, the term means: "production of any sensory image." *See, e.g.,* '637 patent, col. 6, ll. 43-56; col. 10, ll. 15-21; col. 10, ll. 26-29.

>    **2.**    *begin executing when the beginning of a display of the content is ascertained; stop executing when the end of a display of the content is ascertained*

The appropriate construction of these terms from the '637 patent are: "begin executing when it is determined that the content is beginning to be displayed" and "stop executing when it is determined that the content is no longer being displayed," respectively. NetRatings' construction is consistent with the claim language and specification in that the monitoring may commence when the display of content starts (but in some cases before the content is fully displayed). *See, e.g.,* '637 patent, col. 11, l. 57 - col. 12, l. 39; col. 12, ll. 59-67 (describing an embodiment where the monitoring instructions are included with instructions for displaying content; monitoring is "coincident" with display of content).

Coremetrics' construction, on the other hand, is yet another example of Coremetrics' trying to impose absolutes on the claim terms by contending that the monitoring begins and ends only when the content is either *fully visible* or no longer *fully visible*. This limitation is neither required by the claim language nor consistent with the specification. Indeed, the '637 patent provides specific examples of monitoring the display of content where the content is only partially displayed. *See, e.g.,* '637 patent, col. 14, ll. 27-40 (monitoring method determines whether content is hidden). For these reasons, NetRatings' construction, which is fully supported by the patent and ordinary meaning of the terms, should be adopted by the Court.

**D.    Terms Appearing in Claims Across the Patent Families**

    1.    *Stored/Stores/Storing; Generate/Generates/Generating;*
            *Encrypt/Encrypted/Encrypting*

Coremetrics identified the above terms as requiring construction. As with many of the terms

identified by Coremetrics, NetRatings believes that the ordinary meaning of the terms is clear, but

provides constructions in view of Coremetrics' improperly constrained, proposed constructions.

With respect to the word "store," some variant of the word appears in claims in each of the

asserted patents, and the ordinary meaning of such term is "placed in memory or on a mass storage

device."[26] The word is not used in an unusual or limited manner in any of the patents, and is used

with reference to devices and software. For instance, in claim 1 of the '510 patent, a log is "stored in

memory of said computer machines." *See also* '510 patent, col. 2, ll. 57-61 (discussing how

"memory resources" are "allocated to storage"); '155 patent, col. 5, ll. 1-3 (information is "stored on

a server"); '637 patent, col. 18, ll. 15-27 ("instructions and question content could be stored in a

separate file that is called and executed").[27]

The word "generate" and its variants (which appear in the '510, '680 and '155 patents),

should also be construed consistent with the patents and in accordance with ordinary meaning,

"create." *See MW* at A043; *Webster's II* at A033.[28] Finally, the term "encrypt" (in the '680 patent),

should also be construed in accordance with its ordinary meaning, consistent with the patent, as

"encode data to prevent unauthorized access." *See* '680 patent, col. 3, ll. 17-28. *See also Microsoft*

---

[26] *See, e.g., IBM* at A020 ("(1) To place data into a storage device."; "(2) To retain data in a storage device.");
*McGraw-Hill* at A028 (store: "1. To record data into a (static) data storage device. 2. To preserve data in a
storage device."); *IEEE* at A057 ("(1) (electronic digital computers). (A) To retain data in a device from
which it can be copied at a later time. (B) To put data into a storage device)" and "(2) (data management)
(software). (A) To place or retain data in a storage device. (B) To copy computer instructions or data from a
register to internal storage or from internal storage to external storage").

[27] *See also* '680 patent, col. 3, ll. 23-27; '637 patent, col. 8, ll. 55-60; col. 13, ll. 37-40; '386 patent, col. 5, ll.
6-7; col. 6, ll. 57-60; col. 8, ll. 23-24; '155 patent, col. 6, ll. 53-54; col. 8, ll. 18-19.

[28] *See also* '510 patent, col. 4, ll. 52-64; '680 patent, col. 5, ll. 20-32; '155 patent, col. 1, ll. 11-17, 35-46; col.
4, ll. 23-37.

at A062 (encryption: "The process of encoding data to prevent unauthorized access, especially during transmission.").

Nor should the terms be defined in the limiting way that Coremetrics' contends. Coremetrics' limitation of storage to a device, of generate to "holding in temporary memory (RAM)," and of encrypt to reverse transformation through secret keys, is inappropriately narrow and inconsistent with the patents, which do not impose such arbitrary limitations.

> **2.**     *computer usable medium/computer readable medium* ['386 and '637 patents]; *program code which, when executed on a computerized device, causes the computerized device to execute, in a computer network comprising one or more servers and one or more clients, a method* ['386 patent only]

NetRatings' proposed construction for the phrases "computer usable/readable medium" is "one or more devices on which data may be stored in a form a computer can use or read." The crux of the parties' dispute over these phrases is whether each phrase should refer to only *one* device or *one or more*. Claim 13 of the '386 patent begins: "A computer usable medium storing…" Independent claims 57, 59, 64 and 65 of the '637 patent all begin: "A computer readable medium encoded …" It is well settled that in the context of claim interpretation, the word "a" is construed to mean "one or more." *See, e.g., Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1350 (Fed. Cir. 2005) ("'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'"); *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1232 (Fed. Cir. 2005) (reversing lower court and reinstating verdict of infringement where trial court erred in construing the term "in a format"; Federal Circuit held that the term "in a format" had to be construed as "in one or more formats" because "a" is construed to mean "one or more"). *See also CollegeNet, Inc. v. XAP Corp.*, No. CV-03-1229-HU, 2004 U.S. Dist. LEXIS 22370, at *49 (D. Or. Oct. 29, 2004) (construing "a software program" as "one or more" software programs).

This dispute carries over to the term located in claim 13 of the '386 patent, "program code which, when executed on *a computerized device*, causes the computerized device to execute, in a computer network comprising one or more servers and one or more clients, a method" (emphasis supplied). NetRatings' proposed construction of this term is "program code that, when executed on one or more computerized devices in a network, causes the computerized device(s) to perform the method set forth in the claim." Coremetrics' apparent contention is that "a computerized device" must be interpreted as a single computer, and that such single computer performs the entire method set forth in the claim. *See, e.g.,* '386 patent, col. 6, l. 52 - col. 7, l. 9; col. 7, l. 40 - col. 8, l. 8; col. 8, ll. 31-40; col. 9, ll. 27-56; Figs. 2 and 3. This contention may be motivated by a strategic desire respecting Coremetrics' non-infringement arguments, but it is not supported by the patent or the law. As discussed *supra* with respect to "a computer usable/readable medium," the word "a" should be construed as "one or more" and thus NetRatings' construction should be adopted. *See CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d at 1232; and *CollegeNet, Inc. v. XAP Corp.*, 2004 U.S. Dist. LEXIS 22370, at *49.

**E.    Application of 35 U.S.C. § 112 (6) to the '637 and '510 Patents**

The parties have agreed that claims 11-13, 16-18, 20, 28-30, 33-36, 38-41 of the '637 patent, and claim 9 of the '510 patent, contain means-plus-function elements subject to 35 U.S.C. § 112(6). All of the specific elements from these claims which the parties have identified are listed in Table 2 of the Joint Claim Construction Chart, in rows 1, 3, 5, 7, 9-11, 13, 15, 17, 19-20 and 22-28.[29] As to the remaining elements identified in Table 2 (rows 2, 4, 6, 8, 12, 14, 16, 18 and 29-33), Coremetrics erroneously contends that these elements are subject to 35 U.S.C. § 112(6). Both categories of elements are addressed in the sections below.

---

[29] Other than with respect to the terms identified in Table 1 of the Joint Claim Construction Chart (discussed above), there is no dispute as to the meaning of the terms identified in Table 2.

1.    *Means Plus Function Terms*

In construing means-plus-function elements, the Court must first identify the claimed function

and then discern the corresponding structure for performing the function that is described in the

specification. *See WMS Gaming Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1347 (Fed. Cir. 1999); *Creo*

*Prods., Inc. v. Presstek, Inc.,* 166 F. Supp. 2d 944, 964 (D. Del. 2001). Generally, NetRatings'

identification of the structure for each of the elements is consistent with precedent for interpreting

means-plus-function elements in which the disclosed structure is a computer, processor or computer

code. *See, e.g., WMS Gaming,* 184 F.3d at 1349 ("In a means-plus-function claim in which the

disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the

disclosed structure is not the general purpose computer, but rather the special purpose computer

programmed to perform the disclosed algorithm.").

The means elements from the '637 patent may be considered in five groups: (a) means for

monitoring (rows 1, 3, 5, 7, 9-11, 13, 15, 17 and 19-20 of Table 2); (b) means for transferring the

means for monitoring (rows 22 and 23 of Table 2); (c) means for transferring the monitoring

information (rows 24 and 25 of Table 2); (d) means for storing the monitoring information (row 26 of

Table 2); and (e) means for accessing the monitoring information (row 27 of Table 2).[30] For each of

the elements in these groups, the function is as recited in the claim, as identified in Table 2.

With respect to group (a), which includes elements such as "means for monitoring the change

in time of a characteristic of a content display" (row 1) and "means for monitoring display of the

content" (row 7), the structure for such elements is, in short, a set of computer instructions as

described in the specification sections cited, which computer instructions cause one or more computer

---

[30] In an effort to facilitate the Court's consideration of the means-plus-function issues raised in a more
streamlined manner, NetRatings addresses the means-plus-function elements in the five groups identified.
NetRatings has identified in Table 2 of the Joint Claim Construction Chart what it believes is the claimed
function and corresponding structure for each of the means-plus-function elements listed therein, and
respectfully refers the Court to Table 2 for a full recitation of the same.

systems to perform the function recited in the claim. *See, e.g.,* '637 patent, col. 10, l. 58 – col. 11, l. 2 ("a set of monitoring instructions (which can be embodied, for example, in a computer program);" "the monitoring instructions cause the client computer at the content display site 302 to monitor the display of the content to produce monitoring information regarding the manner in which the content is displayed").

The elements in group (b) (rows 22 and 23 of Table 2) include "means for transferring the means for monitoring from the content provider site to the content display site in response to the transfer of content from a content provider site." The appropriate structure for these elements comprises computer instructions implemented on a content provider site, computer instructions implemented on a content display site and a communication network, all as described in the specification sections cited by NetRatings in rows 22 and 23 of Table 2. *See, e.g.,* '637 patent, col. 7, l. 66 – col. 8, l. 5 (in one aspect of the invention, "content is provided by a content provider site over a network to a content display site for display at the content display site, a mechanism for monitoring the display of the content can be transferred from the content provider site to the content display site in response to (e.g., together with) the transfer of content from the content provider site").

Coremetrics largely treats the elements in groups (a) and (b) in the same manner. In keeping with its approach to construing other terms from the asserted patents, Coremetrics' identification of structure for the elements is too restrictive, limited to only one structure described in the specification (that of a Java applet).[31] On the other hand, NetRatings' identification of structure for the elements in groups (a) and (b) is fully supported by the specification of the '637 patent and in accord with applicable case law and, therefore, should be adopted by the Court.

---

[31] In addition, with respect to the elements containing the term "characteristic," Coremetrics' argues that the term is indefinite. For the reasons discussed *supra* pp. 26-28, Coremetrics' argument is in error and should be rejected.

The elements in group (c) (rows 24 and 25 of Table 2) include "means for transferring the monitoring information to a remote site that is part of the network." The appropriate structure for the elements in group (c) consists of computer instructions implemented on a content display site, computer instructions implemented on a content provider site and a communication network, all as described in the specification sections cited by NetRatings in rows 24 and 25 of Table 2. *See, e.g.,* '637 patent, col. 11, ll. 2-7 ("[T]he monitoring information is transferred from the content display site 302 to the content provider site 301 over the network communication line 303. (The monitoring information could, alternatively or additionally, be transferred to another site that is part of the network.)").[32] NetRatings' identification of structure for the elements in group (c) should be adopted by the Court.[33]

The element in group (d) (row 26) is "means for storing monitoring information at the remote site." NetRatings identified the appropriate structure for this element as "any appropriate database on a computer system at the remote site" as described in the specification sections cited by NetRatings in Table 2, row 26. *See, e.g.,* '637 patent, col. 21, ll. 18-21 ("the monitoring information can be stored in any appropriate database, as known to those skilled in the art of constructing and managing databases"). Coremetrics improperly limits the structure for this element to a database at an "application manager's site." Because this ignores clearly identified structure in the patent, Coremetrics' position should be rejected. NetRatings' position, which includes any appropriate database, including but not limited to one at an application manager's site, should be adopted.

---

[32] *See also* '637 patent, col. 10, ll. 22-32 ("'[c]ontent provider site' refers to a device that is part of the network and that can provide content to another device that is part of the network," "'[c]ontent display site' refers to a device that is part of the network and that can receive and display content from another device that is part of the network," "'[c]omputer network' includes any collection of interconnected computer systems").

[33] Coremetrics again provides too limited an identification of structure, pointing only to two examples in the specification (a "http request" and a "CGI script") and, accordingly, should be rejected.

The final group in the '637 patent is (e) (row 27 of Table 2) consists of "means for accessing the monitoring information stored at the remote site from a site on the network other than the remote site, such that the user at the other site can interact with the monitoring information but cannot modify the monitoring information." The structure for this element is a set of computer instructions implemented on a computer system as described in the specification sections cited by NetRatings in row 27 of Table 2. *See, e.g.,* '637 patent, col. 23, ll. 14-24 ("a user interface (e.g., GUI [graphical user interface]) can be provided on the content provider site computer to enable the owner (or representative) of the content provider site to access monitoring information"). *See also* '637 patent, col. 11, ll. 38-56 ("When the invention is used with a computer network or to monitor display of content by a computer system, aspects of the invention can be implemented as one or more computer programs that can be executed by a computer to achieve the functionality of that aspect"). NetRatings' identification of structure of this element should be adopted by the Court.

In addition to the foregoing elements from the '637 patent, there is one means-plus-function element to be addressed in the '510 patent, specifically "means for interpreting the logged machine operation events by reference to the dictionary" (row 28 of Table 2). NetRatings identified the proper structure for this element as a processing system programmed to perform the recited function of interpreting the logged machine operation events by reference to the dictionary, as described in the specification sections cited in row 28 of Table 2 by NetRatings. Coremetrics' identification of structure for this element, a database management system, is too limited as clearly shown by reference to the specification. *See, e.g.,* '510 patent, col. 2, ll. 62-67 ("a central processing system" "may assimilate many local personal computer use logs, translate the log information into useful information, evaluate the information, and create various reports and analyses of computer use"); col. 5, ll. 23-40 ("the central processing station may be a micro processor based computer and may utilized a variety of commercially available and/or custom developed data base management systems

... to manage the computer use data base ... and create a customized data dictionary"). NetRatings'

identification of structure for this element is proper in scope and accordingly should be adopted by the

Court.

### 2.    *"Instructions" Terms*

Coremetrics takes the position that the "instructions" elements from claims 57, 58, 59, 60, 62,

63, 64 and 65 of the '637 patent, should be treated as means-plus-function elements subject to 35

U.S.C. § 112(6). It is incorrect. These claims all generally begin with the following text (or some

slight variant for dependent claims): "A computer-readable medium encoded with one or more

computer programs ... comprising instructions . . . " '637 patent, claims 57, 59, 64 and 65. Within

each of those claims (and their dependents) are elements claiming "instructions" for performing

certain methods. For instance, independent claim 57 and dependent claim 58 read as follows:

> 57. A computer readable medium encoded with one or more computer
> programs for enabling monitoring of the display of content by a computer system,
> comprising;
>     instructions for monitoring the change in time of a characteristic of a content
> display; and
>     instructions for evaluating the change in time of the characteristic of the
> content display to produce monitoring information regarding display of the content.
>
> 58. A computer readable medium as in claim 57, further comprising
> instructions for monitoring the change in time of a characteristic of the computer
> system, and wherein the instructions for evaluating further comprise instructions for
> comparing the change in time of the characteristic of the content display to the change
> in time of the characteristic of the computer system to produce the monitoring
> information.

None of the claims at issue contain any "means" language. As the Federal Circuit has

reiterated on numerous occasions, the absence of such language creates a rebuttable presumption that

35 U.S.C. § 112(6) does not apply. *Phillips,* 415 at 1311. *See also Lighting World, Inc. v.*

*Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004).

Moreover, "[m]eans-plus-function claiming applies only to purely functional limitations that

do not provide the structure that performs the recited function." *Phillips,* 415 at 1311. The claims at

issue clearly identify sufficient structure in claiming "computer readable medium encoded with one or more computer programs … comprising instructions …" for carrying out the specified elements. This conclusion is fully supported by the case law. *See, e.g., Affymetrix, Inc. v. Hyseq, Inc.*, 132 F. Supp. 2d 1212, 1231 (N.D. Cal. 2001) ("§ 112, P 6 does not apply to the terms recited in the form, "computer code that [performs x function]."). The *Affymetrix* Court explained that "'computer code' is not a generic term, but rather recites structure that is understood by those of skill in the art to be a type of device for accomplishing the stated functions." *Id.* In the context of the claims and of the patent, there can be no doubt that "instructions" are computer code. *See, e.g.,* '637 patent, col. 32, claim 59 ("instructions . . . begin executing;" "instructions . . . stop executing"). *See also IEEE* at A056 (instruction: "[a] meaningful expression in a computer programming language that specifies an operation to a digital computer.") and *Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp. 2d 211, 222 (2000) ("computer code" is "primarily [] a set of instructions which, when read by the computer, cause it to function in a particular way"). Accordingly, the claims at issue from the '637 patent (57, 58, 59, 60, 62, 63, 64 and 65) are not subject to 35 U.S.C. § 112(6).

## CONCLUSION

For all the reasons stated above, NetRatings requests that the disputed claim terms be construed in the manner proposed by NetRatings in the Joint Claim Construction Chart.

Dated: April 17, 2006

Respectfully submitted,

John W. Shaw (#3362)
Andrew A. Lundgren (#4429)
**YOUNG CONAWAY STARGATT
& TAYLOR, LLP**
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899
(302) 571-6600
alundgren@ycst.com

Frederick L. Whitmer
Seth H. Ostrow
Arianna Frankl
**BROWN RAYSMAN MILLSTEIN
FELDER & STEINER LLP**
900 Third Avenue
New York, New York 10022
(212) 895-2000

Attorneys for Plaintiff NetRatings, Inc.

908095

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, hereby certify that on April 17, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such document is available for viewing and downloading to the following counsel of record:

> Steven J. Balick, Esquire
> Ashby & Geddes
> 222 Delaware Avenue, 17th Floor
> Wilmington, DE  19801

I further certify that on April 17, 2006, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

### BY E-MAIL

> Robert T. Haslam, Esquire
> Heller & Ehrman LLP
> 275 Middlefield Rd.
> Menlo Park, CA 94025

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> _____
> Josy W. Ingersoll (#1088)
> jingersoll@ycst.com
> John W. Shaw (#3362)
> jshaw@ycst.com
> Andrew A. Lundgren (# 4489)
> alundgren@ycst.com
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, DE  19899
> Telephone: (302) 571-6600