LEXSEE

**BAYER HEALTHCARE LLC, Plaintiff, v. ABBOTT LABORATORIES, Defendant.**

**C.A. No. 03-189-GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2005 U.S. Dist. LEXIS 21042**

**September 26, 2005, Decided**

**PRIOR HISTORY:** Bayer Healthcare LLC v. Abbott Labs., 2004 U.S. Dist. LEXIS 25087 (D. Del., Dec. 10, 2004)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff health care company filed suit for patent infringement against defendant health care company. Defendant sought summary judgment of non-infringement as to all four patent-infringement claims asserted against it.

**OVERVIEW:** Plaintiff alleged that defendant infringed its patents with its product, a machine that detected the presence of chemicals in bodily fluid samples. Plaintiff's machine read bar codes off of rotating containers, and defendant's machine did so in a different way. The court found that in the context of a motion brought by an alleged infringer, summary judgment would be granted if one limitation of the claim did not read on an element of the accused product, either literally or under the doctrine of equivalents. Plaintiff claimed that the sprocket of defendant's machine corresponded to the circular gear, but that was the precise chaining-and-sprocket structure plaintiff had expressly relinquished during prior prosecution, thus the court granted summary judgment to defendant on the literal infringement claim. The court was not persuaded by defendant's argument that summary judgment should be granted under the doctrine of equivalents on grounds that its product's bar code scanning method did not perform substantially the same function. The court found that plaintiff's expert raised disputed issues of material fact as to "function, way, and result," thus it denied defendant's motion.

**OUTCOME:** The court granted the motion in part and denied the motion in part.

**CORE TERMS:** gear, container, rotation, axis, reagent, satellite, collet, circular, examiner, bar code, assembly,

patent, sprocket, scanning, redesigned, vertical, tray, cap, ring gear, ring, beam, chain, summary judgment, concentric, cylinder, rear, axes, infringement, invention, insert

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] Summary judgment is appropriate if, drawing all factual inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
*Patent Law > Infringement Actions > Summary Judgment > Claim Evaluation*
[HN2] In the context of patent infringement, the court decides whether summary judgment is appropriate by first construing the disputed claim terms, and then applying that construction to the accused product.

*Patent Law > Infringement Actions > Claim Interpretation > Construction Preferences*
[HN3] Claim construction is a matter of law to be decided by the court.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN4] The court must begin its analysis by inquiring how a person of ordinary skill in the art at the time of the invention would have defined the disputed claim terms. Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources

available to the public that show what a person of skill in the art would have understood disputed claim language to mean.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN5] The first and most obvious source for the meaning of a claim term is the claim language itself. The second source is the specification, for it is the single best guide to the meaning of a disputed term. The third source of great value is the prosecution history.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > Aids*
[HN6] It can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be. These three sources, the claim language, the specification, and the prosecution history, constitute what is known as "intrinsic evidence." Also helpful are sources known as "extrinsic evidence," including dictionaries and expert testimony. However, extrinsic evidence is generally less reliable than the patent and its prosecution history in determining how to read claim terms. Thus, extrinsic evidence should be discounted when it is at odds with the intrinsic evidence.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > Aids*
[HN7] The prosecution history of a patent serves an important public-notice function because it is a written record of both the inventor's understanding of the invention, and the limitations the inventor may have placed on the invention in order to distinguish it from prior art.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > Aids*
[HN8] Courts refer to the prosecution history, when it is of record, to discern the applicant's express acquiescence with or distinction of the prior art as further indication of the scope of the claims.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*

*Patent Law > Infringement Actions > Claim Interpretation > Aids*
[HN9] As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > Aids*
[HN10] There is a "heavy presumption" that claim terms carry their full ordinary and customary meaning. Thus, the doctrine of prosecution disclaimer may not be invoked where the alleged disavowal of claim scope is ambiguous. Rather, the "heavy presumption" can be overcome only if the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution. Consequently, for prosecution disclaimer to attach, federal circuit precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable.

*Patent Law > Infringement Actions > Claim Interpretation > Aids*
[HN11] The prosecution history of a related patent can be relevant if, for example, it addresses a limitation in common with the patent in suit.

*Patent Law > Infringement Actions > Claim Interpretation > Construction Preferences*
[HN12] Courts presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.

*Patent Law > Infringement Actions > Claim Interpretation > Claim Differentiation*
*Patent Law > Infringement Actions > Claim Interpretation > Construction Preferences*
*Patent Law > Infringement Actions > Summary Judgment > Claim Evaluation*
[HN13] After claim construction disputes are resolved, the court must evaluate whether summary judgment is appropriate.

*Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview*
*Patent Law > Infringement Actions > Summary Judgment > Claim Evaluation*
[HN14] In the context of a motion brought by the alleged infringer, summary judgment will be granted if one limitation of the claim in question does not read on an

element of the accused product, either literally or under the doctrine of equivalents. However, a patentee cannot recapture through the doctrine of equivalents subject matter already precluded by the doctrine of prosecution disclaimer. Therefore, if the accused product does not literally infringe the patent because of prosecution disclaimer, the court need not engage in a doctrine-of-equivalents analysis.

*Patent Law > Infringement Actions > Claim Interpretation > Scope*
[HN15] Application of the doctrine of prosecution disclaimer is not limited to the construction of isolated terms. Rather, it can be invoked if the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution.

*Patent Law > Infringement Actions > Claim Interpretation > Construction Preferences*
[HN16] Courts presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.

*Patent Law > Infringement Actions > Claim Interpretation > Scope*
*Patent Law > Infringement Actions > Doctrine of Equivalents > Elements > Equivalence*
*Patent Law > Infringement Actions > Prosecution History Estoppel > General Overview*
[HN17] When a court applies the doctrine of argument-based estoppel to limit the scope of equivalents, a close examination must be made as to, not only what was surrendered, but also the reason for such a surrender.

*Patent Law > Infringement Actions > Prosecution History Estoppel > General Overview*
[HN18] The court must examine the character of assertions made in the prosecution history in addition to the result of those assertions, i.e., whether they result in allowance, when determining whether they create an estoppel.

*Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview*
[HN19] While it is true that the doctrine of equivalents may not be used to capture subject matter clearly excluded from the claims whether the exclusion is express or implied, the doctrine of specific exclusion must be applied with care, lest it be allowed to swallow the doctrine of equivalents in its entirety.

*Patent Law > Infringement Actions > General Overview*
[HN20] Generally speaking, efficiency considerations do not enter into the infringement analysis.

**COUNSEL:**
[*1] For Bayer Healthcare LLC, Plaintiff: Jeffrey B. Bove, James D. Heisman, Connolly, Bove, Lodge & Hutz, Wilmington, DE; Albert J. Marcellino, Dale M. Heist, Gary H. Levin, Pro Hac Vice.

For Abbott Laboratories, Defendant: Mary B. Graham, James Walter Parrett, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Bayer Corporation, Counter Defendant: Jeffrey B. Bove, Rudolf E. Hutz, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For Abbott Laboratories, Counter Claimant: Mary B. Graham, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Bayer Healthcare LLC, Counter Defendant: Jeffrey B. Bove, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM

### I. INTRODUCTION

The above-captioned action is a suit for patent infringement in which Bayer Healthcare LLC ("Bayer") accuses Abbott Laboratories ("Abbott") of infringing several patents with its Architect immunoassay analyzer. Although Abbott denies that the Architect, as originally designed, infringes most of the asserted patents, n1 Abbott undertook to redesign the Architect in an attempt to definitively avoid Bayer's [*2] patents. Bayer, however, believes the redesigned Architect still infringes independent claim 9 of U.S. Patent No. 6,436,349 ("the '349 patent") and dependent claims 16, 18, and 21 of U.S. Patent No. 6,498,037 ("the '037 patent"). Presently before the court is Abbott's motion for summary judgment of non-infringement as to all four claims asserted against the redesigned Architect. (D.I. 299.) For the following reasons, Abbott's motion will be granted in part and denied in part.

n1 On December 30, 2004, the court granted Bayer's unopposed motion for partial summary judgment that the original Architect infringes claims 15-22 of U.S. Patent No. 6,498,037. (D.I. 260.)

## II. JURISDICTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (1993).

## III. BACKGROUND

Both the '349 patent and the '037 patent relate to various improvements on "an automated analyzer for conducting binding assays of various liquids, [in] particular biological fluids for substances [*3] contained therein." '349 patent, col. I, II. 8-11. In other words, the patents relate to improvements on an automated immunodiagnostic machine that detects the presence of various chemicals (e.g., hormones, markers of disease, etc.) in bodily fluid samples.

### A. The '349 Patent

Claim 9 - the only claim of the '349 patent asserted against the redesigned Architect - describes a rotatable tray with concentric inner and outer rings of reagent container stations (i.e., reagent container holders). The rotation of the tray about its central vertical axis is driven by a first motor. In addition, the reagent container stations of the inner ring are capable of simultaneous rotation about their own respective vertical axes, independent from the rotation of the tray. That simultaneous and independent rotation is driven by a second motor in "mechanical communication" with a circular gear. The circular gear is in "mechanical communication" with satellite gears connected to each reagent container station of the inner ring. Thus, the second motor drives the circular gear, which in turn drives the satellite gears, resulting in the simultaneous rotation of each reagent container station of the [*4] inner ring about its own axis. The exact language of the claim reads as follows:

9. A reagent container transport mechanism, comprising:

a tray mounted for rotation about a primary vertical axis of rotation; a plurality of inner reagent container stations disposed in a first circle on said tray, the first circle being concentric with the primary vertical axis of rotation, each of the plurality of inner reagent container stations having a respective vertical axis of rotation;

a plurality of outer reagent container stations disposed on the tray in a second circle larger than said first circle, the second circle being concentric with the primary vertical axis of rotation;

a circular gear disposed adjacent the tray and concentric with the first vertical axis of rotation;

a satellite gear disposed in mechanical communication with each of the plurality of inner reagent container stations and with the circular gear, each satellite gear being concentric with the vertical axis of rotation of the respective inner reagent container stations;

a first motor in mechanical communication with the tray for selectively rotating the tray;

a second motor in mechanical [*5] communication with the circular gear for selectively rotating the circular gear and thereby rotating each of the satellite gears and the respective inner reagent container stations; and

a computer controller for selectively operating the first and second motors.

'349 patent, col. 58, II. 24-51.

### B. The '037 Patent

Claims 16, 18, and 21 of the '037 patent are asserted against the redesigned Architect. All three of those claims depend from independent claim 15, which teaches a method of reading bar codes adhered to reagent containers. The reagent containers of claim 15 are disposed in two concentric rings rotatable about a common vertical axis. As the rings rotate, they pass in front of a scanning light beam capable of reading bar codes. However, because the bar code on any given reagent container may not be exposed to the reader as it passes through the light beam, the reagent containers are rotated about their respective axes in order to expose the bar code to the reader. Thus, claim 15 reads as follows:

15. A method of handling reagents in random access fashion comprising:

providing a first set of containers, each containing at least one of a first set [*6] of reagents, along a first circular path having an axis of rotation, each of the containers

having bar code about at least a portion of its periphery which identities the reagent it contains;

providing a second set of containers along a second circular path, the second circular path being concentric with the first circular path;

rotating the first set of containers about the central axis;

scanning the bar code on one of the reagent containers of one of the first and second sets by passing a scanning light beam between two of the containers of the other of the first and second sets to determine the identity of the reagent contained therein; and

automatically rotating each reagent container of the first set about its respective axis while it is being scanned.

'037 patent, col. 58, ll. 1-20.

## C. The Architect

As mentioned above, Abbott denies that its original Architect infringes most of the asserted patents. Nevertheless, Abbott deemed it prudent to redesign the Architect in such a way that it would, in Abbott's view, definitively avoid infringement of Bayer's patents. In relevant part, the original Architect has a plurality of gears disposed in a ring [*7] around a central vertical axis. Each of those gears drives the rotation of an individual container about its own vertical axis. The individual container gears are engaged by a much larger, ring-shaped gear (having inwardly-facing teeth) disposed around the ring. The larger ring-shaped gear is driven by a gear disposed at the end of a rotating motor shaft. Thus, when the motor shaft rotates, the gear at the end of the shaft drives the larger ring-shaped gear, which in turn drives the individual container gears, thereby causing the containers to rotate simultaneously about their respective axes. (See D.I. 306 at 6.) The original Architect also has a stationary bar code reader mounted inside the ring of reagent containers. In order to ascertain the location of each container, the ring of containers is rotated about the central axis. When a given container comes into the reader's line of sight, rotation about the central axis is paused, and the light beam from the reader attempts to locate the bar code while the containers were being simultaneously rotated about their axes. Thus, while it is not necessary to simultaneously rotate all the containers in order to read the bar code of a single [*8] container, the nature of the design does not permit selective rotation. Once the bar code is located, rotation

about the central axis resumes until the next container comes into the reader's line of sight. (See D.I. 301 at A259 P 137.)

The redesigned Architect has essentially the same capabilities as the original Architect, however the means by which those capabilities are achieved differ to a certain extent. As to the mechanism for simultaneous rotation of the individual containers, Abbott replaced the large, ring-shaped gear with a chain similar to that found on a bicycle. Abbott also replaced the individual container gears, as well as the gear at the end of the motor shaft, with sprockets. The result is that the redesigned Architect employs roughly the same basic mechanical principles as the original Architect, but with different hardware: a sprocket (formerly a gear) at the end of a motor shaft drives a chain (formerly a ring-shaped gear) around a central axis, which in turn drives simultaneous rotation of individual container sprockets (formerly gears) around their respective axes. To put it succinctly, the only difference is that the redesigned Architect employs a chain-and-sprocket [*9] structure to achieve simultaneous rotation of the individual containers, whereas the original Architect employs the above-described gear structure. (See D.I. 306 at 6.)

As to the manner of searching for bar codes, the redesigned Architect, unlike the original Architect, does not continuously rotate the containers around their respective axes while the light beam from the reader is activated. Rather, the containers on the redesigned Architect are rotated around the central axis until a container enters the reader's line of sight, at which time the light beam is activated to search for that container's bar code. If no bar code is found, the light beam is deactivated and the containers are rotated about their respective axes a certain number of degrees. Rotation then pauses and the light beam is again activated to search for the bar code. The process continues until a bar code is found, or until an error message is generated. Once either of those two events occurs, rotation of the containers about the central axis resumes and continues until the next container enters the reader's line of sight. At no time do the containers on the redesigned Architect rotate about their axes while the [*10] light beam from the reader is activated. (See id. at B1509.) According to Abbott, these changes are sufficient to avoid the '349 patent and the '037 patent entirely. Thus, Abbott has moved for summary judgment of non-infringement as to the redesigned Architect.

## IV. DISCUSSION

[HN1] "Summary judgment is appropriate if, drawing all factual inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and

the moving party is entitled to judgment as a matter of law." *Chimie v. PPG Indus., Inc.,* 402 F.3d 1371, 1376 (Fed.Cir.2005). [HN2] In the context of patent infringement, the court decides whether summary judgment is appropriate by first construing the disputed claim terms, and then applying that construction to the accused product. *Id.*

### A. The '349 Patent

#### 1. Claim Construction

[HN3] Claim construction is a matter of law to be decided by the court. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996). To that end, [HN4] the court must begin its analysis by inquiring how a person of ordinary skill in the art at the time of the invention would have defined the disputed claim terms. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005).

[*11] "Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Id. at 1314* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,* 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

[HN5] The first and most obvious source is the claim language itself. *Phillips, 415 F.3d at 1314.* The second source is the specification, for "'it is the single best guide to the meaning of a disputed term.'" *Id. at 1315* (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The third source of great value is the prosecution history. *Phillips, 415 F.3d at 1317.* [HN6] It "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise [*12] be." *Id.* These three sources - the claim language, the specification, and the prosecution history - constitute what is known as "intrinsic evidence." *See id. at 1314-17.* Also helpful are sources known as "extrinsic evidence," including dictionaries and expert testimony. *Id. at 1317.* However, "extrinsic evidence [is generally] less reliable than the patent and its prosecution history in determining how to read claim terms." *Id. at 1318.* Thus, extrinsic evidence should be discounted when it is at odds with the intrinsic evidence. *See id.*

The parties' primary dispute regarding the '349 patent is the meaning of the term "gear" in claim 9, which is the only claim in that patent asserted against the redesigned Architect. As a general matter, the parties agree that a gear is "a toothed machine part, such as a wheel or cylinder, that meshes with another toothed part, to transmit motion or to change speed or direction." (D.I. 296.) However, Abbott contends that the court should construe the term to "exclude [] a sprocket and/or a chain." (Id.) Abbott argues that during prosecution, Bayer limited the invention of the '349 patent [*13] to the specific gear structure recited in order to secure an allowable claim. Bayer disagrees, and argues that it disclaimed nothing with regard to claim 9. Unfortunately, neither the claim language itself nor the specification is particularly instructive as to the proper construction of "gear." Therefore, the court must look to the prosecution history for guidance. *Phillips, 415 F.3d at 1314-17.*

As mentioned above, [HN7] the prosecution history of a patent serves an important public-notice function because it is a written record of both the inventor's understanding of the invention, and the limitations the inventor may have placed on the invention in order to distinguish it from prior art. *See id. at 1317.* In other words, [HN8] courts "refer to the prosecution history, when it is of record, to discern the applicant's express acquiescence with or distinction of the prior art as further indication of the scope of the claims." *Chimie, 402 F.3d at 1377.* [HN9] "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made [*14] during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1324 (Fed. Cir. 2003). Nevertheless, [HN10] there is "a 'heavy presumption' that claim terms carry their full ordinary and customary meaning." *Id. at 1323.* Thus, the doctrine of prosecution disclaimer may not be invoked "where the alleged disavowal of claim scope is ambiguous." *Id. at 1324.* Rather, the "heavy presumption" can be overcome only if "the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution." *Id. at 1323.* "Consequently, for prosecution disclaimer to attach, [Federal Circuit] precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable." *Id. at 1325-26.*

In the case of the '349 patent, the original application was submitted with twelve claims of two types. Application claims 1, 3-5, 8-9, and 11 more-or-less described the physical arrangement of the reagent containers and the various axes of rotation, but did not describe the gear structure for driving the rotation of the containers. Application [*15] claims 2, 6-7, 10, and 12, n2 on the other hand, included the gear structure not present in the other claims. (D.I. 301 at A281-86.) Among the latter set, application claims 6, 7, and 10 described a "ring gear" for driving the

satellite gears, whereas application claims 2 and 12 described a "circular gear" for driving the satellite gears.

n2 Application claim 12 was issued as claim 9 in the '349 patent.

In a March 2001 office action, the examiner rejected all twelve claims. Application claim 12 was rejected as being anticipated by U.S. Patent No. 5,580,524 to Forrest. (D.I. 301 at A288-95.) Figure 3 of Forrest depicts a portion of a circular arrangement of vertically-oriented cylinders (for holding reagent containers) capable of independent rotation about their respective axes. Figure 3 also depicts a wheel at the end of a motor shaft located outside the circle of cylinders, having an axis of rotation parallel to each cylinder's axis of rotation. The wheel drives rotation of each cylinder about its respective [*16] axis, however it is oriented such that it is in tangential contact with only one cylinder at a time. Thus, as the circle of cylinders rotates about a central axis, only the cylinder in contact with the wheel is rotated. The other cylinders remain stationary. (See id. at A 1712.) In response to the examiner's rejection, Bayer argued:

Claims 1, 6, 8, and 12 recite the capability of simultaneously rotating the agitating assemblies and their respective reagent containers. In addition, these claims recite the structure for accomplishing this. For example, Claim 6 recites a ring gear, concentric with the primary vertical axis of rotation for the reagent tray and coupled to an agitating motor, in driving engagement with each of the satellite gears. In contrast, Forrest provides a motor 103 having a rubber wheel 101 or gear on a motor shaft 102. The rubber wheel is provided at a tangential location proximate a ring of reagent containers. Each container is spun, *one at a time,* as it passes the rubber wheel or gear.

(Id. at A307-08 (emphasis in original).)

In spite of Bayer's arguments, the examiner remained unconvinced and again rejected all twelve claims in a June 2001 [*17] office action. The examiner explained that Forrest incorporates by reference a European patent, which discloses additional motors for use with each cylinder, thereby enabling simultaneous rotation of the cylinders. (Id. at A327.) Subsequently, counsel for Bayer conducted an interview with the examiner and her supervisor. Bayer summarized that interview as follows:

Examiner Bex also indicated during this telephone call that the rejection of Claim 6 under 35 U.S.C. § 103(a) [obviousness] was being withdrawn on the basis that the cited prior art failed to disclose, teach or suggest, alone or in combination, a reagent transport apparatus in which each of plural agitating assemblies comprise a satellite gear in communication with a first reagent container holder and concentric with the vertical axis of rotation of the respective agitating assembly, and a ring gear, concentric with the vertical axis of rotation of a reagent tray, in driving engagement with each of the satellite gears, whereby rotation of the ring gear results in the rotation of each of the satellite gears about their respective axes of rotation. Thus, Claim 6 was indicated by Examiner Bex [*18] as being allowable. Claim 7 is also considered allowable as being dependent from Claim 6.

In general, Examiner Bex indicated that the remaining independent claims would also be allowable if similar limitations with respect to the satellite and ring gears were incorporated therein. For instance, the Examiner indicated that claim 12 would be allowable if the physical relationship between the satellite gear and inner reagent container were more specifically defined.

(D.I. 301 at A340-41.)

With respect to application claim 12, Bayer amended it in the manner directed by the examiner during the interview. Importantly, that amendment did not change any of the pre-existing claim language describing the relationship between the circular gear and the satellite gears. (Id. at A347-48.) Thus, it is apparent that Bayer believed the gear structure of application claim 12 (i.e., the circular gear/satellite gear combination) to be equally as distinguishable from the prior art as the gear structure of application claim 6 (i.e. the ring gear/satellite gear combination). Moreover, after the interview, the application claims without gear structures were still rejected by the examiner as [*19] anticipated by Forrest. Therefore, it must have been Bayer's understanding that the gear structure, and not the simultaneous rotation of the containers about their respective axes, distinguished Forrest. In fact, Bayer went on to argue that the application claims without gear structures were distinguishable because simultaneous rotation in Forrest requires multiple motors, whereas the application claims only required one motor for that task. However, the examiner never accepted that argument. Instead, Bayer cancelled the claims not reciting the allowable gear structure, or amended them to include such a structure, in order to avoid the examiner's rejections:

Examiner Bex indicated that she had reviewed the

claims in light of the previously applied references and the newly cited references... and had come to the conclusion that at least the subject matter of independent claim 6 was allowable. In particular, Examiner Bex indicated that the references failed to anticipate the specific gear structure of claim 6.

...

In light of this conclusion, and without prejudice to pursuing claims of differing scope in one or more continuing applications, claims 1-2, 10, and 13 are [*20] canceled herewith, and limitations similar to the gear structure recited in claims 6, 10 *or 12* are incorporated into each of independent claims 8 and 14. The dependency of claims 3-5 has been amended to refer to claim 6.

(Id. at 372-73 (emphasis added).) n3 Once again, Bayer demonstrated its understanding that the recited gear structure of application claims 6, 10, or 12 was crucial to patentability. Also noteworthy is the fact that Bayer believed, as is demonstrated by the emphasized language above, that the circular gear/satellite gear structure of application claim 12 distinguished the prior art to the same extent as the ring gear/satellite gear structure of application claims 6 and 10.

> n3 Application claims 2 and 10 recited gear structure, but they were canceled nonetheless. However, the important point to note is that no claims without the gear structure remained.

Finally, after the examiner allowed the claims reciting gear structures, both the examiner and Bayer wrote informative explanations [*21] of the reasons for allowance. The examiner commented as follows:

> While the configuration of two sets of containers, both concentric about a primary axis of rotation and positioned on a rotatable tray is well-known in the art, none of the prior art specifically recite the use of a plurality of satellite gears in mechanical communication with each of the agitating assemblies holding one set of the containers. The satellite gears being concentric with the secondary axis of rotation. Additionally, the prior art fails to disclose a ring gear, concentric with the primary vertical axis of rotation, which is in mechanical communication with each of the respective satellite gears, such

that rotation between the reagent tray and ring gear results in the simultaneous rotation of each of the satellite gears about their secondary vertical axis.

(Id. at A383.) Bayer then responded:

> Thus, it is [Bayer's] interpretation of the reasons for allowance that the point of novelty with respect to the cited and applied art lies in the claimed arrangement of satellite gears and a ring gear for simultaneous rotation of each of the satellite gears about a respective secondary axis of [*22] rotation.

> ...

> The purpose of the Interview, from the perspective of [Bayer], was to discuss the possible allowability of the present claims if specific structural elements (e.g., the ring gear and the satellite gears) were added to the independent claim not already reciting such elements. Given the urgency in prosecuting the present application..., a decision was made to preserve for another day the question of whether claims *without* such structural elements were distinguishable from the cited art.

> ...

> In sum, it was asserted by [Bayer] that, with the selective inclusion of specific structural elements relating to a ring gear and satellite gears, the application would be allowable over the cited art.

(Id. at A386-88 (emphasis in original).) Thus, both the examiner and Bayer agreed that the specific gear structure recited in the issued claims was the reason for allowance. Once again, no distinction was drawn between the ring gear/satellite gear structure and the circular gear/satellite gear structure.

Bayer also filed patent application 10/156,849 ("the '849 application"), which is a continuation of the '349 patent. The recited gear structure in [*23] the '849 application claims and the recited gear structure in the '349 patent claims are nearly identical. And, similar to the '349 patent, the '849 application describes a circular gear/satellite gear structure in independent claim 1, and a ring gear/satellite gear structure in independent claim 7. Significantly, all of the claims in the '849 application were rejected in an October 2002 office action as being anticipated by U.S. Patent No. 3,151,073 ("the '073 patent") to Anthon, without regard to which gear structure (i.e., circular or ring) was employed.

Anthon describes a "centrifuging apparatus" having a chain disposed around the periphery of a ring of sprockets with which the chain is engaged. The chain is driven by another sprocket tangentially engaged with the outer side of the chain. Thus, when the drive sprocket rotates, it causes the chain to drive the rotation of each sprocket in the ring about its respective axis. (D.I. 301 at A509.) In rejecting the claims of the '849 application, the examiner explained the operation of Anthon in her own words:

> Anthon teaches a circular ring gear 78 concentric with the primary vertical axis of rotation and coupled with the agitating
> [*24] motor, wherein the circular gear is rotatable by the motor and in communication with each of the satellite gears such that rotation of the circular gear about the primary axis of rotation causes each of the satellite gears to rotate about their [sic] respective secondary vertical axis simultaneously.

(D.I. 298 at A2182.) Bayer responded with the following argument:

> As for both claims 1 and 7, a gear concentric with the primary vertical axis of rotation and coupled to an agitating motor is recited. The American Heritage Dictionary of the English Language, Fourth Edition, Copyright 2000, defines "gear" as "a toothed machine part, such as a wheel or cylinder, that meshes with another toothed part, such as a wheel or cylinder, that meshes with another toothed part to transmit motion or to change speed or direction." The same dictionary defines "chain" as "a connected, flexible series of links, typically of metal, used especially for holding objects together or restraining or for transmitting mechanical power." The roller chain 78 of Anthon can in no way be regarded as the same element as the recited gear.

(D.I. 301 at A448.) Thus, Bayer clearly and unmistakably [*25] distinguished chains from gears, at least insofar as the claims of the '849 application are concerned. However, [HN11] "the prosecution history of a related patent can be relevant if, for example, it addresses a limitation in common with the patent in suit." *Advanced Cardiovascular Sys. Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305 (Fed. Cir. 2001). Thus, [HN12] courts "presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning." *Omega*, 334 F.3d at 1334. Since the '849 application is a continuation of the '349 patent, and since there is no indication that Bayer intended "gear" to have a different meaning in the later

application, the term must be construed identically in both. Consequently, the court's construction of "gear" in the '349 patent must exclude chains.

The more difficult question is whether the court's construction must also exclude sprockets. Although neither the prosecution history of the '349 patent, nor the prosecution history of the '849 application contain an explicit disclaimer of sprockets, Abbott contends that Bayer's citation to the dictionary definition of "gear" [*26] was sufficient to act as a disclaimer. More specifically, Abbott argues that since a sprocket meshes with a chain, and not with another toothed part, sprockets do not fit within Bayer' s dictionary definition of "gear." Bayer responds by pointing to several sources that refer to sprockets as gears. Bayer also directs the court's attention to the last sentence of its response to the rejection in light of Anthon, in which Bayer merely distinguished chains, *not* sprockets. This last point is dispositive. Excluding sprockets from the definition of "gear" requires the court to infer that Bayer explicitly relinquished sprockets because it defined "gear" as "a toothed machine part... that meshes with another toothed part," whereas sprockets mesh with chains (which allegedly have no teeth). In the court's view, that inference is too tenuous to amount to a clear and unmistakable surrender of subject matter. Thus, the term "gear" will be construed as "a toothed machine part, such as a wheel or cylinder, that meshes with another toothed part, to transmit motion or to change speed or direction, and which excludes a chain."

### 2. Summary Judgment

[HN13] After the claim construction disputes are [*27] resolved, the court must evaluate whether summary judgment is appropriate. See *Chimie*, 402 F.3d at 1376. [HN14] In the context of a motion brought by the alleged infringer, summary judgment may be granted if one limitation of the claim in question does not read on an element of the accused product, either literally or under the doctrine of equivalents. See *id. at 1376-77*. However, "a patentee cannot recapture through the doctrine of equivalents subject matter already precluded by the doctrine of prosecution disclaimer." *AccuScan, Inc. v. Xerox Corp.*, 76 Fed. Appx. 290, 293 (Fed. Cir. 2003) (nonprecedential). Therefore, if the accused product does not literally infringe the patent because of prosecution disclaimer, the court need not engage in a doctrine-of-equivalents analysis.

As explained above, the doctrine of prosecution disclaimer does not exclude sprockets from the scope of "gear." However, [HN15] application of that doctrine is not limited to the construction of isolated terms. Rather, it can be invoked if "the patentee unequivocally imparted a novel meaning to those terms *or expressly relinquished*

*claim scope* during prosecution." *Omega*, 334 F.3d at 1323

[*28] (emphasis added). Insofar as the gear structure disclosed in claim 9 is concerned, Bayer's theory of infringement is that the driving sprocket of the redesigned Architect corresponds to the circular gear, and the ring of sprockets corresponds to the circle of satellite gears. (D.I. 306 at B1066.) However, that is the precise chain-and-sprocket structure that Bayer distinguished during prosecution of the '849 application. Thus, Bayer expressly relinquished the chain-and-sprocket *structure* of Anthon that Bayer distinguished during prosecution of the '849 application. Thus, Bayer expressly relinquished the chain-and-sprocket *structure* of Anthon from the scope of both independent claim 1 (circular gear/satellite gear structure) and independent claim 7 (ring gear/satellite gear structure), even though it did not relinquish sprockets from the scope of the term "gear." And since [HN16] courts "presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning," *Omega*, 334 F.3d at 1334, Bayer disclaimed the very structure it now accuses of infringing the '349 patent. Furthermore, Bayer explicitly acknowledged during prosecution that the reason claim 9 (application claim 12) was allowable was because of "the selective inclusion of specific structural [*29] elements relating to a ring gear and satellite gears" (D.I. 301 at A388), which, for the purpose of patentability, is equivalent to the inclusion of a circular gear and satellite gears. Accordingly, Abbott's motion for summary judgment of noninfringement of claim 9 of the '349 patent will be granted.

**B. The '037 Patent**

**1. Claim Construction**

In the '037 patent, the parties dispute the meaning of the last limitation of claim 15: "automatically rotating each reagent container of the first set about its respective axis while it is being scanned." Bayer proposes that the phrase be construed as "automatically rotating the containers of the first set about their axes during the time that the bar codes on those containers are read." Abbott, on the other hand, proposes that the phrase be construed as "Automatically rotating each individual reagent container about its respective axis during the time its (i.e., the same container's) bar code is being read by the bar code reader." (D.I. 296.) Thus, the parties' disagreement centers around what it means to automatically rotate a container "while it is being scanned." Bayer's proposed construction is relatively broad, and literally [*30] encompasses devices that automatically rotate the containers at some time during the overall scanning process. In contrast, Abbott's construction is relatively narrow, and literally encompasses only those devices that continuously (and automatically) rotate the containers while the bar code reader is active.

A text search of the entire patent reveals that the word "scan" is used only in the claims, and not in the specification. Even so, "the context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. Although it is the last limitation of claim 15 that is at issue here, it is the second-to-last limitation that provides the instructive context:

> *scanning* the bar code on one of the reagent containers of one of the first and second sets *by passing a scanning light beam* between two of the containers of the other of the first and second sets to determine the identity of the reagent contained therein.

'037 patent, col. 58, ll. 13-17 (emphasis added). This claim language clearly and unambiguously defines "scanning" as "passing a scanning light beam." Therefore, the phrase "while it is being scanned" [*31] is properly construed as "while it is being passed by a scanning light beam." It does not refer to the overall process of reading bar codes, as Bayer suggests. Thus, the court will construe the last limitation of claim 15 as "automatically rotating each reagent container of the first set about its respective axis while it is being passed by a scanning light beam."

**2. Summary Judgment**

In its brief, Bayer asserts that "summary judgment of no literal infringement [can] be entered only if the Court not only adopts Abbott's construction as proposed, but also adopts the further narrowed construction. . . that the 'scanning' time period encompasses only those fractions of a second when the bar code reader laser impinges on the container." (D.I. 306 at 30.) Whether or not the court's construction is co-extensive with the "further narrowed construction" described by Bayer, it is clear that Bayer admits summary judgment of no literal infringement is proper if the court's construction requires the reader's scanning light beam to be activated while the containers are being continuously and automatically rotated about their respective axes. Since that is precisely what the court's construction [*32] requires ("automatically rotating . . . *while* it is being passed by a scanning light beam"), Abbott's motion will be granted as to literal infringement of claims 16, 18, and 21 (which depend from claim 15) by the intermittent-rotation scheme of the redesigned Architect.

As to infringement under the doctrine of equivalents, Abbott argues that Bayer relinquished territory beyond the literal scope of its claims, i.e., the territory beyond continuous and automatic rotation while the reader is

active. For support, Abbott points to several statements Bayer made in distinguishing the prior art:

> Copeland, however, fails to disclose or suggest the automatic rotation of each *individual* reagent container about its axis as it is being scanned to facilitate scanning of a bar code . . . .

(D.I. 301 at A401 (emphasis in original).)

> None of the references cited by the Examiner teach or suggest, alone or in combination, the automatic rotation of each reagent container about its axis as it is being scanned to facilitate scanning of a bar code ...

(Id. at A402.) Abbott also directs the court's attention to several similarly-worded statements Bayer made in a related [*33] application to the Japanese Patent Office. (See id. at A478-83.) Thus, it is Abbott's contention that Bayer's repeated use of the phrase "as it is being scanned" in distinguishing the prior art creates an argument-based estoppel that prevents Bayer from claiming infringement under the doctrine of equivalents.

Bayer responds by arguing that it was merely distinguishing prior art in which the individual containers do not automatically rotate about their own axes *at all*, without regard to whether the rotation is continuous or intermittent. Bayer directs the court to the following argument it made to the examiner subsequent to the prosecution statements pointed to by Abbott:

> The scanning of bar code or other optically scanned labels requires proper positioning of the label with respect to the scanner for accurate and complete data retrieval. If stationary containers are not properly positioned on the tray, the labels may be obscured so as to not be properly read by the scanner. Avoiding this situation requires meticulous placement of the bottles on the tray and even requires that the associated machinery be shut down in order to allow the repositioning of bottles not properly [*34] placed on the tray. Alternatively, special physical features, such as keying or tabs, must be provided on both the bottles and the tray to ensure proper positioning of the labeled containers on the tray to facilitate accurate label scanning.

> Rotation of each of the individual reagent containers about each container's respective axis of rotation, apart from the rotation of the supporting tray, obviates the need for meticulous installation of individual containers. As previously submitted, the rotation of each

container about its respective axis of rotation is not taught or suggested by any of the cited references.

(Id. at A417-18.) Abbott replies by arguing that Bayer should be held to its previous "over-argument." (D.I. 313 at 17.) Thus, even if continuous rotation was not necessary to distinguish the prior art, Abbott contends that Bayer should be estopped from recapturing the allegedly surrendered territory.

[HN17] "When a court applies the doctrine of [argument-based] estoppel to limit the scope of equivalents, a close examination must be made as to, not only what was surrendered, but also the reason for such a surrender." *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1580 (Fed. Cir. 1995) [*35] (citation omitted). "Thus, [ [HN18] the court] must examine the character of assertions made in the prosecution history in addition to the result of those assertions, i.e., whether they result in allowance, when determining whether they create an estoppel." *Id.* at 1583. In *Southwall*, for example, the plaintiff owned U.S. Patent No. 4,799,745 ("the '745 patent"), which describes an improved method of coating glass with a metal-oxide layer. *Id.* at 1573. The '745 patent explains that the prior art methods require a two-step process, in which the glass is first coated with the metal, and then converted to an oxide through exposure to oxygen. *Id.* at 1574. The invention of the '745 patent, on the other hand, permits the glass to be coated with a metal-oxide layer with just one step. *Id.* at 1580. In distinguishing prior art during prosecution, the plaintiff "chose not to rely on the exact method by which" the prior art formed its coating. *Id.* Rather, the plaintiff "specifically relied on the fact that [the prior art] showed a multistep process for doing so, whereas [the plaintiff] claimed a dielectric layer formed by [*36] a one-step process." *Id.* In the most telling passages from the prosecution history, the plaintiff explained the differences between its invention and the prior art:

> As pointed out in the specification such layers can be laid down directly by reactive sputtering processes in which the metal is sputtered off of a metal target *and directly converted to the oxide,* compound or salt by the presence of a suitable gaseous reactant [i.e., the conversion takes place in one step].

*Id.* at 1576 (emphasis added).

To further emphasize the distinctions between the

present invention and the [prior art,] it should be noted that [the prior art] obtains [its] metal oxide layers by depositing a metal layer *and then chemically converting it to the desired oxide* [i.e., the conversion takes place in two steps.]

*Id. at 1581* (emphasis added). Although the plaintiff may have gone too far in distinguishing the prior art, the Federal Circuit held that "the limits imposed by prosecution history estoppel on the permissible range of equivalents can be broader than those imposed by the prior art." *Id.* Thus, because "the surrender [*37] was quite deliberate and express," the plaintiff was estopped from arguing that the accused device, which converted in two steps instead of one, was equivalent to the patent claim at issue. *Id. at 1580-81.*

The Federal Circuit arrived at the opposite conclusion in *Eagle Comtronics, Inc. v. Arrow Commc'ns Labs., Inc.*, 305 F.3d 1303 (Fed. Cir. 2002). In that case, the plaintiff owned U.S. Patent No. 5,662,494 ("the '494 patent"), which relates to a "sealed collet assembly" that prevents moisture from entering an electrical signal filter. '494 patent, col. 1, 11. 15-18. The filter is surrounded by a housing that is substantially cylindrical in shape. *Id.*, fig. 9. Located at one end of the filter is a female receptacle for receiving an external cable or wire, over which the housing extends as well. *Id.* The "collet" is the supporting structure surrounding the receptacle, and is disposed inside the housing. *Id.* The prior art collet depicted in the '494 patent consists of two pieces, a front cap and a rear insert body. *Id.*, fig. 6. The front cap fits over the rear insert body in the same way that the cap of an ink pen fits over the tip of the pen. [*38] During the manufacturing process, the prior art collet is inserted into the end of the housing, and an epoxy sealant is used to form a barrier between the collet and the filter. *Id.*, col. 3, 11. 22-27.

The '494 patent improves on the prior art collet by providing a non-epoxy seal, such as an O-ring, between the front cap and the rear insert body. *Id.*, col. 4, 11. 1-5. In the ink pen analogy, an O-ring would be slid over the tip of the pen (i.e., the collet's rear insert body) until it reaches what would otherwise be the stopping point for the cap (i.e., the collet's front cap). The cap would then be slid over the tip until it reaches the O-ring. The O-ring provided in the '494 patent is slightly larger in diameter than the collet assembly itself. *Id.*, col. 3, 11. 38-53. Thus, when the collet is inserted into the end of the housing, the rubber seal presses tightly against the housing, thereby eliminating the need for an epoxy sealant. *Id.*

During prosecution and on appeal, the plaintiff in *Eagle* distinguished the prior art as follows:

The presently claimed invention is directed to an improved collet assembly, and a filter structure including such a collet [*39] assembly. The collet assembly includes a front cap, a rear insert body, a collet contact extension passing through the rear insert body, and a seal located between the front cap and the insert body. By providing the seal between the rear insert body and the front cap (see Figs. 7 and 8, for example), the claimed invention prevents moisture and other contaminants from entering the collet assembly and filter structure by sealing an interface between the collet assembly and the filter housing.

305 F.3d at 1310.

The presently claimed invention has been developed to improve upon the prior art collet assembly and filter structure shown in Figs. 6 and 10, respectively. . . . According to the prior art collet assembly, a rear insert body is pressfitted with a front cap. No seal is provided between the front cap and the rear insert body. To seal the collet assembly inside housing 30, epoxy material 100 is loaded into an interior of the housing after assembly.

*Id.*

The art does not suggest the particular position of the O-ring as presently claimed. Replacement of the admitted prior art epoxy with an O-ring does not provide a structure as claimed, [*40] wherein the O-ring is provided between the front cap and rear insert body.

*Id.*

The accused devices in *Eagle* were essentially the same as the invention described in the '494 patent, with the exception that the collet was made of one solid piece, rather than a front cap and a rear insert body. 305 F.3d at 1310-11. Recycling the ink pen analogy one more time, the accused devices had the same as the pen-ring-cap configuration described above, with the exception that the cap was not removable from the pen. The defendant argued that the plaintiff, in distinguishing the prior art, relinquished any equivalents not consisting of two parts, i.e., a front cap and rear insert body. *Id. at 1315-16.* The Federal Circuit disagreed:

After reviewing the entire prosecution history

here, we do not find the required clear and unmistakable surrender of subject matter to invoke prosecution history estoppel. While [the plaintiff] repeatedly distinguished the prior art by noting that the claimed seal was located between the front cap and the rear insert body, its arguments were not based on the fact that the claimed collet assembly was made of two pieces [*41] or were separable. Rather, those arguments were based on the prior art not teaching or suggesting the use of a seal at the interface between the collet assembly and the filter housing. The '494 patent acknowledges that the prior filter and collet assemblies applied sealant to the rear portion of the collet assembly. The improvement of the '494 patent provides a collet that self-seals at the interface between the collet assembly and the filter housing, as opposed to the rear of the collet assembly. [The plaintiff's] repeated references to the location of its seal were attempts to distinguish the claimed seal location from the location found in the prior art. [The plaintiff's] use of the specific claim language to define further the location of the claimed sealant does not amount to a surrender of seals located elsewhere along the interface between the collet assembly and the filter housing.

*Id.* at 1316. Therefore, because the alleged surrender was not "clear and unmistakable," the plaintiff was not estopped from accusing the defendant's one-piece collet of infringement under the doctrine of equivalents. *Id.*

The difference between the plaintiffs' arguments [*42] to the examiners in *Southwall* and Eagle, although perhaps subtle, is sufficiently clear to be dispositive in this case. In *Southwall*, the plaintiff essentially drew a line in the sand between the two-step processes of the prior art, and the one-step process of its invention. In contrast, the plaintiff's description in *Eagle* of the two-piece collet during prosecution was merely incidental to its description of sealing the filter with an O-ring around the collet instead of an epoxy sealant behind the collet. In the present case, there is no doubt that Bayer distinguished the prior art by pointing to the "automatic rotation of each reagent container about its axis *as it is being scanned*." However, Bayer later clarified that the automatic nature of the rotation "obviates the need for meticulous installation of individual containers." Bayer never came close to arguing that intermittent, automatic rotation would not yield the same benefits as continuous, automatic rotation. Therefore, the court holds that Bayer did not make a clear and unmistakable surrender of subject matter in the way Abbott suggests.

Abbott also argues that Bayer is precluded from asserting the doctrine [*43] of equivalents by the doctrine of specific exclusion. [HN19] While it is true that the doctrine of equivalents may not be used to capture subject matter "clearly excluded from the claims whether the exclusion is express or implied," *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345 (Fed. Cir. 2001), the doctrine of specific exclusion must be applied with care, lest it be allowed to swallow the doctrine of equivalents in its entirety. Indeed, Abbott's argument does that very thing by summarily asserting that because Bayer did not write claims broad enough to literally encompass intermittent rotation, it specifically excluded that territory from the reach of the doctrine of equivalents. (D.I. 313 at 18.) If the court were to accept Abbott's argument, no plaintiff could ever invoke the doctrine of equivalents to expand the claim scope beyond what is literally claimed. For that reason, the doctrine of specific exclusion is properly invoked only in special cases, such as where the plaintiff attempts to expand the patent's claims in a way that defies logic, or in a way that encompasses the exact opposite of what is claimed. *See SciMed*, 242 F.3d at 1345-46 [*44] (e.g., non-metallic vs. metallic, major vs. minor, at least three lines vs. two lines, etc.). In this case, it most definitely does not defy logic to expand claim 15 to encompass intermittent, automatic rotation. As Bayer explained to the examiner, the very purpose of the invention of the '037 patent is that it "obviates the need for meticulous installation of individual containers." Automatic rotation, whether continuous or intermittent, accomplishes that goal. Thus, Abbott's specific exclusion argument is not persuasive.

Finally, Abbott argues that summary judgment should be granted because "the bar code scanning method of the redesigned Architect does not perform substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed method." (D.I. 300 at 36.) More specifically, Abbott claims that the redesigned Architect performs the scanning function in a very different way than the claimed method because the redesign orients the bar code labels "through a series of small, intermittent movements, which limit[s] the overall efficiency, and flexibility of the system." (Id.) Abbott also points out that "the redesigned system required [*45] additional modifications (such as [an] additional bracket), and takes twice as long as the claimed method." (Id.) [HN20] Generally speaking, efficiency considerations do not enter into the infringement analysis. *Insituform Techs. v. Cat Contr.*, 161 F.3d 688, 693 (Fed. Cir. 1998). But even if they did, Abbott's argument would be unavailing because it compares the efficiency of the redesigned Architect to the efficiency of the original Architect, not the efficiency of

the asserted claims. Indeed, Abbott fails to point out *any* intrinsic evidence relating to efficiency or timing. As to Abbott's claim that the redesigned Architect required an additional bracket and other such modifications, the court is unable to comprehend how that is relevant because none of the claim limitations relate to brackets, or any other mundane implementation details. Therefore, because Abbott's arguments are not persuasive, and because Bayer raises disputed issues of material fact as to "function, way, result" through the report of its expert, Dr. Slocum (D.I. 306 at B1075-77), Abbott's motion for summary judgment on infringement under the doctrine of equivalents will be denied.

[*46]

## V. CONCLUSION

For the reasons discussed above, Abbott's motion for summary judgment is granted in part, and denied in part.

Dated: September 26, 2005

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

### ORDER

IT IS HEREBY ORDERED THAT:

1. The term "gear," as used in claim 9 of U.S. Patent No. 6,436,349 ("the '349 patent"), be construed as "a toothed machine part, such as a wheel or cylinder, that meshes with another toothed part, to transmit motion or to change speed or direction, and which excludes a chain;"

2. The phrase "automatically rotating each reagent container of the first set about its respective axis while it is being scanned," as used in claim 15 of U.S. Patent No. 6,498,037 ("the '037 patent"), be construed as "automatically rotating each reagent container of the first set about its respective axis while it is being passed by a scanning light beam;" and

3. Abbott Laboratories' motion for summary judgment (D.I. 299) be GRANTED as to both literal infringement and infringement under the doctrine of equivalents of the '349 patent, GRANTED as to literal infringement of the '037 patent, and DENIED as to infringement under [*47] the doctrine of equivalents of the '037 patent.

Dated: September 26, 2005

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

LEXSEE

**COLLEGENET, INC., a Delaware corporation, Plaintiff, v. XAP CORPORATION,
a Delaware corporation, Defendant.**

**No. CV-03-1229-HU**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON**

**2004 U.S. Dist. LEXIS 22370**

**October 29, 2004, Decided**

**PRIOR HISTORY:** Collegenet, Inc. v. Xap Corp., 2004
U.S. Dist. LEXIS 21059 (D. Or., Oct. 12, 2004)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patentee filed a
patent infringement action against defendant company.
The parties sought construction of various terms of the
two patents at issue. The matter was referred to a
magistrate judge (MJ).

**OVERVIEW:** The patents dealt with a manner of
allowing students applying to colleges and universities to
complete a single, generic application form provided by a
third party who would then transmit the application to
any designated institution. The second patent was a
continuation of the first patent. The MJ construed various
patent claim terms and phrases. The MJ construed the
phrase "processing by the third party forms servicer an
electronic payment associated with the form." In doing
so, the MJ recommended adherence to its prior
construction of certain terms, including "by the third
party forms servicer" and "electronic payment," i.e., an
electronic transfer of funds, such as an electronic check,
credit card, or debit card. Inter alia, the MJ construed the
terms at issue in the user information database function,
recommending that "database" be construed as an
organized collection of information that could be
searched, retrieved, changed, and sorted using software.
The MJ found that certain claim terms did not need to be
construed, as they were used in their plain, ordinary
meanings; one such term was "alterations."

**OUTCOME:** The MJ recommended various
constructions for patent claim terms and phrases. The MJ
also recommended that steps in claim 1 of one patent and
claim 16 of the second patent be performed in the order
recited.

**CORE TERMS:** database, user, processing, engine,

electronic, servicer, third party, specification, application
form, customized, stored, row, patent, storing, format,
embodiment, recommend, invention, proposed
construction, generator, automatically, corresponding,
recited, metadata, generating, construe, relieving,
software, collection, network

**LexisNexis(R) Headnotes**

*Patent Law > Infringement Actions > Claim
Interpretation > Fact & Law Issues*
[HN1] The first step in any validity or infringement
analysis is to construe the claims. The meaning of a term
in a patent claim is a matter of law to be resolved by the
court.

*Patent Law > Infringement Actions > Claim
Interpretation > General Overview*
[HN2] Patent claims should be interpreted, when
reasonably possible, to preserve their validity. In
construing a claim, the court should first look to the
intrinsic evidence, that is, the claims themselves, the
written description portion of the specification, and the
prosecution history.

*Patent Law > Claims & Specifications > Enablement
Requirement > General Overview*
*Patent Law > Infringement Actions > Claim
Interpretation > General Overview*
[HN3] Generally, patent claim construction begins with
the words of the claim. It is standard practice that in
determining the proper construction of an asserted claim,
the court looks first to the intrinsic evidence -- the patent
specification, including of course the written description,
and, if in evidence, the prosecution history. Absent an
express definition in the specification of a particular
claim term, the words are given their ordinary and
accustomed meaning; if a term of art, it is given the

ordinary and accustomed meaning as understood by those of ordinary skill in the art.

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN4] Terms in a claim are given their ordinary meaning to one skilled in the art unless it appears from the patent and prosecution history that the inventor used them differently. A patentee may be his own lexicographer, but any special definition given to a word must be clearly defined in the specification or file history.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN5] A patent claim term should generally be read so as not to exclude the inventor's device or the inventor's preferred embodiment.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN6] While examining the patent specification is appropriate, it is improper to import, or "read in" to a claim, a limitation from the specification's general discussion, embodiments, and examples.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN7] It is improper to eliminate, ignore, or "read out" a patent claim limitation from a claim in order to extend a patent to subject matter disclosed, but not claimed.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN8] Patent claims are not limited to the preferred embodiment.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN9] When intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence to contradict the meaning of patent claims. If, after considering the intrinsic evidence, a claim term is ambiguous, a court may look to extrinsic evidence to assist in determining the meaning or scope of terms in a claim. Extrinsic evidence includes expert testimony, inventor testimony, and technical treatises or articles. Extrinsic evidence cannot, however, alter the clear meaning of a claim arising from the patent or prosecution history.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN10] The court gives considerable weight to its previous patent claim constructions.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN11] The court presumes, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN12] Generally, limitations of dependent claims are not normally read into the independent claim from which they depend.

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Claims & Specifications > Definiteness > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN13] While claim terms must be construed as they would be understood by a person of ordinary skill in the art to which the invention pertains, and thus, what the claim terms would mean to laymen is irrelevant, if a person of ordinary skill, in the art would understand the term in its ordinary, everyday sense, there is no need to construe the term.

*Patent Law > Claims & Specifications > Claim Language > Preambles*
*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN14] Generally, language in a preamble limits a claim where it breathes life and meaning into the claim, but not where it merely recites a purpose or intended use of the invention.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN15] Claim construction standards ordinarily require the same term in a claim to be interpreted consistently.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN16] Reference to the specification is not an improper claim construction tool, because it is permissible to read the claims in light of the specification. Thus, to the extent the specification is used as a way to confirm the apparent meaning of the claim language, the use of the

specification is acceptable.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN17] Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one. However, requiring the performance of the steps of a method in the order recited may ensue when the method steps implicitly require that they be performed in the written order.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN18] A two-part test is used for determining if the steps of a method claim that do not otherwise recite an order, must nonetheless be performed in the order in which they are written. First, the court looks to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written. If not, the court next looks to the rest of the specification to determine whether it directly or implicitly requires such a narrow construction. If not, the sequence in which such steps are written is not a requirement.

**COUNSEL:**
 [*1] Attorneys for Plaintiff: Kristin L. Cleveland, Scott E. Davis, Jared S. Goff, Michael N. Zachary, KLARQUIST SPARKMAN, LLP, Portland, Oregon.

Attorneys for Defendant: Alexander C. Johnson, Stephen S. Ford, MARGER, JOHNSON & McCOLLUM, P.C., Portland, Oregon; Daniel Johnson, Jr., Henry C. Su, FENWICK & WEST LLP, Mountain View, California.

**JUDGES:** Dennis James Hubel, United States Magistrate Judge.

**OPINIONBY:** Dennis James Hubel

**OPINION:**

  FINDINGS & RECOMMENDATION

HUBEL, Magistrate Judge:

    Plaintiff CollegeNET, Inc. brings this patent infringement action against defendant XAP Corporation. Plaintiff is the owner of two patents: United States Patent Number 6,345,278 B1 ("the 278 patent), and United States Patent Number 6,460,042 ("the 042 patent). In its Second Amended Complaint, plaintiff brings two claims of patent infringement, one for each of the two patents. Plaintiff also brings a claim for declaratory judgment related to a September 10, 2003 press release published by plaintiff, as well as two claims for unfair competition.

    Defendant raises affirmative defenses of noninfringement, invalidity, and unenforceability. Defendant additionally counterclaims for declaratory judgments of noninfringement, [*2] invalidity, and unenforceability. Finally, defendant also brings claims for unfair competition.

    Presently, the parties seek construction of various terms of the two patents. This Findings & Recommendation contains my recommended claim constructions.

    This Court has had the opportunity to previously oversee the adjudication of these two patents in two cases, unrelated to the present case, brought by plaintiff against ApplyYourself, Inc. In case number CV-02-484-HU, plaintiff brought infringement claims against ApplyYourself related to the 278 patent. In case number CV-02-1359-HU, plaintiff brought infringement claims against ApplyYourself related to the 042 patent. The cases were consolidated and were tried to a jury in August and September 2003. As part of that litigation, I construed some claims in both patents. CollegeNET v. ApplyYourself, No. CV-02-484-HU, Opinion (D. Or. Dec. 19, 2002) (construing claims in the 278 patent); CollegeNET v. ApplyYourself, Nos. CV-02-484-HU, CV-02-1359-HU, Opinion (D. Or. July 7, 2003) (construing claims in both patents). I refer to my previous constructions as discussed below.

  BACKGROUND AND OVERVIEW OF THE INVENTIONS

I. The 278
 [*3] Patent

    As described in the patent itself, students applying to colleges and universities typically complete a separate paper application for each institution to which they seek admission. Exh. A to Sec. Am. Compl. (Col. 1, lines 19-21). n1 The applicant then mails each application to the corresponding institution along with a fee. 1:21-23.

    n1 References to the 278 patent will be to this exhibit and will be denoted simply by the column and line number referred to, such as 1:19-21.

    Many institutions prefer Internet applications. 1:24-25. One problem with such applications, however, is that the student is required to re-enter the same information for each subsequent application to a different institution or to the same institution perhaps for a different academic term. Additionally, the institution cannot change the application form without revising the source code that creates the application form, making

changes expensive and inconvenient. 1:26-34.

One way to reduce the redundancy for the applicant would be' [*4] to allow students to complete a single, generic application form provided by a third party who would then transmit the application to any designated institution. 1:35-38. The drawback to such a system is that the institution cannot customize its application form. 1:38-48.

As described by plaintiff, a typical applicant would use the patented invention by first viewing a college's website and proceeding to the admissions web page. The student would typically be using a personal computer that was running a web browser to access the website. Somewhere in the on-line admissions materials, there is a prompt for applying on line. Clicking on this would lead the student through a series of instruction pages and ultimately to a "log on" page where the student establishes a user ID and a password.

Next, the student would receive a prompt which would say something like "Application" or "Apply Now." When the student clicks on this prompt, the browser on the student's computer sends a request over the Internet to the third party servicer's web server. The forms engine processes the request. The request itself would identify the specific college application form being requested and the student [*5] who is requesting it.

The forms engine then creates a copy of the requested application form for the student. The forms engine can create a copy of the college's application form in a variety of ways. The forms engine queries the database to determine whether the particular student has information stored that corresponds to any of the fields in the newly requested application form. If it is that student's first application with the third party servicer's system, there will be no stored information. If the student has previously filled out other application forms, the forms engine will identify the like fields and obtain data from the database. The forms engine will merge the retrieved data into the corresponding form data fields on the application form. The forms engine will then provide the application form to the student, sending it from the web server over the Internet.

The student then enters personal information into the form data fields. When the student clicks "save" or "save and go to next page," the browser will send the information entered by the student and post it to the third party servicer's web server. The forms engine then stores the information into the database. [*6]

Once the student has completed the form, the student can hit the "transmit" or "send application to school" prompt. It is then possible for the forms engine to perform a "data validation" check on the application. For example, Lewis & Clark College may specify that the "high school attended" and "SAT scores" are required fields and that it will not accept application forms in which those fields are left blank.

In addition, error-checking criteria may be specified, such as the "SAT score" must be between 200 and 800. The forms engine compares the data entered by the student for these fields and determines whether they are filled in and whether any specified criteria are met. If the criteria are met, the data is "valid" and will be further processed. If not, the system will send back to the student, over the Internet, an error-correction form or message that the student must change entries for the fields that did not meet the prescribed criteria.

Once the application is complete, the student can also select a payment method to "e-pay" the school's application fee.

Next, the same student may want to fill out a second application to a different college or university. The student logs [*7] on to that school's website and follows the application prompts. The forms engine creates an application form for the student. Assuming both colleges use plaintiff's services, and because the student has previously filled out a form, information regarding that student is already stored in the database. The forms engine will retrieve information required for the second application that the student has already entered on the first application. The forms engine then automatically inserts the previously stored information required by the second application, into the form data fields of the second application form and sends it back to the student over the Internet. . . . The student will fill in the remaining blanks of the form, then "save" it. His or her data will then be sent over the Internet and posted to the web server. The forms engine will then store the data in the database.

## II. The 042 Patent

The 042 patent is a continuation patent of the 278 patent. Exh. B to Sec. Am. Compl. (Col. 1, lines 4-5). n2

> n2 References to the 042 patent will be to this exhibit and will be denoted simply by the column and line number referred to, such as 1:4-5.

[*8]

The abstract of the patent explains the patent as

follows:

> A forms engine allows data sharing between customizable on-line forms, such as college admissions applications. Before applying, an applicant opens an account with a third party application servicer. After the applicant completes an application for one institution, the data is saved in a data base and automatically populates fields in subsequent application forms. The form for each institution is created from a form description file. Each form is branded for its institution and forms for different institutions differ in appearance and content so that the presence of the third party servicer is transparent to the applicant.

> The system is extensible without programming, allowing new applicant attributes to be readily incorporated into the system and allowing the content and appearances of the application to be readily changed by changing the description file. The use of aliases for applicant attributes permits data to be readily shared between forms even though labeled and arranged differently on different forms. Information stored about each attribute allows the specification of data validation rules and data sharing [*9] and grouping rules, as well as dependency rules that permit application page content to depend on applicant's responses on a previous page.

Exh. B to Sec. Am. Compl. at p. 1.

The attributes of the 042 patent are fairly consistent across the independent claims and include the following general features: (1) presenting a customized form to an applicant; (2) allowing the applicant to enter user and payment information; (3) receiving the user and payment information; (4) processing the user and payment information; and (5) sending the user information back to the institution in a format specified by the institution.

The dependent claims further define the form in various ways: (1) as having multiple pages, as seen in claims 6, 21, 33, and 43; (2) providing for data validation at the client computer or after each page of the multiple page application is posted, as seen in claims 7, 8, 10, 11, 14, 22, 23, 25, 27, 30, and 33; (3) providing for further data validation at the server level or when the application is completed, as seen in claims 8, 10, 11, 12, 14, 23, 25, 27, 28, 30, 34, and 35; and (4) providing for automatic data population between multiple application forms, as [*10] seen in claims 4, 19, 36, 37, and 41.

## CLAIM CONSTRUCTION STANDARDS

[HN1] The first step in any validity or infringement analysis is to construe the claims. See, e.g., Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc., 183 F.3d 1347, 1353 (Fed. Cir. 1999) ("the first step in any validity analysis is to construe the claims of the invention to determine the subject matter for which patent protection is sought"); Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc) (first step in two-step patent infringement analysis is to determine "the meaning and scope of the patent claims asserted to be infringed[, . . .] commonly known as claim construction or interpretation [.]"), aff'd, 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996). The meaning of a term in a patent claim is a matter of law to be resolved by the court. Markman, 517 U.S. at 389-91.

[HN2] Claims should be interpreted, when reasonably possible, to preserve their validity. Modine Mfg. Co. v. United States Int'l Trade Comm'n, 75 F.3d 1545, 1556 (Fed. Cir. 1996). In construing a claim, the court should first look to the intrinsic evidence, that is, the [*11] claims themselves, the written description portion of the specification, and the prosecution history. Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys., 132 F.3d 701, 705 (Fed. Cir. 1997).

[HN3] Generally, claim construction begins with the words of the claim. K-2 Corp. v. Salomon S.A., 191 F.3d 1356, 1363 (Fed. Cir. 1999).

> It is standard practice that in determining the proper construction of an asserted claim, the court looks first to the intrinsic evidence -- the patent specification, including of course the written description, and, if in evidence, the prosecution history. Absent an express definition in the specification of a particular claim term, the words are given their ordinary and accustomed meaning; if a term of art, it is given the ordinary and accustomed meaning as understood by those of ordinary skill in the art.

Zelinski v. Brunswick Corp., 185 F.3d 1311, 1315 (Fed. Cir. 1999); see also Georgia-Pacific Corp. v. United States Gypsum Co., 195 F.3d 1322, 1332 (Fed. Cir.) ("The specification of the patent in suit is the best guide to the meaning of a disputed term."), amended, 204 F.3d 1359 (Fed. Cir. 1999).
[*12]

[HN4] Terms in a claim are given their ordinary meaning to one skilled in the art unless it appears from the patent and prosecution history that the inventor used them differently. A patentee may be his own

lexicographer, but any special definition given to a word must be clearly defined in the specification or file history. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Additionally, [HN5] a claim term should generally be read so as not to exclude the inventor's device or the inventor's preferred embodiment. See, e.g., id. at 1581 (claim interpretations excluding the preferred embodiment are heavily disfavored); Modine Mfg., 75 F.3d at 1550 ("[A] claim interpretation that would exclude the inventor's device is rarely the correct interpretation[.]").

[HN6] While examining the patent specification is appropriate, it is improper to import, or "read in" to a claim, a limitation from the specification's general discussion, embodiments, and examples. See, e.g., Intel Corp. v. United States Int'l Trade Comm'n, 946 F.2d 821, 836 (Fed. Cir. 1991) ("Where a specification does not require a limitation, [*13] that limitation should not be read from the specification into the claims.") (internal quotation omitted); Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 1571 (Fed. Cir. 1988) ("Although the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims.").

[HN7] It is also improper to eliminate, ignore, or "read out" a claim limitation from a claim in order to extend a patent to subject matter disclosed, but not claimed. See, e.g., Ethicon Endo-Surgery, Inc. v. United States Surgical Corp., 93 F.3d 1572, 1582-83 (Fed. Cir. 1996) (court cannot read a limitation out of a claim); see also Unique Concepts, Inc. v. Brown, 939 F.2d 1558, 1562 (Fed. Cir. 1991) (patentee cannot be allowed to expressly state throughout specification and claims that his invention includes a limitation and then be allowed to avoid that claim limitation in infringement suit by pointing to one part of specification stating an alternative lacking the limitation).

[HN8] Claims are not limited to the preferred embodiment. [*14] CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146, 1158 (Fed. Cir. 1997) ("as a general matter, the claims of a patent are not limited by preferred embodiments."); see also Amhil Enters., Ltd. v. Wawa, Inc., 81 F.3d 1554, 1559 (Fed. Cir. 1996) ("A preferred embodiment . . . is just that, and the scope of a patentee's claims is not necessarily or automatically limited to the preferred embodiment.").

Finally, [HN9] when intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence to contradict the meaning of the claims. See Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1308-9 (Fed. Cir. 1999). If, after considering the intrinsic evidence, a claim term is ambiguous, a court may look to extrinsic evidence to assist in determining the meaning or scope of terms in a claim. Vitronics, 90 F.3d at 1584. Extrinsic evidence includes expert testimony, inventor testimony, and technical treatises or articles. Id. Extrinsic evidence cannot, however, alter the clear meaning of a claim arising from the patent or prosecution history. Id.

DISCUSSION

I. Terms Proposed for Construction [*15] by Plaintiff

Plaintiff seeks the construction of three claim terms or phrases: (1) automatically; (2) file; and (3) "processing by the third party forms servicer an electronic payment associated with the form."

A. Automatically

The term "automatically" appears in claims 1, 9, 12, 13, 14, 21, and 32 of the 278 patent, and in claims 4, 19, 36, and 38 of the 042 patent. In each instance, the term modifies one of three functions: populate, insert, or store. The term principally appears as "automatically" and occasionally as "automatic." This different use is immaterial to the construction of the term.

I previously construed the term in the December 19, 2002 Opinion in the ApplyYourself case. Dec. 19, 2002 Op. at pp. 10-29. Plaintiff's proposed construction is the same as the construction I adopted there. I agree with defendant that the constructions adopted in the ApplyYourself case are not controlling here. Texas Instruments, Inc. v. Linear Techs. Corp., 182 F. Supp. 2d 580, 586 (E.D. Tex. 2002) (court's claim construction by another judge in same district in prior suit did not collaterally estop unrelated defendant from obtaining new claim construction; [*16] independent review of the claims would ensure fairness to all parties).

Nonetheless, while the previous claim constructions do not have preclusive effect here, to the extent neither party raises new arguments, I defer to the prior claim constructions. KX Indus., L.P. v. PUR Water Purification Prods., Inc., 108 F. Supp. 2d 380, 387 (D. Del. 2000), aff'd, 18 Fed. Appx. 871, 2001 WL 902507 (Fed. Cir. 2001). Additionally, even in the presence of new arguments, [HN10] I give "considerable weight" to my previous claim constructions. See Colby v. J.C. Penney Co., 811 F.2d 1119, 1123 (7th Cir. 1987) (under the principles of stare decisis "a court must give considerable

weight to [its own previous decisions] unless and until they have been overruled or undermined by the decisions of a higher court, or other supervening developments, such as a statutory overruling").

The construction of "automatically" that I adopted in the ApplyYourself case is: "Once initiated, the function is performed by a machine, without the need for manually performing the function." Dec. 19, 2002 Op. at p. 29. Defendant does not oppose this construction, but contends that because

[*17] the term modifies different functions, the construction of the term must be made specifically in the context of the claim limitation in which it appears.

I disagree. "Automatically" describes how the function is to be performed. There is no suggestion from the claim language that the nature of that performance depends on the particular function being performed. Furthermore, generally, the same meaning is ascribed to the same claim term. Omega Eng'q, Inc. v. Raytek Corp., 334 F.3d 1314, 1334 (Fed. Cir. 2003) [HN11] ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."). Here, there is no compelling reason to construe "automatically" as it appears in each separate claim limitation. Thus, I recommend adoption of the prior construction of "automatically."

B. File

This term appears in claims 30 and 32 of the 278 patent. I previously construed the term to mean "an electronically stored collection of information that has a unique name." Dec. 19, 2002 Op. at pp. 30-32. Plaintiff contends that I should adopt the same construction here.

Defendant states that while it has no objection to

[*18] this construction, the term should be construed in the context of the claim in which it appears. The term appears in the context of the phrase "application information file," in claim 32 of the 278 patent. But, it appears independently in claim 30 of the 278 patent, and it was separately construed in the ApplyYourself case. Given that it appears independently in at least one claim, it warrants its own independent construction, divorced from the "application information file" phrase. Accordingly, I recommend adoption of the prior construction.

C. "Processing by the Third Party Forms Servicer an Electronic Payment Associated With the Form"

This phrase appears in independent claims 1, 16, and 32 of the 042 patent. In its entirety, the claim phrase reads: "processing by the third party forms servicer an electronic payment associated with the form, the

processed payment being from the form user to the one of the multiple institutions to which the form is directed[.]" 35:29-32; 36:45-48; 37:63-67. Both parties seek construction of this phrase, although defendant adds some additional claim phrases related to the "electronic payment function." For efficiency, I address all proposed [*19] constructions related to the electronic payment function, here.

The proper construction of this claim phrase was vigorously contested in the ApplyYourself case. After briefing and oral argument, I construed the phrase as follows:

> Using the received payment information to facilitate the clearance, settlement, and/or transfer of the electronic payment. The processing function includes, but is not limited to, processing by the business entity hosting the forms engine software and excludes any processing by any public form user or any of the institutions of higher education.

July 7, 2003 Op. at pp. 25, 45-55. Plaintiff argues for the adoption of this previous construction. Plaintiff additionally argues for the adoption of two terms within this claim phrase which I construed in the ApplyYourself case: (1) "electronic payment": "An electronic transfer of funds, such as an electronic check, credit card or debit card payment. The term electronic payment does not include a fee waiver." (2) "form": "A structured document having a collection of fields for entering and containing data. The form may be rendered to a user on a client computer or any web-browser enabled [*20] graphical display." Id. at p. 25.

Defendant does not dispute the prior construction of "electronic payment." In the ApplyYourself case, I concluded that the construction of "electronic payment" as "an electronic transfer of funds, such as an electronic check, credit card or debit card payment [and] does not include a fee waiver[,]" was appropriate because it was consistent with the claim language. July 7, 2003 Op. at p. 45. That same reasoning applies here. Accordingly, I recommend adherence to the prior construction for "electronic payment."

Defendant proposes a different construction for "form": "an electronic document having fields for the entry and display of data, which consists of one or more pages." Curiously, while defendant offers this alternative construction, it makes no mention of the previous construction.

Defendant points to two parts of the 278 patent specification in support of its proposed construction of "form." First, defendant notes that the specification states

that "the present invention comprises a universal forms engine that permits the creation and processing of customizable electronic forms and selective sharing of information between the customized [*21] forms." 2:1-4. Based on this, defendant argues that "form" means an electronic document. Next, defendant points to the specification's statement that "[a] form is considered to be essentially a container for data and implies an associated process." 2:22-23. Then, defendant notes that moreover, several claims of the 278 patent describe a form as having fields for the entry of information. 22:40-41, 22:57-58, 25:7-8, 26:11-13.

Next, because several of the dependent claims in the 278 patent refer to multiple form pages and multiple pages, 24:37-40, 25:53-54, 26:61, 26:64, defendant argues that the construction of "form" should include that the electronic document consists of one or more pages. Thus, defendant's proposal reads: "an electronic document having fields for the entry and display of data, which consists of one or more pages."

I recommend rejecting defendant's proposed construction of "form." The word "electronic" is not necessary because first, it is redundant in that some uses of the word "form" in the patent claims and specification are preceded by "electronic." Second, my previous construction, by discussing how the form may be rendered to the user, implicitly defines [*22] "form" as being electronic.

Also, the construction does not need to expressly state that a form is one or more pages because by construing the word without reference to any page limitation, none is suggested. Furthermore, the characteristic of multiple pages is expressed in dependent claims. Cases hold that [HN12] generally, limitations of dependent claims are not normally read into the independent claim from which they depend. Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971-72 (Fed. Cir. 1999).

Finally, I agree with plaintiff that there is no support for the inclusion of the word "display" in the construction of form. The specification provides that "a form is considered to be essentially a container for data and implies an associated process." 2:22-23. As such, plaintiff argues that a "display" requirement is not inherent in the meaning of the word form, nor is it required by the specification. I agree with plaintiff that while other claim language may suggest that the "form" is displayed, the term "form" itself does not. Therefore, I recommend rejecting defendant's proposed construction of "form" and adhering to the previous construction.

As to the [*23] larger claim phrase at issue, defendant

suggests that in addition to the claim phrase quoted above regarding electronic payments, other claim phrases related to the electronic payment function need to be construed. Defendant cites to the following claim language: "receiving by the third party forms servicer over the computer network . . . electronic payment information entered by the user." This phrase appears in claims 1, 16, and 32 of the 042 patent. 35:26-28; 36:42-44; 37:60-62. Defendant also proposes that the slightly different language in claim 38 be construed: "receiving from the form user via the third party form servicer an electronic payment associated with the customized form[.]" 38:54-56.

Defendant offers separate constructions for five subparts of the originally construed phrase quoted at the beginning of this section and the additional phrases quoted in the preceding paragraph. The subparts proposed for construction are: (1) "processing . . . an electronic payment associated with the form"; (2) "receiving . . . electronic payment information"; (3) "by the third party forms servicer"; (4) "via the third party form servicer"; and (5) "entering payment information."
[*24]

1. "By the Third Party Forms Servicer"

Because the central dispute in regard to this electronic payment phrase concerns the phrase "by third party forms servicer," I start with it. The heart of the dispute regarding this claim phrase in the ApplyYourself case was whether the entire function of processing the electronic payment had to be exclusively performed by the third party forms servicer itself or whether the third party forms servicer could contract with another party to perform the function. July 7, 2003 Op. & Ord. at pp. 44-55. I rejected the argument that the function had to be performed exclusively by the third party forms servicer. Thus, my claim construction indicates that the processing function includes processing by the business entity hosting the forms engine software, but that the processing is not limited to that entity. Defendant here contends that my prior construction was in error.

Defendant raises arguments similar to those raised by the defendant in ApplyYourself and which I considered and rejected. For example, defendant points to Figure 15 in the 042 patent as demonstrating that the payment processing occurs inside the forms engine operated by the [*25] third party forms servicer. But, as explained in the July 7, 2003 Opinion, this argument "fails to account for the fact that a fourth entity must be involved in the processing of an electronic payment because of the nature of all electronic payments." July 7, 2003 Op. at p. 53. Because the electronic payment function requires a financial intermediary which authenticates credit cards and verifies account balances and two banks, the function

necessitates the involvement of entities other than the forms engine host. Id. at pp. 53-54. Even if the business entity hosting the forms engine were to acquire the ability to perform the credit card clearinghouse function, the electronic payment processing function still requires the participation of two banks whose functions cannot be delegated to a non-bank entity. Id. at p. 54. Thus, reliance on Figure 15 is unpersuasive.

In the July 7, 2003 Opinion, I also addressed the defendant's argument that because the claim language provides that the third party forms servicer receives and processes both user information and electronic payment information and because the business entity hosting the forms engine is the third party forms servicer [*26] entity which processes the user information, it must be that same entity that processes the payment information. I rejected this argument in favor of plaintiff's argument that because these are "comprising claims," nothing in the claim language precludes another party from taking part in the processing of electronic payments. As I explained:

> However, plaintiff notes that these are "comprising" claims which recite required steps and elements, but which do not preclude additional steps or elements. Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc., 212 F.3d 1377, 1382-83 (Fed. Cir. 2000) ("The phrase consisting' of is a term of art in patent law signifying restriction and exclusion while, in contrast, the term comprising' indicates an open-ended construction. . . . In simple terms a drafter uses the phrase consisting of' to mean I claim what follows and nothing else.' A drafter uses the term comprising' to mean I claim at least what follows and potentially more.'") (citations omitted); Georgia-Pacific Corp. v. United States Gypsum Co., 195 F.3d 1322, 1327-28 (Fed. Cir. 1999) (use of the word "comprising" means including the elements that follow, [*27] but not excluding additional, recited elements).

> Plaintiff argues that because these are "comprising" claims, nothing in the claim language precludes another party from taking part in the processing of electronic payments. Plaintiff contends that as "comprising" claims, the claims merely require that the third party forms servicer include the business entity hosting the forms engine as a party involved in the processing of payments, but not the sole party performing that function.

> I agree with plaintiff. Although the claim language noted by defendant requires the "third party forms servicer" to "receive" both user and payment information and then to "process" both user and payment information, it does not, by itself, limit the interpretation of "third party forms servicer" to the forms engine host business entity nor does it preclude that entity from utilizing a fourth party to participate in the "processing." I note that the parties themselves define "processing" to include "facilitation" of the electronic payment. This suggests that the role of the "third party forms servicer" is not restricted to the actual performance of the processing function, but may include a facilitator [*28] capacity.

> Given the nature of a "comprising" claim, additional elements may be part of the claim. Accordingly, based on the claim language, I interpret the disputed phrase "processing by the third party forms servicer," to mean that the processing function, as previously construed by the parties, includes, but is not limited to, processing by the business entity hosting the forms engine software and excludes any processing by any public form user or any of the institutions of higher education.

July 7, 2003 Op. at pp. 48-49.

Defendant in the present case renews the argument made by the defendant in ApplyYourself and suggests that I misinterpreted the law regarding "comprising" claims. I disagree.

Defendant primarily relies on Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261 (Fed. Cir. 1986). There, the court rejected Moleculon's argument that "comprising" language opened the patent claim and its individual method steps to additional structural elements in addition to opening the claim to additional steps. Id. at 1271. The court concluded that Moleculon's position was too broad. Id. The court held that while

> a transitional [*29] term such as "comprising" or, as in the present case, "which comprises," does not exclude additional unrecited elements, or steps (in the case of a method claim), . . . the transitional phrase does not, in the present case, affect the scope of the particular structure recited within the method claim's step.

Id.

Defendant also cites to a 1997 case for the proposition that " comprising' is a term of art used in claim language which means that the named elements are

essential, but other elements may be added and still form a construct within the scope of the claim." Genentech, Inc. v. Chiron Corp., 112 F.3d 495, 501 (Fed. Cir. 1997).

Defendant relies on these cases to argue that the term "comprising" cannot be used to read out the claim limitation's express requirement that processing an electronic payment be performed by a third party forms servicer. Defendant argues that the

> open-ended "comprising" term permits the inclusion of additional steps, which may or may not be performed by additional actors, but it cannot alter or abrogate the express requirement that the *third party forms servicer*, i.e., the same entity responsible for processing
>
> [*30] the *forms*, actually perform the *payment processing* step.

Deft's Op. Cl. Constr. Brief at p. 29.

What defendant fails to recognize is that the prior construction requires the business entity hosting the forms engine to retain responsibility for processing the electronic payment. The construction mandates processing by the business entity hosting the form (e.g. the third party forms servicer that also processes the user information) but allows some processing steps related to electronic payments to be performed by another entity, except the public form user or any of the institutions of higher education. Thus, the prior interpretation is consistent with the law regarding "comprising" claims because it keeps the "named element" of having the third party forms servicer that also processes the user information, process the electronic payment information, but it allows the extra step of a fourth entity participating in such processing along with that third party forms servicer. I fundamentally disagree with defendant's argument that all of the electronic payment function process must be performed by the host of the forms engine. That entity must perform some, but not all, [*31] of the electronic payment function. Accordingly, I recommend adhering to the prior construction for the reasons initially explained in the July 7, 2003 Opinion and expressed herein.

2. "Via the Third Party Forms Servicer"

This phrase appears in claim 38 of the 042 patent. Defendant proposes the following construction: "the institution taking possession of funds in its account through an electronic transfer of those funds from the form user, where the funds that are being transferred to the institution from the user have come by way of or by means of the third party form servicer." To the extent this phrase requires construction at all, I construe it consistently with my previous construction in the

ApplyYourself case and consistently with the construction for "by the third party forms servicer" discussed in the preceding section. That is, the third party forms servicer, because it is required to be involved in the processing function as described above, may ultimately transfer the funds from the user to the institution, but other portions of the payment processing function may have been performed by a separate entity so long as it is not the user/applicant or the institution.

[*32]

3. "Processing . . . an Electronic Payment Associated with The Form"

Defendant proposes the following construction for this claim phrase: "subjecting an electronic payment associated with the form to[,] or handling an electronic payment associated with the form through[,] an established and routine set of procedures for effecting an electronic transfer of funds, including procedures for authorization, clearance and settlement."

Since "electronic payment" and "form" have already been addressed, the only remaining term in this phrase actually needing construction is "processing." Plaintiff proposes that "processing" in the context of the payment function be construed as "the manipulation of data within a computer system." Defendant argues that the term means " to subject to a special process or treatment (as in the course of manufacture'" or " to subject to or handle through an established usu. routine set of procedures[.]'" Deft's Op. Cl. Constr. Brief at pp. 25-26 (quoting Merriam Webster's Collegiate Dictionary 929 (10th ed. 1994)). Thus, defendant's proposed construction for this claim phrase uses the terms "subjecting . . . to [,] or handling . . . through [,] an established

[*33] and routine set of procedures[.]"

Defendant contends that because the claim specifies that the third party forms servicer processes an electronic payment rather than electronic payment information as recited in the previous limitation regarding the receipt by the third party forms servicer of electronic payment information entered by the user, the term "processing" as used in the phrase "processing by the third party forms servicer an electronic payment associated with the form," means something more than "processing" information or data. Defendant also contends that if "processing" means only the manipulation of data within a computer system, then the stated and claimed goal in the subsequent claim limitation which recites "relieving the institution of the administrative burden of processing forms and payments," would not be achieved.

I disagree with defendant. First, the distinction between "electronic payment" and "electronic payment information" does not support defendant's construction.

Under the claim language, an "electronic payment" gets "processed" while "electronic payment information" gets "received." Thus, there is no basis to conclude that the term "processing" [*34] when used with "electronic payment" means anything more than "the manipulation of data within a computer system." The previous function is restricted to receiving information which requires no manipulation of data.

Second, I reject defendant's argument that "manipulation of data within a computer system" is insufficient to relieve the institution of processing forms and payments. "Manipulation" is a broad term and is not confined, in this construction, to a narrow task.

Accordingly, I recommend that plaintiff's proposed construction for "processing" be adopted.

4. "Receiving by the Third Party Forms Servicer Over the Computer Network User Information and Electronic Information Entered by the User"

Defendant proposes the following construction: "the third party forms servicer takes possession of the electronic payment information entered by the user, but need not do anything with it." Defendant notes that the act of "receiving" is passive and stands in contrast to "processing" which requires the third party forms servicer to do something.

I agree with defendant and conclude that this proposed construction is supported by the claim language. I also note that defendant's argument [*35] in regard to this phrase underscores my reasoning in regard to the construction of the term "processing." I recommend that defendant's proposed construction of the "receiving" phrase be adopted.

5. "Entering Payment Information Onto the Form"

Dependent claims 2 and 17 of the 042 patent provide a limitation in which the payment information entered by a user is entered onto the form. Defendant contends that the claims refer, as their antecedent basis, to the form claimed in independent claims 1 and 16, respectively. Thus, defendant argues, entering the payment information onto the form must mean "entering the payment information in some designated data field(s) of the form generated by the forms engine program and customized in its appearance and content in accordance with the preferences of the institution." I agree with defendant that this construction is a fair interpretation of the claim language and I recommend that it be adopted.

II. Terms Proposed for Construction by Defendant

Defendant groups its constructions into six different functions performed by the invention covered by the two patents. One of these groups addresses all of the claim limitations directed at the [*36] "electronic payment function." As noted above, the preceding discussion of plaintiff's proposed construction of "processing by the third party forms servicer an electronic payment associated with the form," includes a discussion of defendant's proposed constructions for the "electronic payment function" and there is no need to further address those constructions.

The remaining five functions are: (1) forms engine; (2) user information database; (3) no rewriting of code; (4) forms processing; and (5) relief from administrative burden. In addition, defendant proposes constructions for two miscellaneous terms: (1) metadata; and (2) relational database.

A. Forms Engine Function

1. "Application Form" and "Application"

"Application" appears in claims 1 and 32 of the 278 patent and in claim 26 of the 042 patent. "Application form" appears in claims 1 and 32 of the 278 patent and in claim 39 of the 042 patent. Defendant proposes slightly different constructions for each term.

Defendant argues that "application form" should be construed as "a form representing an application for admission to a higher education institution." Defendant bases its proposal on the preamble to claim 1 of [*37] the 278 patent which recites: "[a] method of creating and processing over a computer network forms representing applications to different higher education institutions[.]" 22:34-36. Defendant argues that because the preamble indicates that claim 1 is directed to a method that results in application forms to "higher education institutions," the construction of "application form" must include a reference to such institutions.

In contrast, defendant proposes the following for the construction of "application": "[a] form representing an application to an institution." Defendant notes that because the preamble of claim 32 of the 278 patent refers only to "applications to institutions" and not "forms" for "applications" to "institutions of different higher education institutions," "application" must be construed more broadly to refer to all "institutions."

[*38] does not support this proposition. In Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1366 (Fed. Cir. 2004), the court held that "the district court must instruct the jury on the meanings to be attributed to all disputed terms used in the claims in suit so that the jury will be able to intelligently determine the questions presented." Id. (internal quotation omitted). That statement, however, was made in the context of resolving the question of whether a district court must instruct the jury on all the constructions it actually rendered. Id. at 1365-66. The court did not consider the question of whether a claim term which appears to be used in its ordinary sense, and not in any particular technical or scientific sense, must be construed simply because one party requests its construction.

[HN13] While claim terms "must be construed as they would be understood by a person of ordinary skill in the art to which the invention pertains," and thus, "what the claim terms would mean to laymen is irrelevant[,]" Searfoss v. Pioneer Consol. Corp., 374 F.3d 1142, 1149 (Fed. Cir. 2004), if a person of ordinary skill, in the art would understand [*39] the term in its ordinary, everyday sense, there is no need to construe the term. E.g., Biotec Biologische Naturverpackungen GmbH v. Biocorp, Inc., 249 F.3d 1341, 1349 (Fed. Cir. 2001) (district court did not err when it declined to construe "melting" when the meaning of "melting" did not depart from its ordinary meaning or otherwise require construction); Applera Corp. v. Micromass UK Ltd., 186 F. Supp. 2d 487, 524, 526 (D. Del. 2002) (court declined to construe terms "maintain," "maintaining," "and a "whereby" clause because they were clear on their face and the meaning was "self-evident"); Zip Dee, Inc. v. Dometic Corp., 63 F. Supp. 2d 868, 872 (N.D. Ill. 1998) (rejecting defendant's "artificial construct" of the term "tension" because no construction beyond the "ordinary English language meaning of the term" was required and thus, the patent's "references to tension"' [would] go to the jury without the interposition of any judicial gloss.").

Both "application" and "application form" are easily understood terms which the patents use in their ordinary sense. Neither the claim language nor the specification suggests [*40] that the meaning is anything other than the form used to apply to an institution or an institution of higher education. To the extent any construction is needed, I agree with plaintiff that it should be limited to "a form corresponding to an application."

I further conclude that only the term "application" needs the construction. "Application form" needs no further construction because it already clearly communicates its ordinary, everyday meaning in its own words. To apply the construction for "application" to

"application form" would be an exercise in redundancy.

Additionally, there is no support in the claim language to restrict "application form" to an admissions application. The term "admissions" is not used to modify "application form" in claim 1 of the 278 patent. The specification of the 042 patent indicates that although the preferred embodiment of the invention is directed toward admissions forms, the invention may be used for "processing many different types of forms." 9:25.

Finally, I reject defendant's suggestion that "application form" is restricted to applications to "institutions of higher education" while "application" corresponds to the broader "institutions."
[*41] " The only reference to institutions of higher education is in the preamble to claim 1 of the 278 patent. It does not appear anywhere else in that claim and it does not appear in claim 32 of the 278 patent or in claim 39 of the 042 patent, claims which also refer to "application form." [HN14] Generally, "language in a preamble limits a claim where it breathes life and meaning into the claim, . . . but not where it merely recites a purpose or intended use of the invention." Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1118 (Fed. Cir. 2004) (citation omitted). In this case, the reference to "institutions of higher education" in the preamble is only a recitation of a purpose or intended use and adds no separate meaning to the claim.

Accordingly, I recommend that plaintiff's proposed construction of "a form corresponding to an application, "be adopted for the term "application."

2. "Institution"

This term appears in claims 1, 21, and 32 of the 278 patent and in claims 1, 16, 32, and 38 of the 042 patent. Defendant proposes it be construed as "an established organization or corporation." Defendant's construction is based on a definition [*42] from Merriam Webster's Collegiate Dictionary 606 (10th ed. 1994).

Plaintiff argues that the term needs no construction because it is used only in its ordinary meaning. I agree with plaintiff that because the term is used only in its plain, customary meaning and there is no technical or scientific meaning ascribed to it, providing a construction for the term simply adds unnecessary complexity.

3. "Creating" or "Generating"

One or both of these terms appear in claims 1, 2, 21, and 32 of the 278 patent, and in claim 1 of the 042 patent. Defendant again relies on Merriam Webster's Collegiate Dictionary to construe the terms as "bringing into

existence." I agree with plaintiff that because these terms are used only in their ordinary, everyday sense, there is no need to construe them.

4. "In Response to a Request"

This term appears in claims 1, 21, and 32 of the 278 patent and claims 1, 19, and 36 of the 042 patent. Defendant states that both "response" and "request" have their common, everyday meanings. Nonetheless, defendant proposes that the phrase be construed as "in reaction of an instance of a user asking for that form." Plaintiff argues that the phrase needs no construction [*43] as it is readily understandable without further elaboration. I agree with plaintiff that the phrase need not be construed even as defendant notes, the words are used in their ordinary, plain meaning.

5. "Providing" and "Transmitting"

"Providing" is seen in claims 1 and 32 of the 278 patent and in claims 1, 16, 32, and 38 in the 042 patent. For example, in claim 1 of the 278 patent, it is used as follows: "providing, to the applicant over a computer network the first application form[.]" 22:42-43. "Transmitting" appears in claims 6, 27, and 32 of the 278 patent. For example, in claim 32, it is used as follows: "transmitting the customized application over a computer network to a requesting applicant[.]" 26:17-18.

For "providing," defendant seeks the following construction: "making the generated form available to the user." For "transmitting," defendant proposes: "sending the generated form to the user." Defendant relies on Merriam Webster's Collegiate Dictionary for its proposed constructions.

Plaintiff argues that the terms "providing" and "transmitting" are everyday words used in their ordinary, everyday sense and thus, they need no construction. I agree with plaintiff.

[*44] I further agree with plaintiff that neither the claim language nor the specification requires the construction to include the object of the action, e.g. "the generated form", or to whom it is directed, e.g. "the user." For example, if defendant's construction of "transmitting" were used, the claim phrase "transmitting the customized application over a computer network to a requesting applicant" in claim 32 of the 278 patent, would read: " sending the generated form to the user' the customized application over a computer network to a requesting applicant." I agree with plaintiff that this makes the claim limitation unreadable.

6. "Forms Engine Program" and "Forms Generator"

Claim 21 of the 278 patent and claim 1 of the 042

patent refer to the software program that generates a response to a request from a user. Claim 21 of the 278 patent provides: "a forms engine program operating on the server computer for generating a form from the form description information[.]" 25:3-5. Claim 1 of the 042 patent states: ". . . the form being generated by a forms generator that generates multiple forms corresponding to multiple institutions of higher education, the forms generator generating [*45] forms that are . . ." 35:11-14.

Defendant proposes one construction for both phrases: "a software program responsible for performing, among other tasks, the creation or generation of multiple forms corresponding to multiple institutions." Plaintiff proposes separate, but simpler phrases: "A software program that can be used to generate a form" for the term "forms engine program" and "a software program that can be used to generate forms" for the term "forms generator."

Both parties' proposals incorporate the phrase "a software program." I agree with the parties that the phrase "forms engine" is used in the technical, computing sense to mean "a software program." I further agree, as is seen in both parties' proposals, that the phrase "forms engine program" can generally be understood as a software program that creates or generates forms.

Plaintiff contends that defendant's proposal inappropriately inserts "among other tasks" which suggests that the forms engine program and forms generator are required to perform unspecified other tasks, other than generating forms. I agree with plaintiff that the claim language and specification does not support a construction suggesting that the [*46] forms engine program or forms generator must be able to perform other tasks. While the forms engine program or forms generator may actually be able to do so, the claims do not mandate the performance of other tasks. The disclosed function for forms engine program and forms generator appears limited to generating forms.

I agree with defendant that the construction for both terms properly includes the reference to "multiple forms corresponding) to multiple institutions." Plaintiff notes that in claim 21, the term "forms engine program" is used only in conjunction with the generation of a form, in the singular, not multiple forms. Dependent claim 23 in the 278 patent discusses a forms engine program that can generate more than one form. But, plaintiff argues, the requirement that it generate more than one form does not derive from the phrase "forms engine program" itself, but from additional language in the claim.

I disagree with plaintiff. The preamble to claim 21

Page 13

provides for "[a] system for creating an processing customized forms for unrelated institutions." 24:52-53. This establishes that the purpose of the claim is to create more than one form. Each step in the claim discusses

[*47] "form" in the singular because the system generates only one form at a time. But, the invention, to fulfill its purpose, must include a forms generator or forms engine program that generates multiple forms. The whole point of the invention is that a single forms generator or forms engine program can generate forms for multiple institutions and populate subsequent forms with data stored from earlier forms. A construction of "forms generator" and "forms engine program" without the requirement of generating multiple forms for multiple institutions would exclude the invention.

This distinguishes this reference to the preamble from the one discussed above in connection with the terms "application" and "application form." There, the preamble's reference to "institutions of higher education" was not a separate claim limitation because it merely recited a purpose of the invention. Here, while the use of the plural "forms" also indicates a purpose of the forms engine program, the plural term is required for the forms generator and forms engine program to have any meaning which comports with the invention.

Notably, defendant's proposed construction does not require that the forms engine program

[*48] or the forms generator generate multiple forms simultaneously. The requirement is only that the forms engine program or forms generator be able to generate more than one form, not that it do so at the same time.

Thus, I recommend that the terms "forms engine program" and "forms generator" both initially be construed to mean "a software program which creates or generates multiple forms corresponding to multiple institutions."

Finally, although perhaps not obvious in the proposed constructions of these phrases, the briefing reveals that the parties dispute whether "a software program" as used in the construction of "forms generator" and "forms engine program" is a single program or multiple programs. Defendant contends that the "forms engine program" or "forms generator" is a single program that generates multiple forms corresponding to multiple institutions. Defendant relies on a reference in claim 1 of the 042 patent to "a. forms generator" in the singular, "that generates multiple forms . . ." 35:12-14 (emphasis added). Defendant also notes that the prosecution history reveals that one of the named inventors differentiated the invention disclosed in the 278 patent from an

[*49] earlier version of the system called "ApplyWeb I," by noting that ApplyWeb I required a separate software

program for each application form for each school. Exh. A to Deft's Op. Cl. Constr. Brief. n3 Thus, defendant contends, the invention disclosed in the patents in suit must be to a single program.

> n3 I request that in the future, defendant paginate all exhibits and refer to specific pages of an exhibit when citing to it.

Plaintiff counters this argument by noting that the word "a", as used in defendant's proposed construction "a software program" is typically understood to mean "one or more" in patent claims. Tate Access Floors, Inc. v. Interface Architectural Resources Inc., 279 F.3d 1357, 1370 (Fed. Cir. 2002). Thus, by using "a software program," the construction means one or more programs. Plaintiff also notes that it is common for a "program" to include other "code," which may also be considered a "program," or to call upon other "programs," containing certain functions, with the "programs"

[*50] working together to create a desired result.

Plaintiff argues that as long as the "forms engine program" or "forms generator" is involved in the generation process, the claim language is satisfied. Plaintiff also contends that nothing in the plain language of the claim deviates from this typical understanding or requires the "forms engine program" or "forms generator" to be the only software included in the form generation.

Plaintiff argues that as long as the "forms engine program" or "forms generator" is involved in the generation process, the claim language is satisfied. Plaintiff also contends that nothing in the plain language of the claim deviates from this typical understanding or requires the "forms engine program" or "forms generator" to be the only software included in the form generation.

Furthermore, plaintiff argues, the intrinsic evidence contradicts defendant's position. In the preferred embodiment, the "forms engine" operates in concert with other software such as the web server software and the database management system software. Plaintiff argues that while the specification states that the "preferred implementation of the invention comprises a single forms engine

[*51] program . . .", this statement is limited to the preferred implementation and implies that implementations using more than one forms engine are possible.

I agree with plaintiff. Because the forms generator or forms engine program may use other code or programs to actually generate the form, and because it generates the form only in tandem with the web server and the database