IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NETRATINGS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-314-GMS |
| | ) | |
| COREMETRICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT COREMETRICS' OPENING *MARKMAN* BRIEF

*Of Counsel:*

Robert T. Haslam
Nitin Subhedar
Bhanu K. Sadasivan
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, CA 94025
Telephone: (650) 324-7000
Facsimile: (650) 324-0638

Matthew C. Lapple
HELLER EHRMAN LLP
4350 La Jolla Drive, 7th Floor
San Diego, CA 92121
Telephone: (858) 450-8400
Facsimile: (858) 450-8999

Dated: April 17, 2006

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
Ashby & Geddes
222 Delaware Ave., 17th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888
Facsimile: (302) 654-2067
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendant Coremetrics, Inc.*

## **TABLE OF CONTENTS**

I.     INTRODUCTION .......................................................................................... 1

     A.    The Parties And Procedural Posture .......................................................... 1

     B.    Background Technology ............................................................................ 1

     C.    The Patents-In-Suit ................................................................................... 2

            1.    The '637 Patent .............................................................................. 2

            2.    The '510 And '680 Patents ............................................................ 3

            3.    The '386 And '155 Patents ............................................................ 3

II.    PRINCIPLES OF CLAIM CONSTRUCTION ............................................ 4

     A.    Clarification Of The Claim Construction Process ..................................... 4

     B.    Construction Under 35 U.S.C. § 112(6) ................................................... 4

     C.    The Court Should Not Redraft Poorly Written Claims, Even If That
         Results In A Nonsensical Construction Or Physical Impossibility ............ 7

     D.    Merely Paraphrasing Terms In A Claim Does Not Constitute Genuine
         Claim Construction ................................................................................... 7

     E.    The Incorrect Invocation Of *"Markush"* Claiming ................................... 7

III.   THE '637 PATENT .................................................................................... 9

     A.    The Only '637 Corresponding Structure For The Means-Plus-Function
         Elements Is An Unexplained "Java Applet" .............................................. 9

     B.    Netratings Has Failed To Identify The Corresponding Structure ............. 11

     C.    The Term "Characteristic" Is Indefinite ................................................... 12

     D.    The "Instructions For" Claim Elements Are Governed By 112(6) ........... 14

            1.    "Means" And "Instructions" Are Used Interchangeably In The
                Patent Claims ............................................................................... 14

            2.    The Terms "Means" And "Instructions" Were Used
                Interchangeably During Prosecution ............................................. 16

            3.    One Of Ordinary Skill In The Art Would Not Understand
                 "Instructions" As A Known Structure ........................................... 17

        4.      The Limitations And Patentability Arguments All Derive Solely From Functional, Not Structural, Expressions ........................ 18

IV.    THE '510 AND '680 PATENTS ................................................................ 19

    A.    Coremetrics' Definition Of "Local Computer Use Meter / User Meter" Is Correct .............................................................................. 19

    B.    Netratings' Definition Of The "Log Of Predetermined Events" Is Simplistic And Omits Key Limitations .......................................... 21

    C.    "Identifies Character Strings Reflecting On-Line Activity" ............ 25

    D.    "Logs / Logging" Is More Than Just "Recording" .......................... 25

    E.    Netratings' Definition Of "Installed" Lacks The Concept Of Permanence Inherent In That Term ................................................ 26

    F.    Coremetrics' Definition Of "Dictionary" Is Taken Directly From The Patent ............................................................................................ 26

    G.    "Identify Titles Of Open Windows" ............................................... 27

    H.    "Reflects A Log Of Titles Of World Wide Web Pages" ................. 28

    I.    The Difference Between "Generating" And "Storing" ................... 29

V.    THE '386 AND '155 PATENTS ............................................................... 30

    A.    The Phrase "Monitor Interaction . . . With At Least One Of The First Resource And One Or More Second Resources" Is Not A *Markush* Group And Instead Requires Interaction With Two Distinct Resources ................. 30

    B.    The "Embedded" vs. "Executable Program Not Being Part Of The Resource" Dichotomy ..................................................................... 31

    C.    "Resource Use Data" Must Address Two Or More Actions Taken While Using A "Resource" ......................................................................... 33

    D.    "Client Identifying Indicia" Must Be Able To Link Two Actions To A Single Client Computer .................................................................... 34

    E.    A User Must Activate An Input Device To Be A "User Action" ...... 34

    F.    The "Tracking Program" And "Executable Program" Must Operate Over Time And On The Client Computer ........................................ 35

    G.    "Computer Usable Medium" / "Computer Readable Medium" Means A Single Storage Device ..................................................................... 37

H.    The "Program Code Which, When Executed . . . Causes The Computerized Device" Must Mean That The Entire Method Is Carried Out By One Computer ............................................................................................ 38

I.    "Data Representative Of A Plurality Of Preferences Of A User / Plurality Of Interests Of A User".......................................................................................... 39

J.    "Monitoring Input Device Events" ........................................................................ 39

VI.    CONCLUSION ................................................................................................................ 40

## TABLE OF AUTHORITIES

### Cases

*Aqua-Aerobic Sys., Inc. v. Aerators, Inc.,*
 211 F.3d 1241 (Fed. Cir. 2000) ...................................................................7

*Asyst Tech., Inc. v. Empak Inc.,*
 268 F.3d 1364 (Fed. Cir. 2001) ...................................................................7

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.,*
 73 F.3d 1573 (Fed. Cir. 1996) ...................................................................19

*Budde v. Harley-Davidson, Inc.,*
 250 F.3d 1369 (Fed. Cir. 2001) ...................................................................7

*C.R. Bard, Inc. v. United States Surgical Corp.,*
 388 F.3d 858 (Fed. Cir. 2004) ...................................................................7

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,*
 296 F.3d 1106 (Fed. Cir. 2002) ...................................................................6

*Chef Am., Inc. v. Lamb-Weston, Inc.,*
 358 F.3d 1371 (Fed. Cir. 2004) ...................................................................7

*Chiuminatta Concrete Concepts v. Cardinal Indus., Inc.,*
 145 F.3d 1303 (Fed. Cir. 1998) ...................................................................5

*Cole v. Kimberly-Clark Corp.,*
 102 F.3d 524 (Fed. Cir. 1996) ...................................................................15

*Ex Parte Markush,*
 51 U.S.P.Q. 70 (P.O.B.A. 1941) ...................................................................7

*Ex-Parte Stanley,*
 121 U.S.P.Q. 621 (Bd. App. 1959) ...................................................................6

*Halliburton Oil Well Cementing Co. v. Walker,*
 329 U.S. 1 (1946) ...................................................................5

*Harris Corp. v. Ericsson, Inc.,*
 417 F.3d 1241 (Fed. Cir. 2005) ...................................................................7, 12

*In re Swinehart,*
 169 U.S.P.Q. 226 (CCPA 1971) ...................................................................6

*Isogon Corp. v. Amdahl Corp.,*
 47 F. Supp. 2d 436 (S.D.N.Y. 1998) ...................................................................5

*JVW Enter., Inc. v. Interact Accessories, Inc.,*
 424 F.3d 1324 (Fed. Cir. 2005) ...................................................................6

*Laitram Corp. v. Rexnord, Inc.,*
    939 F.2d 1533 (Fed. Cir. 1991) ................................................................................18

*Mas-Hamilton Group v. LaGard, Inc.,*
    21 F. Supp. 2d 700 (E.D. Ky. 1997) ..........................................................................15

*Micro Chemical, Inc. v. Great Plains Chem. Co.,*
    103 F.3d 1538 (Fed. Cir. 1997) ...................................................................................6

*O'Reilly v. Morse,*
    56 U.S. (15 How.) 62 (1853) .......................................................................................5

*Personalized Media Commc'n, L.L.C. v. International Trade Comm'n,*
    161 F.3d 696 (Fed. Cir. 1998) ...............................................................................5, 18

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) ...................................................................................4

*Raytheon Co. v. Roper Corp.,*
    724 F.2d 951 (Fed. Cir. 1983) .....................................................................................5

*Sage Prod., Inc. v. Devon Indus., Inc.,*
    126 F.3d 1420 (Fed. Cir. 1997) ...................................................................................6

*See Mas-Hamilton Group Inc. v. LaGard, Inc.,*
    48 U.S.P.Q.2d 1010 (Fed. Cir. 1998) ...............................................................5, 16, 18

*Serrano v. Telular Corp.,*
    111 F.3d 1578 (Fed. Cir. 1997) ...................................................................................6

*South Corp. v. United States,*
    690 F.2d 1368 (Fed. Cir. 1982) ...................................................................................6

*SuperGuide Corp. v. DirecTV Enterprises, Inc,*
    358 F.3d 870 (Fed. Cir. 2004) .....................................................................................8

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) .....................................................................................4

*WMS Gaming, Inc. v. International Game Technology,*
    184 F.3d 1339 (Fed. Cir. 1999) ..............................................................................6, 12

## Statutes

35 U.S.C. § 112(6) ...........................................................................................4, 5, 6, 14

35 U.S.C. § 112, ¶ 1 ...................................................................................................7

35 U.S.C. §112, ¶ 2 ..................................................................................................19

**Other Authorities**

*Landis On Mechanics of Patent Claim Drafting*, §6:2.............................................................................8

*MPEP* §2181 ...................................................................................................................................18

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **Coremetrics** | Defendant Coremetrics, Inc. |
| **NetRatings** | Plaintiff NetRatings, Inc. |
| **'637 patent** | U.S. Patent No. 6,108,637 |
| **'510 patent** | U.S. Patent No. 5,675,510 |
| **'680 patent** | U.S. Patent No. 6,115,680 |
| **'386 patent** | U.S. Patent No. 6,763,386 |
| **'155 patent** | U.S. Patent No. 6,138,155 |
| **112(6)** | 35 U.S.C. § 112, paragraph 6 |
| **JCCC** | The Joint Claim Construction Chart filed by the parties on April 3, 2006, and attached as Exhibit 2 to the Declaration of David Klausner In Support Of Coremetrics, Inc.'s Opening Claim Construction Brief |
| **Jt. App.** | Joint Appendix filed by Plaintiff and Defendant, accompanying the Opening Markman Briefs |
| **File History** | The prosecution history of any given patent before the U.S. Patent & Trademark Office |
| **MPEP** | Manual of Patent Examining Procedure |
| **Klausner ¶ __, Ex. __** | Declaration Of David Klausner In Support Of Coremetrics, Inc.'s Opening Claim Construction Brief (with paragraph or exhibit cite) |
| **Sadasivan Decl.** | Declaration of Bhanu K. Sadasivan In Support Of Defendant Coremetrics' Opening Markman Brief |

## I.    INTRODUCTION

### A.    The Parties And Procedural Posture

Defendant Coremetrics is a leading provider of on-demand web analytics and precision marketing solutions.  Founded in 1999, Coremetrics provides services that help on-line retailers learn how visitors and customers use, explore, and navigate through their commercial websites. By analyzing this information, Coremetrics' clients are able to learn invaluable information that can be used to optimize the design of their websites in order to achieve greater commercial success.

On May 19, 2005, Plaintiff NetRatings brought this action against Coremetrics, asserting infringement of four patents:  (1)  U.S. Pat. No. 6,108,637; (2) U.S. Pat. No. 5,675,510; (3) U.S. Pat. No. 6,115,680; and (4) U.S. Pat. No. 6,763,386.  On January 13, 2006, NetRatings amended its complaint to add a fifth patent, U.S. Pat. No. 6,138,155.  NetRatings is presently asserting that Coremetrics infringes over one-hundred different claims from the five patents-in-suit.

By a scheduling order dated October 12, 2005, this Court set a *Markman* hearing for June 15, 2006 to address all claim terms having meanings that are in dispute between the parties. From February 6, 2006 to the present, the parties have met and conferred numerous times in order to narrow the number of terms in dispute and to sharpen the issues for presentation to the Court. Coremetrics now respectfully submits this opening *Markman* brief.

### B.    Background Technology

The field of technology to which NetRatings is attempting to apply the patent-in-suit deals with gathering data about how people use their computers, especially when using the Internet.  When a person views a web page, they normally use a software application called a web browser to locate and display the web page.  The two most popular browsers are Netscape Navigator and Microsoft Internet Explorer.  Both of these are graphical browsers, which means that they can display graphics as well as text.  In addition, most modern browsers can present multimedia information, including sound and video.  In turn, the information that is "rendered" by the browser as a web page is based on a file written in "HTML," short for HyperText Markup

Language, the authoring language used to create documents on the World Wide Web. HTML defines the structure and layout of a Web document by using a variety of "tags" and "attributes." There can be hundreds of different tags used to format and layout the information in a Web page. Tags are also used to specify hypertext links. These allow Web developers to direct users to other Web pages with only a click of the mouse on either an image or word. These HTML documents are provided to the computer's web browser by a "server," which is a computer on a network that manages network resources and that delivers (or serves up) Web pages. Every Web server has an IP address and possibly a domain name. For example, if a user enters the URL http://www.google.com in a browser, this sends a request to the server whose domain name is google.com. The server then fetches the home page for that site and sends it to the browser. A server can also download computer programs.

### C.    The Patents-In-Suit

#### 1.    The '637 Patent

The '637 patent, entitled "Content Display Monitor," was issued on August 22, 2000. Although the patent specification is extremely vague regarding the details of how the alleged invention actually operates, the abstract of the patent states that "[t]he invention can enable monitoring of the display of content by a computer system. Moreover, the invention can enable monitoring of the displayed content to produce monitoring information from which conclusions may be deduced regarding the observation of the displayed content by an observer." ('637, Abstract, Jt. App., Tab B). In other words, the '637 patent describes the general concept of monitoring or gathering information about the visibility of content that has been downloaded and made visible on a user's computer screen. Notably, as will be discussed below, the '637 patent provides virtually no information about the actual software that is supposed to accomplish this monitoring other than to say, repeatedly, that it must be done with a small downloadable program, written in the Java programming language, called an "Applet." The details of how this Applet should be created are not disclosed in the '637 patent, nor is a single example of the programming instructions that could be used to define the Applet ever provided.

### 2.    The '510 And '680 Patents

The '510 patent, entitled "Computer Use Meter and Analyzer," was issued on October 7, 1997 (Jt. App., Tab A). The '680 patent (Jt. App., Tab C), which was a continuation-in-part of the '510 patent, was issued on September 5, 2000. The '510 and '680 patents have the same title and very similar specifications. As the abstracts of these patents explain, the alleged invention "measures and reports the use of a personal computer by a user through a log file." Specifically, a device called a "use meter" is installed in an individual user's computer, and it then monitors and intercepts certain messages that the personal computer's operating system creates as it performs its tasks. These messages – which can include the titles that appear in the title bars of desktop windows or the character strings that have been sent to the computer's modem – are entered into a log file, which collects information regarding multiple events over time and a variety of attributes associated with each event. The log file is stored on the user's computer, and from time to time, the information contained in the log about the numerous monitored events is collected and loaded into a centralized database.

### 3.    The '386 And '155 Patents

The '386 patent (Jt. App., Tab D), entitled "Method and Apparatus for Tracking Client Interaction With a Network Resource Downloaded From a Server," was issued on July 13, 2004. It is a continuation of an earlier patent, the '155 patent (Jt. App., Tab E), which is entitled "Method and Apparatus for Tracking Client Interaction with a Network Resource and Creating Client Profiles and Resource Database." Both patents share the same specification. These patents both deal with a method of monitoring a user's interaction with a number of resources, such as web pages, that are downloaded from a server in a computer network. While more than one embodiment is disclosed in the patents, this "monitoring" is generally accomplished by downloading a tracking program from a server to a client computer. The tracking program, which is also referred to as an executable program, then runs on the client computer and "tracks" – or monitors over time – the individual's use of the downloaded resources. For example, the patents state that the "simplest" embodiment of the alleged invention records the time when a

web page is opened and then records the time when the web page is closed. Finally, the tracking program communicates data about the various actions taken by the user in connection with the various resources to one or more servers on the computer network.

## II.    PRINCIPLES OF CLAIM CONSTRUCTION

In light of the Court's familiarity with the *Markman* process and the fundamental doctrines that guide that analysis, Coremetrics will dispense with an extensive recitation of the basic law of claim construction. Instead, Coremetrics provides a summary of recent decisions and authorities that are pertinent to the claim terms in dispute in the present case.

### A.    Clarification Of The Claim Construction Process

Last year, the Federal Circuit clarified the process of claim construction and the role of intrinsic and extrinsic evidence in its *en banc* decision *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) *cert. denied*, 2006 WL 386393 (U.S. Feb. 21, 2006). Although the actual words of the claims are the controlling focus, 415 F.3d at 1312, they must be viewed in conjunction with the patent as a whole and construed as they would be understood by a person having ordinary skill in the art. *Id.* at 1313. "[T]he specification is the 'single best guide to the meaning of a disputed term,' and 'acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.'" *Id.* at 1320-21 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

The Court is free to consult both intrinsic and extrinsic evidence — in any sequence — as long as the Court "attach[es] the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Phillips*, 415 F.3d at 1324. Dictionaries and technical treatises (along with expert testimony) may be considered, but such evidence is generally less reliable than intrinsic evidence. *Id.* at 1318-19.

### B.    Construction Under 35 U.S.C. § 112(6)

The case at bar presents a number of claims with elements that call out purely functional attributes. Some of these claims are acknowledged by both parties as being governed by 35 U.S.C. § 112(6), while others are not. Section 112, ¶ 6 provides that an element in a claim for a

combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof. If a claim element is drafted in this manner, however, the element is limited to the corresponding structure, material, or acts described in the specification and equivalents thereof. *See Chiuminatta Concrete Concepts v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308 (Fed. Cir. 1998) ("[T]he 'means' term in a means-plus-function limitation is essentially a generic reference for the corresponding structure disclosed in the specification."). The rule that a patentee cannot attempt to claim <u>all</u> of the conceivable means or structures that perform a recited function has been a bedrock principle of patent law for more than a century. *E.g., O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 112-113 (1853); *see Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1 (1946) (before enactment of the "safe harbor" of 112(6), holding invalid, for policy reasons, claims in which the novelty is described in functional terms: "[U]nless frightened from the course of experimentation by broad functional claims like these, inventive genius may evolve many more devices to accomplish the same purpose").

The threshold determination of whether a claim limitation is written as a means-plus-function element is a question of law. *Personalized Media Commc'n, L.L.C. v. International Trade Comm'n*, 161 F.3d 696 (Fed. Cir. 1998). "Means-plus-function" claims often are expressed using the phrase "means for." This has led to a presumption that 112(6) applies when "means" is used, and a contrary presumption when it is not. Notably, however, a claim that does not use the word "means" must still be construed under 112(6) if it lacks sufficiently definite structure. *See Mas-Hamilton Group Inc. v. LaGard, Inc.*, 48 U.S.P.Q.2d 1010, 1016-17 (Fed. Cir. 1998) (applying 112(6) to claim elements preceded by "lever moving element" and "movable link member" because, even though "the catch phrase ['means for'] is not used, the limitation's language does not provide any structure"); *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983) (construing functional language introduced by the phrase "so that" as equivalent to "means for"); *Isogon Corp. v. Amdahl Corp.*, 47 F. Supp. 2d 436, 440 (S.D.N.Y. 1998) (holding that the terms "event detector for detecting," "collector for obtaining," "recorder

for recording" and "correlator for correlating" were means-plus-function claims subject to 112(6) because they contained "no recitation of structure" and were "dominated by functional description").[1]  Moreover, it is not enough to avoid 112(6) that a claim happens to recite some structure.  Rather, the structure recited within the claim itself must be sufficient "to perform entirely the recited function." *Sage Prod., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427-28 (Fed. Cir. 1997).

The construction of means-plus-function claim limitations, like the process of construing other claim limitations, is a question of law. *See Serrano v. Telular Corp.*, 111 F.3d 1578, 1582 (Fed. Cir. 1997); *Micro Chemical, Inc. v. Great Plains Chem. Co.*, 103 F.3d 1538, 1547 (Fed. Cir. 1997).  To construe means-plus-function claims, the Court must first identify the "function" contained in the means-plus-function limitation. *JVW Enter., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005).  Then, in construing the "means" part of the claim, the Court must look to find the corresponding structure, if any, disclosed in the specification as being clearly associated with performance of the claimed function. *See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002).  When construing a 112(6) claim element for a computer-implemented function, the corresponding structure is the algorithm disclosed in the specification. *WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339, 1348-49 (Fed. Cir. 1999); *Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005).

---

[1] In setting forth guidelines for identifying 112(6) claims, the PTO has recognized that although "there is no particular language that must appear in a claim in order for it to fall within the scope of 35 U.S.C. §112, sixth paragraph . . . it must be clear that the element in the claim is set forth, at least in part, by the function it performs as opposed to the specific structure, material, or acts that perform the function." [*MPEP* §2181, p. 2100-175 (Sadasivan Decl., Ex. 1] The *MPEP* provides an example of a claim element that lacks the word "means" yet falls within the scope of  §112, ¶ 6:  "a jet driving device so constructed and located on the rotor as to drive the rotor . . ." [*Id.* at p. 2100-176, *citing Ex-Parte Stanley*, 121 U.S.P.Q. 621 (Bd. App. 1959)]

The CCPA, a predecessor to the Federal Circuit whose decisions are binding precedent upon that court [*South Corp. v. United States*, 690 F.2d 1368 (Fed. Cir. 1982)], also had occasion, in *In re Swinehart*, 169 U.S.P.Q. 226, 228-29 (CCPA 1971), to deal with a claim element not written in conventional means-plus-function format, but which used the functional language "transparent to infrared rays" instead.  The court noted that the use of such broad functional language, on its face, would improperly cover "any and all embodiments which perform the recited function," and resorted to the specification to delimit the claim. *Id.*

Moreover, the disclosed structure must actually perform the claimed function, "not merely enable the pertinent structure to operate as intended...." *Asyst Tech., Inc. v. Empak Inc.*, 268 F.3d 1364, 1371 (Fed. Cir. 2001). Failure to disclose an adequate structure in the specification results in the claim being indefinite in scope, and thus invalid under 35 U.S.C. § 112, ¶ 1; *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001).

### C. The Court Should Not Redraft Poorly Written Claims, Even If That Results In A Nonsensical Construction Or Physical Impossibility

As described below, NetRatings appears to be asking the Court to enter certain constructions in this case in order to try to save certain claims from being found invalid or indefinite. In *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004), however, the Federal Circuit explained that "courts may not redraft claims, whether to make them operable or to sustain their validity .... [W]e construe the claim as written, not as the patentees wish they had written it." Similarly, in *Aqua-Aerobic Sys., Inc. v. Aerators, Inc.*, 211 F.3d 1241, 1245 (Fed. Cir. 2000) the court held that expert testimony might clarify the patented technology, "but it may not correct errors or erase limitations or otherwise diverge from the description of the invention as contained in the patent documents."

### D. Merely Paraphrasing Terms In A Claim Does Not Constitute Genuine Claim Construction

In its proposed constructions, NetRatings also seems to fall prey to the temptation to just paraphrase claim terms, rather than provide illuminating definitions. "[M]erely rephrasing or paraphrasing the plain language of a claim by substituting synonyms does not represent genuine claim construction." *C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004). NetRatings' repeated efforts to merely rephrase or reword, such as for example, its request to construe "user actions" as "performance of an action by a user" is entirely unhelpful to both the Court and the jury and should be rejected.

### E. The Incorrect Invocation Of "*Markush*" Claiming

The parties are also in dispute regarding NetRatings' incorrect argument that, in its '386 patent, it has claimed a "*Markush*" group in claims 1, 13 and the dependent claims thereof. A "*Markush*" group, named after the case of *Ex Parte Markush*, 51 U.S.P.Q. 70 (P.O.B.A. 1941), is

typically used in chemical claims in which a particular claim element can be satisfied by any one of a finite number of choices. A *Markush* group is normally expressed as the phrase "selected from the group consisting of," followed by a list of items in which the final item is preceded by the conjunction "and." *Landis On Mechanics of Patent Claim Drafting*, §6:2 (Sadasivan Decl., Ex. 2). A *Markush* group is also understood to be "closed" or limited to one of the items specifically listed in the group. *Id.* Thus, a classic example of a *Markush* group is "a halogen selected from the group consisting of chlorine and bromine." *Id.* (*e.g.*, this clause omits the other three known halogens -- fluorine, iodine and astatine).

It is worth noting that there is another accepted technique for setting forth a *Markush* group. Specifically, the patentee can omit the phrase "selected from the group consisting of" and simply set forth a list of the possible options from which the one required selection must be made, but in that case the patentee must use the word "or" – instead of "and" – before the last entry of the list. *Id.* Careless use of the word "and" prior to the last entry on the list results in a significant limitation of the scope the claim. According to *Landis*:

> "Improper use of the Markush form, even if unintentional, may have an unexpected result. In *Superguide Corp. v. DirecTV Enterprises Inc.*, the patentee claimed '...information which met at least one of the desired program start time, the desired program end time, the desired program service, and the desired program type.' The Federal Circuit said that language required one member of each category be present in order to meet the claim element. Had 'or' been used in place of 'and,' there might have been only need for one element from one category to meet the claim element. Alternatively, had the expression begun 'information which met at least one of the group consisting of the desired program ...,' that would have become a properly recited Markush Group and the patentee's construction might have prevailed."

*Id.* (citing *SuperGuide Corp. v. DirecTV Enterprises, Inc*, 358 F.3d 870, 886 (Fed. Cir. 2004)).

As will be discussed further below, NetRatings' '386 patent uses language that precludes the claim element at issue from being interpreted as a *Markush* group.

### III.     THE '637 PATENT[2]

#### A.     The Only '637 Corresponding Structure For The Means-Plus-Function Elements Is An Unexplained "Java Applet"

The '637 patent has column after column of "specification," but, strikingly, it seems to disclose virtually nothing specific at all.  Indeed, a close examination reveals that the disclosure can be boiled down to a mere suggestion that one might consider writing a particular kind of program in the Java programming language, called an "Applet," that should be able to do two things:  (a) cause the computer to download "content" through the Internet; and (b) then "monitor" the display of the "content" that was downloaded as it appears on a user's computer screen.  Yet, the patent is remarkably vague as to how either of these two things are accomplished.  The only thing that the patent is clear on is that whatever it is that the alleged invention is supposed to be able to do, it has to do it with the unexplained "Java Applet."

Notably, the '637 patent fails to provide any of the source code for the Java Applet.  The '637 patent also fails to disclose other key information, such as the complete algorithm necessary to perform each of the "monitoring" tasks that it suggests can undertaken.[3]  The patent also fails to identify any other kind of computer programming language or "structure" that might be used to perform monitoring instead of a Java Applet.  In other words, the patent specification does little more than tell the reader to create an empty box (the Java Applet) and then tell the reader to fill that empty box with whatever he wants (the unidentified pre-existing Java methods) to "monitor" something related to a "display of content."

A review of the '637 patent specification demonstrates that the only "structure" that is

---

[2] Due to the large number of claims asserted, a significant number of terms must be construed by the Court.  In an effort to simply the claim construction process, Coremetrics addresses these terms grouped by patent, but notes that some claim terms appear in more than one patent.  Coremetrics believes that the construed terms should have a consistent definition across all of the asserted patents.

[3] At best, the patent mentions one or two pre-existing Java methods, *i.e.*, subroutines that come included with every copy of the Java language itself, that can be called from inside the Java Applet to perform some portion one or two of the identified monitoring tasks.  However, these methods are only mentioned by name, in passing, without any description of the way in which they should be implemented.

identified to perform the majority of the functions described in the claims is the generic and

unexplained Java Applet. Further, the patent itself emphasizes, again and again, that all

meaningful action takes place through the use of a Java Applet:

> "In a particular embodiment, the monitoring instructions are part of a computer program that also includes instructions for displaying the content. Illustratively, such a computer program can be an applet written in the Java programming language. As will be appreciated by those skilled in the use of html, Example 1 below illustrates a set of instructions in accordance with the html syntax that can be used to cause execution of an applet that both displays content and monitors the display." ('637 Col. 11, ln. 57-67, Jt. App., Tab B, JA00025)(emphasis added).

> "The instructions identify the location ("image") at the content provider site of an applet (a small application program) called 'AdInsert' that includes further instructions which, when executed perform a monitoring method according to the invention, as well as cause the content to be displayed. (The steps that can be implemented in such a monitoring method are discussed further below). Upon receipt of the request by the http daemon at the content provider site, the AdInsert applet is transferred to the requesting content display site and begins executing." ('637, Col. 12, ln. 15-24, Jt. App., Tab B, JA00025) (emphasis added).

> "The 'monitoring instructions' of such an applet may be no more than an instruction that causes an indication that the applet has executed to be stored or transferred to an appropriate network site." ('637, Col. 13, ln. 37-40, Jt. App., Tab B, JA00026)(emphasis added).

> "When the monitoring method is implemented as an applet that also displays the content, such monitoring can occur naturally, since only events concerning the content display are transmitted to the monitoring method. For example, the applet can use a pre-existing Java method (e.g. the method named HandleEvent in a current version of Java) to monitor events as transmitted by the operating system." ('637, Col. 16, ln. 17-27, Jt. App., Tab B, JA00027) (emphasis added).

> "When the monitoring method is implemented by an applet written in Java, the time stamp can be obtained using a method that exists as part of the Java language." ('637, Col. 17, ln. 11-13, Jt. App., Tab B, JA00028)(emphasis added).

> "When a monitoring method according to the invention is implemented by a Java applet, the remote site is the content provider site, since, currently, such applets can only communicate information to the network site from which they were transferred." ('637, Col. 20, ln. 4-8, Jt. App., Tab B, JA00029)(emphasis added).

10

Thus, the patentee plainly intended the Java Applet to carry out nearly every function identified in the patent. Likewise, the file history of the '637 patent hammers home the patent applicant's belief that the use of a Java Applet, to perform certain functions, was the alleged invention:

> "As described in Applicant's specification at page 22, lines 3-18, aspects of the invention can be implemented, for example, as one or more <u>computer programs, written in the Java programming language,</u> that can execute on any type of computer. Further, as described in Applicant's specification at page 22, lines 26-27, <u>such computer program(s) can be an applet written in the Java programming language.</u> <u>One of skill in the art of writing computer programs in the Java programming language</u> and, if appropriate for the system being implemented, with knowledge of relevant operating system characteristics (as could easily be obtained by such skilled person) can readily write <u>such applets</u> in view of the detailed description in Applicant's specification . . ." (October 22, 1999 Response to Office Action, p. 12, Jt. App., Tab Q, JA00224)(emphasis added).

Simply put, the only "structure" that can be identified to carry out the functions of the alleged invention is an empty Java Applet, which has to be filled by the programmer with some unexplained selection of Java code, including certain unidentified pre-existing Java methods. Because the patentee failed to make a full and complete disclosure of what actually goes into the Java Applet, or what other programming technique might have been used in place of a Java Applet, there is insufficient "corresponding structure" for all of the means-plus-function clauses that the specification describes as relying upon a Java Applet. (JCCC, Table 2, Rows 1-23; 29-33) Accordingly, each and every one of those elements – and the claims in which they are found – are indefinite under 35 U.S.C. § 112(1).

## B.    Netratings Has Failed To Identify The Corresponding Structure

In its portion of the Joint Claim Construction Chart, NetRatings has failed to meaningfully identify its interpretation of the structure that corresponds to the '637 means-plus-function claim elements. Instead, NetRatings repeatedly provides a boilerplate definition that merely invites the Court and the jury to go digging through the patent to try to find -- and then synthesize -- an understanding of the corresponding structure:

> "A set of computer instructions as described in the specification sections

cited below, which can be embodied in one or more computer programs, which cause one or more computer systems to perform the recited function, and which can be implemented using any appropriate computer language, and all structural equivalents of such set of computer instructions." (*E.g.*, JCCC, Table 2, No. 1)

For each element, NetRatings then provides a string cite to the '637 patent specification, without any further explanation of the cited sections. Thus, NetRatings itself is unable to state in words what the corresponding structure actually is. By failing to do so, NetRatings seems to acknowledge the strength of Coremetrics' position – namely, that the '637 patent has column after column of "disclosure," but in the end, says nothing more than "write a Java Applet and fill it with some unspecified Java methods, that somehow download some content and then observe what is visible to the user on the computer screen."

NetRatings' proposal should also be rejected because it violates the Federal Circuit's mandate in *WMS Gaming*, 184 F.3d at 1348-49 and *Harris*, 417 F.3d at 1253. Specifically, NetRatings completely fails to identify what it believes is the algorithm that allegedly corresponds to each of the "means for" claim elements. As such, NetRatings' claim construction proposal, on its face, cannot be correct.[4]

### C.    The Term "Characteristic" Is Indefinite

Several of the claims of the '637 patent use the fatally indefinite term "characteristic." As the '637 patent Examiner stated in his first Office Action on March 3, 1999:

"Claim 12 [sic -- 11] is rejected under 35 U.S.C. 112, second paragraph, as being incomplete for indefiniteness " . . . means for monitoring the change in time of a characteristic of the content display . . .". This characteristic should be defined (e.g., position, or shape, or color . . .). Appropriate correction is required." (Jt. App., Tab M, JA00144)(emphasis in original).

In responding to the rejection, the patentee argued that the term was not indefinite, simply

---

[4] In its portion of the JCCC, Coremetrics has asserted that these claims are indefinite, non-enabled, and invalid for failure to disclose the best mode. Coremetrics accordingly is not surprised that NetRatings cannot identify the complete algorithm that corresponds to these "means for" clauses, because the complete algorithm does not appear anywhere within the patent. Thus, Coremetrics has identified, as corresponding structure, the only thing that arguably is corresponding structure – the generic, empty and unexplained Java Applet.

because the patentee believed that he was not obligated to recite a list of "characteristics" that can be monitored, because doing so might limit the scope of the claim. (Jt. App., Tab N, JA00160). Yet, the patentee made no effort to actually try to explain what the term "characteristic" actually meant, nor did he make any changes to the claim that the Examiner had rejected as indefinite.

Strangely, in his next Office Action, the Examiner dropped the objection, on the grounds that the claim had been amended. The file history has no record of any amendment being made, however, either to claim 11 or to any other claim with respect to the term "characteristic." (Jt. App., Tab O, JA00190). Thus, the Examiner clearly made a mistake and erroneously allowed claims to issue that he himself had identified as indefinite. This same indefinite term is now presented to this Court.

The definition of "characteristic" proposed by NetRatings does little to clarify the indefiniteness first identified by the Examiner. NetRatings suggests that this term should mean "a distinguishing attribute, element, trait, quality or property." (JCCC, p. 11). NetRatings further suggests that a "characteristic of a content display" should mean "a characteristic of any sensory image produced by a device or a characteristic of data used to produce a sensory image on a device." (JCCC, p. 11). Yet, this definition, when inserted into the text of claim 11, in brackets and bold, produces a claim so vague that it could be asserted to cover the act of watching <u>nearly anything</u> associated with what is shown on a computer screen:

> "A system for monitoring display of content by a computer system, comprising:
>
> means for monitoring the change in time of **[a distinguishing attribute, element, trait, quality or property of any sensory image produced by a device or a distinguishing attribute, element, trait, quality or property of data used to produce a sensory image on a device]**; and
>
> means for evaluating the change in time of **[a distinguishing attribute, element, trait, quality or property of any sensory image produced by a device or a distinguishing attribute, element, trait, quality or property of data used to produce a sensory image on a device]** to produce monitoring information regarding display of the content."

Thus, this simple example shows that the term "characteristic" is so vague that it is indefinite. Further, even with NetRatings' proposed definition, one of ordinary skill in the art

would have no understanding as to what this claim covers, and what it does not cover. (Klausner ¶ 10). Accordingly, the Court should hold that the term "characteristic" is indefinite and decline to provide a definition for this term.

### D.    The "Instructions For" Claim Elements Are Governed By 112(6)

In addition to the "means for" claim elements discussed above, the '637 patent also contains a number of claims with elements using the phrase "instructions for." Each "instructions for" limitation defines a function to be performed rather than the structure used to perform it, and accordingly should be construed under 112(6).

The reasons for such a construction are as follows. First, the patentee has used the terms "means" and "instructions" interchangeably in the claims. Second, both the patentee and the '637 patent Examiner treated the terms "means for" and "instructions for" as interchangeable during prosecution of the patent. Third, the "instructions" claims cannot be structural because one of ordinary skill in the art would not, by the nature of the word, know what structure the patentee sought to claim. Fourth, the limitations of all of these claims derive solely from the functional expressions following the terms "means" or "instructions," not from those terms themselves. This is emphasized by the fact that the patentee's arguments for patentability all focused on functional, not structural, differences with the prior art. Accordingly, the only way to prevent NetRatings from improperly claiming all conceivable means or "instructions" that perform the recited functions is to confine all of the claims – whether drafted using the word "means" or the word "instructions" – to the generic and unexplained Java Applet disclosed in the specification.

#### 1.    "Means" And "Instructions" Are Used Interchangeably In The Patent Claims

The parties agree that the elements of the '637 claim that recite a "means for" performing a function, without recitations of structure, are properly construed under 112(6). (JCCC, p. 14). For example, in claim 11, NetRatings claims a "system for monitoring display of content by a computer system" in terms of two "means" for performing specified functions. Yet, in claim 57, NetRatings appears to claim the same invention by swapping out the term "means"

14

for the term "instructions."

As stated by the district court in *Mas-Hamilton Group v. LaGard, Inc.*, 21 F. Supp. 2d
700, 724 (E.D. Ky. 1997), and implicit in the approach adopted by the Federal Circuit in
affirming the district court's ruling, a patentee's interchangeable use of "means" and a similarly
generic term suggests that claims incorporating the latter also should be construed as means-
plus-function claims:  "The claims of the '656 patent also use the terms 'means' and 'element'
interchangeably.  These terms are all used to describe the same mechanical structure, and should
therefore be construed in the same way under §112, ¶ 6."  *Id.*  (citations omitted).  Just as "lever
operating means" and "lever moving element" were used interchangeably in *Mas-Hamilton*, so
here NetRatings uses "means" and "instructions" interchangeably to introduce the same claimed
functions:

| Claim 11 | Claim 57 |
|---|---|
| A system for monitoring display of content by a computer system comprising: | A computer readable medium encoded with one or more computer programs for enabling monitoring of the display of content by a computer system, comprising: |
| means for monitoring the change in time of a characteristic of a content display; and | instructions for monitoring the change in time of a characteristic of a content display; and |
| means for evaluating the change in time of the characteristic of the content display to produce monitoring information regarding display of the content. | instructions for evaluating the change in time of the characteristic of the content display to produce monitoring information regarding display of the content. |

This juxtaposition is particularly revealing because the patentee designed the functional
expressions in claim 11 to be limitations of means-plus-function claims, with the term "means"
as a generic reference for whatever corresponding structure may have been disclosed in the
specification.  In other words, the elements of claim 11 were drafted so as not to provide
structure.  Had claim 11 recited definite structure, it would not have been entitled to treatment
under 112(6).  *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996).  Replacing the
generic term "means" by the equally generic term "instructions" cannot create definite structure

where before there was none.[56]

### 2. The Terms "Means" And "Instructions" Were Used Interchangeably During Prosecution

During prosecution, both the patentee and the Examiner regularly used the terms

"means" and "instructions" interchangeably.  As the patentee stated:

> "Claims 11 and 57 <u>each recite means or instructions for</u> 'monitoring the
> change in time of a characteristic of the content display.'" (Jt. App., Tab
> N, JA00169)(emphasis added).

> "Further, Claims 11 and 57 <u>each also recite means or instructions for</u>
> 'evaluating the change in time of the characteristic of the content display
> to produce monitoring information regarding display of the content.'
> (<u>Id.</u>)(emphasis added).

Similarly, the Examiner treated the "means for" and "instructions for" claims together,

both during his rejections based on prior art, and his eventual (incorrect) allowance.  In one of his

rejections he states:

> "[The prior art reference] disclose a system/method/computer-readable
> medium for monitoring displays by a computer system, comprising:

> instructions for causing the content to be displayed by a computer
> system . . .

> <u>means/step/instructions for</u> monitoring a position/a change in time of an
> image on a computer system . . .

> <u>means/step/instructions for</u> evaluating/comparing/judging a position/a

---

[5] In *Mas-Hamilton*, both the district court and the Federal Circuit followed a similar approach, first construing a conceded "means" claim ("lever operating means for positively driving said lever toward said cam"), and then construing as means-plus-function a contested claim that substituted "lever moving element" for "lever operating means" ("lever moving element for...engaging the protrusion of the lever with the cam"). 48 U.S.P.Q.2d at 1015-17.  The court reasoned that "the limitation's language does not provide any structure.  The limitation is drafted as a function to be performed rather than definite structure or materials." *Id.* at 1016-17. Contrary to the patentee's assertion, "lever moving element" and "movable link member" do not have a generally understood "structural meaning in the art." *Id.*  Most important, unless §112, ¶ 6, were applied, the claims would be so broad they would improperly cover "every conceivable way or means to perform the function of moving a lever." *Id.* at 1017.

[6] Because of the number of claims at issue, it is not feasible to discuss each disputed "instructions for" element in detail.  However, a comparison of the "means for" and "instructions for" terms in the JCCC shows identity in the functional language of many claims, and substantial similarities in most others.

change in time of an image on a display screen." (Jt. App., Tab M, JA00146)(emphasis added).

Further, in his reasons for allowance, the Examiner even went so far as to not even mention "instructions" separately, despite the fact that he calls out, by claim number, claims that contain the "instructions for" claim elements:

> "The independent claims 1, 11, 13, 18, 30, 36, 42, 48, 57, 59, 64-65 are patentable [sic] distinct over the closest prior art . . . because there is no expressed teaching in this reference for a computer readable medium encoded with programs for enabling monitoring of displayed contents by a computer system in which said contents are displayed in response to a content display instruction that is provided from a source external to said computer system and not part of said monitoring programs, comprising a means for:
>
> - evaluating a position / (a change in time) of a content display, using a specific way of accomplishing such evaluating as described in this applicant's specification." (Jt. App., Tab R, JA00232)(note identification of "instructions for" claims 57, 59 and 64-65).

In other words, throughout the examination process, the Examiner consistently treated both the "means for" claims and the "instructions for" claims as governed by 112(6). So should this Court.

### 3. One Of Ordinary Skill In The Art Would Not Understand "Instructions" As A Known Structure

In computer parlance, an "instruction" is no more than a statement written in a computer programming language that tells a computer to do something. (Klausner ¶ 11). However, this term does not, by itself, tell one of ordinary skill in the art at the time of filing of the patent what the computer is supposed to do or how it is supposed to do it. The term "instructions" does not identify any particular programming language, does not identify any type of instruction (e.g., an "if-then" or an assignment statement), and does not identify any sequence in which tasks should be undertaken as part of those "instructions." (Klausner ¶ 11). In computer programming, the term "instruction" is no more descriptive of a particular structure than "device" or "mechanism" would be in the mechanical arts. (Klausner ¶ 11). Also "instructions" has no dictionary definition conferring "definiteness of structure." (Klausner ¶ 11). Thus, to one of ordinary skill in the art, the term "instructions" does not inherently describe any structure. (Klausner ¶ 11).

In contrast, in *Personalized Media*, 161 F.3d 696, the court held that dictionary definitions of "detector" demonstrated it was "connotative of structure, including a rectifier or demodulator." "Instructions" is not like a "detector" but more akin to "[g]eneric structural term[s] such as 'means,' 'element,' or 'device,'" which the court in that case recognized call for interpretation under 112(6). *Id.*

Additionally, the only further elaboration on the "instructions" in claim 57, for example, is that they are part of "one or more computer programs for enabling monitoring of the display of content by a computer program . . ." -- *i.e.,* more functional language. Just as in *Mas-Hamilton*, each "limitation is drafted as a function to be performed rather than definite structure or materials." 48 U.S.P.Q.2d at 1016.

Finally, even if "instructions" were deemed to provide some structure, the predominance of the functional aspects of the claim elements would require application of 112(6). "The recitation of some structure in a means plus function element does not preclude the applicability of section 112, ¶ 6." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed. Cir. 1991). If "the element is set forth, <u>at least in part,</u> by the function it performs as opposed to reciting the specific structure, material, or acts that perform the function," then § 112, ¶ 6, is usually applicable. [*MPEP* §2181 at 2100-177 (emphasis added) (Sadasivan Decl., Ex. 1)]. Accordingly, the term "instructions" provides no recognizable structure and should be treated under 112(6).

### 4. The Limitations And Patentability Arguments All Derive Solely From Functional, Not Structural, Expressions

An examination of the "instructions for" clauses all reveal something in common – they all derive their differences from one another based on their functional requirements, not any structural limitation. By way of explanation, in claim 57, the two "instructions for" claim elements says what the instructions should do, but they do not say how that makes the instructions physically different – *e.g.,* how they might look different, be organized differently, or be treated differently by different computers.

This point is also borne out by the fact that during prosecution, the patentee's

patentability arguments all focused on functional differences, not structural ones. For instance, in response to the Examiner's prior art rejection based on Curran (UK Patent App'l GB 912418805, Jt. App., Tab V), the patentee argued that the claimed invention (including as claimed in the "instructions for" claims) accomplished a different result ("monitoring of the display of content" vs. "screen capture") using a different way (not using a pixel control signal). (Jt. App., Tab N, JA00164-165). These are inherently "functional," not structural, arguments.

Not once during prosecution did the patent applicant rely on structural differences from the prior art to support patentability of the apparatus claims. The file history fails to shed light on what structure, if any, is recited in the "instructions for" claims as each and every distinction over the prior art was based on functional limitations.

Finally, 35 U.S.C. § 112, ¶ 2 requires that, given competing claim construction choices, the narrower construction must be selected even where both choices are equally tenable. *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1537 (Fed. Cir. 1996). In this case, assuming *arguendo* that there is any support for the proposition that "instructions" connotes structure, the mandate of *Athletics Alternatives* is met by construing the "instructions for" claims in accordance with 112(6).

## IV. THE '510 AND '680 PATENTS

### A. Coremetrics' Definition Of "Local Computer Use Meter / User Meter" Is Correct

The dispute over the term "local computer use meter / user meter" demonstrates again the parties' different approaches to claim construction. Coremetrics follows the bedrock principle that claim terms should be given their ordinary meaning as viewed in light of the intrinsic record, while NetRatings offers a vague paraphrase that is only loosely anchored to the patent specification. It is worth noting at the outset that the phrase "local computer use meter / user meter" is not a term of art and has no special meaning in the field. Coremetrics accordingly reads the term in light of the patent specification and proposes the following definition: "a device within the client computer that monitors and records occurrences that cause operating system software, such as Microsoft Windows, to generate an internal message as a direct result of a call

to an operating system function." (JCCC, p. 1).  Analysis of the '510 and '680 specifications show the accuracy of this definition.

As the "Summary of the Invention" section of the patents explains:

"According to the invention, a system may be provided to intercept and monitor operating system messages.  Such messages may be targeted instructions to various applications or operating system overhead messages.  Such messages may be generated internally by the operating system software, such as the Microsoft Windows operating environment.  A system according to the invention may filter through a vast array of messages and capture only specific messages, such as those which indicate a change of focus from one application to another.  These changes in focus may include but are not limited to an application launch, the termination of an application, switching resources from one application to another, minimizing an application or restoring an application.

According to the invention, operating system messages may be intercepted and relevant messages may be recorded in a log file, along with other pertinent or useful information." ('510 Col. 1, ln. 50-67, Jt. App., Tab A, JA00006).

This general explanation of the computer use meter invention is elaborated upon, but not modified, in the detailed description.  Figure 2 of the patents demonstrates that the "local computer use meter" is a complex piece of software, which is intimately linked to – and able to intercept and record messages generated by – the computer's operating system.  As the specification explains:

"FIG. 2 shows a computer use meter according to the invention with a representation of information and data flow installed in an IBM-compatible personal computer operating in the Windows environment.  The windows environment internally generates messages used by various modules to manage the operation of the computer and allocate its resources." ('510 Col. 5, ln. 64-67, Jt. App., Tab A, JA00008).

"As shown in FIG. 2, the main operating module of the computer use meter is identified as RITA and operates within its own window.    The Windows user module generates application-specific messages . . . .  [The] RITA module monitors these messages for commands invoking the RITA application main window.  * * * During operation of the personal computer, the Windows user module generates Windows call-back or "CBT" events.  Certain specific events are intercepted by the HOOKS DLL module and transmitted to the RITA main module.  Upon receipt of such messages, the RITA main window sends certain messages to the RITA logging subsystem." ('510 Col. 6, ln. 14-31, Jt.

App., Tab A, JA00008).

Thus, the plain teaching of the patents' specification demonstrates that the "invention" *i.e.*, the computer use meter, is a software module that is designed to carry out a very specific way of monitoring the use of a personal computer. Namely, the computer use meter monitors, and then records, selected occurrences of operating system messages that are created as a result of "callbacks" that occur when the computer user does certain things, like open a new application window. This concept is captured by Coremetrics proposed definition.

In contrast, the broad definition proposed by NetRatings -- "a software program designed to collect information regarding the use of other software programs on a computer on which the software program is installed" (JCCC, p.1) – finds no support in the intrinsic evidence. Indeed, NetRatings' definition completely ignores the concept of monitoring messages from the operating system (as opposed to some other part of the computer), which the patent specification describes in painstaking detail. NetRatings' proposal must be rejected as inconsistent with, and unsupported by, the intrinsic record.

**B.      Netratings' Definition Of The "Log Of Predetermined Events" Is Simplistic And Omits Key Limitations**

With an understanding of the basic operation of the "computer use meter" in hand, it becomes apparent that NetRatings' definition for the "log" that the computer use meter creates is overly simplistic and omits key limitations. Based on the plain and ordinary meaning of the term "log" and teaching of the patent specification, the "log of predetermined events" created by the computer use meter must: (a) have two or more time sequential entries of pre-selected events; (b) have two or more attributes associated with each entry; and (c) be saved on the user's hard drive. Coremetrics' definition accomplishes all three of these key points. (*See* JCCC, p. 2).

In considering the proper definition, it is useful to look at an example of what the patents themselves term a "log:"

| 00001 | 05/25/95 | 10:40:27 | METER | 1234561 0000 | [D=2.00-02] |
| 00002 | 05/25/95 | 10:40:27 | PANEL | 1234561 0000 | [D=John Doe] |
| 00003 | 05/25/95 | 10:40:27 | START | 1234561 0000 | [D=ini StartTask=1 EndTask=1 Minimize=2 Maximize=1 Activate=1 Restore=1 Running=1] |
| 00004 | 05/25/95 | 10:40:27 | RUNNG | 1234561 2a96 | [D=C:\DOS\MOUSE\POINTS R.EXS] [T=Pointer Options] [S=10432] |
| 00005 | 05/25/95 | 10:40:27 | RUNNG | 1234561 201e | [D=C:\WINDOWS\NETDDE.E XS] [T=NetDDE] [S=82432] |
| 00006 | 05/25/95 | 10:40:27 | RUNNG | 1234561 1f6e | [D=C:\WINDOWS\SYSTEM\ DDEML.DLL] [S=39424] |
| 00007 | 05/25/95 | 10:40:27 | RUNNG | 1234561 0736 | [D=C:\WINDOWS\SYSTEM\ USER.EXE] [S=264096] |
| 00009 | 05/25/95 | 10:40:27 | RUNNG | 1234561 37de | [D=C:\HH\HH.EXE] [T=HH] [S=55656] |

As can be seen, this example log plainly shows multiple entries (the rows) each corresponding to an occurrence at a specific date and time, and multiple attributes for each entry (the columns). The text of the '510 and '680 patent specifications also show that the "log" must have multiple entries, and that each entry in the log must have multiple attributes:

> "Each event that is logged requires construction of a log entry as described below. Each entry will include an operation code indicative of the type of event being logged." ('680, Col. 8, ln 1-3, Jt. App., Tab C, JA00045)

If the log was not meant to contain more than one entry, this description would not have referred to "each entry" but would instead have referred to "the entry." The patents go on to explain:

> "The entries into the log file will advantageously include at least date, time, household ID number, individual within the household using the computer, the handle to the instance of the parent application, the parent application's current Window title, and the child Windows title." ('510, Col. 2 ln. 29-34, Jt. App., Tab A, JA00006)(emphasis added).

> "The log file may use a fixed column format to store data. The first column may contain a logging sequence number that may be used for post processor parsing. The log file may also include columns for a date stamp and a time stamp to be applied to each record." ('680 Col. 8, ln. 24-29, Jt. App., Tab C, JA00045).

> "As can be seen from the log entry table, each entry includes a sequence number, date stamp, time stamp, operation code or event type, and data field." ('680 Col. 9, ln. 67- Col. 10, ln. 66, Jt. App., Tab C, JA00046).

These passages, in addition to emphasizing that the log is made up of multiple entries, also demonstrates that each entry is made up of multiple attributes. If this were not the case, the specification would never need to address the idea of having a separate column for each attribute because there would only be one column. Further, there is no suggestion or statement, anywhere in either patent, that the "log" could be limited to a single entry, or that a single entry could be limited to a single attribute.[7]

Coremetrics' definition of "log" also includes the requirement that the log must be saved on the personal computer's hard drive. This requirement is also well supported by the specification. The following three quotes each illustrate the need for the log to be saved on a hard drive in a different way:

> "The data compression and encryption system may advantageously be provided to minimize the memory resources which must be allocated to storage of the event log . . ." ('680 Col. 3, ln. 17-22, Jt. App., Tab C, JA00043).

> "Upon application start up, a START operation code log entry is made which records configuration information in the data field. According to an advantageous embodiment, the computer use meter is automatically minimized after start up." ('680 Col. 11 ln. 9-14, Jt. App., Tab C, JA00047).

> "The computer use meter and its supporting software may from time to time undergo system updates. These updates are intended to add features to the software and to correct any system bugs. Each panelist will be contacted on a fixed cycle, advantageously once per month, for the purpose of collecting the prior month's logged activity." ('680 Col. 3, ll. 40-45, Jt. App., Tab C, JA00043).

First, inferentially, unless the log is stored on a hard drive, there is simply no reason to compress the log to minimize the "memory resources," *i.e.*, hard disk space, that is occupied by the log. Next, if the computer use meter, as well as the log, is in existence when the computer is started up, and presumably before the computer makes any connection to the Internet, then both

---

[7] Even the extrinsic evidence definition cited by NetRatings during the meet and confer process supports the common sense requirement that a log is intended to have multiple entries: "A record of computer operating runs, including tapes used, control settings, halts, and other pertinent data." (Sadasivan Decl., Ex. 3).

the computer use meter and the log had to be saved on the computer's hard drive. Third, because

the patentees contemplate updating the stored use meters and then collecting the "logged activity"

on a regular basis ("advantageously once per month") it is apparent that the use meter and the log

must reside in a long-term memory – namely a hard drive. Again, common sense dictates that a

log containing multiple entries, stored over a period of time, is only useful if it is retained in a

long-term storage device and is retrievable at a later point in time.

Proper construction of the term "log of predetermined machine operation events" also

requires a determination of what a "machine operation event" is, and what other kind of

"predetermined events" could be meant besides "machine operation" events. A "machine

operation event," of course, refers to the intercepted operating system messages discussed above.

By implication, when the '680 patent uses the phrase "log of predetermined events" it must mean

something broader than just a log of the machine operation events discussed above. The

additional non-machine operation events that can be logged, and which are included in this

phrase, are explained by the '680 patent as follows:

> "In addition, it is an object of the invention to monitor and log certain
> external communications. The local meter application will monitor
> strings of characters sent to a communication port such as a modem.
> The system may be set to monitor for certain predetermined character
> strings and log certain information upon occurrence of such strings. If
> for example, the system detects a "http:" string, then the system will
> recognize that what follows should be the remainder of a Universal
> Resource Locator (URL) for a hypertext protocol site on the Internet's
> World Wide Web. If the local meter application identifies a URL, it
> will intercept and log the full URL." ('680, Col. 2, ln. 41-52, Jt. App.,
> Tab C, JA00042)(emphasis added).

> "In the Windows operating system, each displayed window is made up
> of a number of display elements. The display elements include inter alia
> edit boxes and buttons. According to a preferred feature, the content of
> edit boxes may be examined. If the content is consistent with a
> predetermined criteria, the content will be logged. For example, it is
> assumed that, if the content of an edit box is consistent with the syntax
> of a URL, then the window corresponds to an internet browser program.
> Logging the content of the edit box will be indicative of the user's
> access of documents on the internet." ('680, Col. 11 ln. 51-61, Jt. App.,
> Tab C, JA00047)(emphasis added).

Thus, the patent teaches that the "log of predetermined events" of the '680 patent also

includes: (a) intercepted character strings sent to a communication port or entered into an edit

box; which (b) were identified in advance, by the designer of the computer use meter, as strings

to be intercepted and logged. Coremetrics' definition includes and explains this aspect of the

phrase "log of predetermined events" (*see* JCCC, p. 2).

### C.    "Identifies Character Strings Reflecting On-Line Activity"

After properly identifying the types of events that are entered into the "logs", the '680

claim phrase "identifies character strings reflecting on-line activity" is readily understood. The

phrase refers to those same intercepted character strings, from the modem or an edit box, that are

discussed above. Thus, Coremetrics' definition – "sets forth the character sequences that were

intercepted by the use meter while being sent to a communication port or entered into an edit

box" (JCCC, p. 5) – should be adopted. As with a number of its other proposals, NetRatings'

suggested definition for this term – "identifies a group of characters that reflect activity

performed online" (JCCC, p. 5) -- is overly broad and unsupported, because the patent

specification only identifies two very particular kinds of character strings, to wit, those captured

on the way to the modem or in an edit box. There is simply no support in the patents for any

other way to capture character strings, and adoption of NetRatings' proposed definition would

result in a claim scope far broader than anything that the named inventors of the '510 and '680

patents claimed to have invented.

### D.    "Logs / Logging" Is More Than Just "Recording"

The '680 patent uses the terms "logs" and "logging" as a way to describe a specific action

taken by the "local computer use meter." Coremetrics contends that the plain and ordinary

meaning of these terms is "enters/entering into a 'log'" (JCCC, p. 6), with the term "log" defined

as set forth above. NetRatings asserts, incorrectly, that this verb should simply be paraphrased as

"records" or "recording." (JCCC, p. 6). In doing so, it misses the fundamental idea that the use

meter program, which is taking this action, is not just recording that information anywhere, in a

random manner. Instead, the information is being placed in a specific file – a log – with other

time-sequential entries of similar information. (See the example "log," '680 patent, Col. 8-9, Jt.

App., Tab C, JA00045-46).  Accordingly, the Court should adopt Coremetrics definition.

**E.     Netratings' Definition Of "Installed" Lacks The Concept Of Permanence Inherent In That Term**

In keeping with the plain and ordinary meaning of terms, as viewed in light of the patent specification, Coremetrics has proposed the following definition for the term "installed" -- "resident on the hard drive of, and ready for execution by, the computer." (JCCC, p. 3).  This definition clearly sets out the common sense understanding of what it means to install computer software.

On the other hand, as with its definitions of many other terms, NetRatings' proposed definition of the term "installed" fails to include a key concept that is inherent in the given term. In this case, the NetRatings' definition fails to explain the idea that when a program is installed on a computer, the program has a measure of permanence and is not merely present for a single use or a temporary use.  NetRatings' definition merely says that "installed" is "placed on and ready for use by a computer" (JCCC, p. 3).  However, the '510 patent specification states:

> "The computer use meter and its supporting software may from time to
> time undergo system updates.  These updates are intended to add
> features to the software and to correct any system bugs. * * * * The data
> transfer program, delivered on whatever medium, may first check for
> any outstanding software upgrades.  If one is scheduled, then software
> will automatically be transferred to the panelist's computer." ('510,
> Col. 3, ln. 6-16, Jt. App., Tab A, JA00007).

As discussed above with respect to the permanence of the "log", the installed computer use meter would not need upgrades unless it is permanently located on the user's hard drive.  If the computer use meter was not on the user's hard drive, but was instead downloaded each and every time it was used, there would never be a reason for the computer use meter to be updated – the server would just download the latest version.  Coremetrics' definition addresses this inherent property of the term "installed" and should be adopted.

**F.     Coremetrics' Definition Of "Dictionary" Is Taken Directly From The Patent**

Continuing to stay true to the intrinsic evidence, Coremetrics proposes that the definition of the term "dictionary" be "a file containing entries used to correlate raw data to useful information." (JCCC, p. 3).  This definition is almost precisely the one that the patentees set forth

in the '510 patent specification, which states:

> "The central processing station may be a micro processor based
> computer and may utilize a variety of commercially available and/or
> custom developed data base management systems to manage the
> computer use data base and create a customized data dictionary. <u>The
> customized data dictionary is used to interpret the raw data provided by
> the event log files</u>." ('510 Col. 5, ln. 26-34, Jt. App., Tab A,
> JA00008)(emphasis added).

Because Coremetrics' proposed definition is perfectly consistent with the patent

specification, it should be adopted. In contrast, NetRatings again attempts to impermissibly

broaden the scope of this term beyond the patents' plain definition by suggesting that it should be

"a database or file containing entries used to interpret or correlate data." (JCCC, p. 3). In doing

so, it attempts to walk away from the plain teaching that the dictionary is intended to interpret not

just any data, but the raw data contained in a log of predetermined events.

### G. "Identify Titles Of Open Windows"

Coremetrics proposes that this term means "sets forth the full text that appears in the title

bars of open windows." (JCCC, p. 4). Coremetrics' definition is well-founded in both the patent

specification and the file history. As the patents state:

> "According to the invention, a meter application installed in a personal
> computer may log events for top-level Windows for any given
> application. Events which are specific to child Windows of an
> application may not necessarily be logged. For certain applications,
> additional detailed event logging for such child Windows will occur."
> ('510 Col. 2, ln. 21-35, Jt. App., Tab A, JA00006).

The patentees' intention that this phrase refers to the text of the title bar of the window

opened by the operating system was even emphasized by during the prosecution of the patent. As

the patentees explained:

> "The meters monitor the use of personal computers and log <u>the titles of
> the active or top most window</u>. This creates a log of events which
> reflects what software is receiving the attention of the computer
> processor. The title of the open window will reflect the title of any
> world wide web page that a user is viewing." (Response Under 37
> C.F.R. § 1.111, Jt. App., Tab F, JA00086)(emphasis added).

In contrast to this teaching, NetRatings' suggests that this phrase could mean that the log

should merely "contain characters" that identify open windows. (JCCC, p. 4). In doing so, it

impermissibly broadens the phrase well beyond anything that the patentees could even remotely claim to have invented.  Under NetRatings' construction, these characters would not have to be the title of the window and could instead be virtually anything – a short-hand version, a code, or any characters whatsoever – that somehow or another correspond to, or can be interpreted to determine the windows that are open.  This definition appears nowhere in the claim language itself, the specification, or the prosecution history, and should be rejected.

### H.    "Reflects A Log Of Titles Of World Wide Web Pages"

Coremetrics definition for this term is well supported by the specification and understandable – "includes two or more entries, each entry setting forth the full text that appears in the title bar of the browser window in which a world wide web page is displayed." (JCCC, p. 5).  Yet, as with the phrase discussed above, NetRatings tries to morph the phrase "reflects a log of titles of world wide web pages" into something much broader than what the patentees' intended.  As the prosecution history states:

> "The meters monitor the use of personal computers and log the titles of the active or top most window.  This creates a log of events which reflects what software is receiving the attention of the computer processor.  The title of the open window will reflect the title of any world wide web page that a user is viewing." (Response Under 37 C.F.R. § 1.111; Jt. App., Tab F, JA00086).

The patent specification is in accord:

> "The system according to the invention may advantageously collect child Window information for commercial on-line service providers and user applications.  Window titles of these applications' child Windows generally hold useful descriptions of the activity at that moment.  For example, if a subscriber is using the mail system for that service, then the Window title will so indicate.  The system according to the invention will record those titles in the log file." ('510, Col. 4 ln. 11-19 Jt. App., Tab A, JA00007)(emphasis added).

Despite this strong intrinsic evidence, NetRatings suggests that this term can be something as amorphous as a "reflects a record of characters useful in identifying world wide web pages." (JCCC, p. 5).  Yet, it is hardly clear what would constitute a "useful character" and or how a collection of them would identify a world wide web page.  This vague definition should be rejected, because the patent specification teaches otherwise.  The definition proposed by

Coremetrics is correct and should be adopted.

## I.    The Difference Between "Generating" And "Storing"

Finally, two groups of terms, which appear throughout most of the asserted patents, and which are addressed here for convenience, are "generate/ generates/ generating" and "stored/ stores / storing."  These two groups of terms must mean different things, as they are sometimes used in the same claim, such as in '510 Claim 11:

> "A method for determining the nature of computer use by a plurality of computer systems comprising the steps of:
>
> generating a log of machine operation events in each of a plurality of user computer systems;
>
> storing each of the events in said log in the local computer memory of said user computer systems; . . ." ('510, Cl. 11, Jt. App., Tab A, JA00011)(other claim elements omitted)(emphasis added).

This necessary difference is reflected in Coremetrics' definitions:

> generate/generates/generating – "creating and holding in temporary memory (RAM)" (JCCC, p. 5).
>
> stored/stores/storing – "copied/copies/copying to the hard drive of the computer" (JCCC, p. 4)

Logically, if something is "generated" in a computer, it must be held somewhere. Normally, this is in a computer's temporary storage, commonly known as RAM.  (Klausner ¶ 12). The concept of "storing," on the other hand, requires a deliberate and more permanent way of saving something.  On a modern personal computer, this usually is done on a hard drive. (Klausner ¶ 13).

In contrast to this straightforward approach, NetRatings offers:

> generate/generates/generating – "create/creates/creating" (JCCC, p. 5)
>
> stored/stores/storing – "placed/places/placing in memory or on a mass storage device." (JCCC, p. 4)

The principal differences are NetRatings' implicit suggestions that: (a) something can be generated without existing somewhere in the computer's memory; and (b) that storing could mean putting something in either "memory" or a "mass storage device," e.g., a hard drive, despite

the fact that once something has been generated, it will necessarily already be in temporary memory.[8] Because of these flaws, NetRatings' proposed definitions should be rejected.

## V.    THE '386 AND '155 PATENTS

### A.    The Phrase "Monitor Interaction . . . With At Least One Of The First Resource And One Or More Second Resources" Is Not A *Markush* Group And Instead Requires Interaction With Two Distinct Resources

Coremetrics takes the straightforward position that the phrase "monitor interaction . . . with at least one of the first resource and one or more second resources" means what it says. Namely, the phrase requires that the monitoring be of "at least two distinct 'resources.'"[9] NetRatings' incorrectly asserts that this key phrase in the independent claims of the '386 patent should be construed as a *Markush* group. As a result, NetRatings incorrectly argues for a dramatically broader scope for the claims of this patent than is warranted. Specifically, NetRatings argues that the phrase should mean: "monitor interaction through the user computer with a first <u>or</u> second resource." (JCCC p. 10)(emphasis added). Without putting too fine a point on it, NetRatings is attempting a legal maneuver to change the word "and," which appears in the claim, into the word "or" in NetRatings' definition. The Court should reject this blatant effort at litigation-inspired claim redrafting.

By suggesting that the phrase is a *Markush* group, NetRatings ignores the Federal Circuit's recent decision regarding the incorrect invocation of a *Markush* group. In *SuperGuide*, 358 F.3d at 886, the Federal Circuit explained that a *Markush* group requires a specific form and, if using the less common alternate form, it must use the word "or" to separate the distinct elements of the group. Thus, the phrase in dispute would be a *Markush* group **only if** it had been claimed as:

---

[8] NetRatings' definition would allow the act of holding something in RAM to qualify as "storing." This is nonsensical because everything in a computer is necessarily held in RAM at some point in its use. In other words, there would be no reason to claim the step of "storing" if that step were always and necessarily done in every possible use of a computer.

[9] Coremetrics notes that this plain meaning should also apply to the disputed phrase "choices being associated with at least one of the first resource and the one or more second resources." (JCCC, p. 10).

1.    "selected from the group consisting of the first resource and one or more second resources"; or

2.    "at least one of the first resource or one or more second resources"

In this example, the underlined language is critical to invoking *Markush* treatment. Instead of using either of these formats, the disputed claim element uses the word "and" to link the two portions of the claim, rather than the word "or." This word selection, while seemingly small, is determinative, and removes the claim element from the world of *Markush* claims. *Id.* As a result, there is simply no basis for NetRatings' assertion that this claim element should be construed to require monitoring interaction with either one or the other, *i.e.*, the first or second resource, rather than both. Accordingly, this phrase should properly be construed to mean "monitor the user's interaction with at least two distinct resources."

**B.     The "Embedded" vs. "Executable Program Not Being Part Of The Resource" Dichotomy**

The '386 patent and the '155 patent both have claims which relate to the logical location of the "tracking program" or "executable program" with respect to a downloaded resource, *e.g.*, a web page. Specifically, the '386 patent has claims which refer the "tracking program" as "embedded" in a downloaded resource. (See, '386 Claim 3, Jt. App., Tab D, JA00066). In contrast, all of the claims of the '155 patent include a limitation that the "executable program" which does the monitoring is "not part of the resource" that is downloaded by the user's computer. (See, '155, Claim 1, Jt. App., Tab E, JA00084). Relying on the plain and ordinary meaning and the intrinsic evidence, Coremetrics contends that these terms are opposites of one another.

Specifically, Coremetrics proposes that the term "embedded" means "entirely contained or encapsulated within" and that the phrase "executable program not being part of the resource" means "all of the pre-existing computational instructions of the 'executable program' are found entirely outside of the 'resource.'" (JCCC p. 9, 7). As the patent specification states:

"In accordance with the present invention, a tracking program is

31

embedded in a resource, such as an HTML document which is sent from a server to a client based on a TCP/IP request. The tracking program may originate on a different server than the resource, in which case it may be obtained by the client through a TCP/IP request to the other server." ('155, Col. 8 ln. 14-18, Jt. App., Tab E, JA00078).

"While in the preferred embodiment, the tracking program is embedded in an HTML document, those skilled in the art will recognize that other mechanisms are possible for embedding the tracking program in the client hardware, and the patent is not limited to implementation as an executable program embedded in an HTML document." ('155 Col. 8 ln. 45-50, Jt. App., Tab E, JA00078).

"Unless the tracking program is already resident in the client, it is embedded in the Web page and downloaded to the client along with the Web page." ('386 Col. 9, ln. 4-7, Jt. App., Tab D, JA00061).

Thus, the tracking program / executable program, can either be: (a) entirely inside of a resource (an HTML document / web page); or (b) it can be outside of the resource and be downloaded separately, or as the specification also suggests, it can be part of the computer's hardware.

In contrast, NetRatings seems to take the position that these terms are neither mutually exclusive, nor do they mean quite what they say. NetRatings suggests that the term "embedded" means "contained within or incorporated by reference." (JCCC, p. 9)(emphasis added). Similarly, NetRatings argues that the "not being part of the resource" limitation can simply be paraphrased to be "executable program not contained within the resource." (JCCC, p. 7). The key difference between the parties' positions on these two terms is, of course, NetRatings' suggestion that "embedded" can include something that is "incorporated by reference." This is inconsistent with the patent specification and patent law, because it would make these two limitations meaningless.

NetRatings appears to hang its argument on a suggestion in the specification that a URL link that identifies where the executable program can be downloaded from can be included in an HTML document. In other words, if the executable program is not part of the resource (the HTML document), the resource can include a link that will cause the client computer to go back to the Internet and fetch the executable program. NetRatings' error is in not recognizing that,

although the term "embedded" is used (imprecisely) in this portion of the patent, this embodiment falls under the concept of the program "not being part of the resource," rather than the concept of the program being "embedded." Indeed, the patents fail to show any other way that a program that is not part of a downloaded resource could be otherwise obtained. "Incorporation by reference" cannot be what the patent claim term "embedded" means. If it does, then the terms "embedded" and "not being part of the resource" become meaningless. For example, with NetRatings' definition, the tracking program could be "embedded" if it has all, some, or only one line of its code inside the HTML document, so long as the rest of the code is somehow incorporated by reference. Likewise, the tracking program could never be "not part of the resource" because without the URL link discussed above, the described embodiment is non-operational.

Thus, NetRatings has confused the two embodiments shown in these two patents. As a result, it has confused the appropriate definitions of each of these claim terms.

### C.    "Resource Use Data" Must Address Two Or More Actions Taken While Using A "Resource"

The definition of "resource use data" must include the fundamental concept that it describes or is derived from two or more actions taken by a user. Coremetrics definition accomplishes this – "information describing or derived from two or more actions taken by a user of a client computer while using a 'resource.'" (JCCC, p. 9). The patent specification strongly supports this definition when it describes the "simplest" version of the claimed invention – a timer for determining how long a web page is viewed:

> "In its simplest form, the tracking program is a timer program linked to an HTML document and is downloaded and executed on a client when the HTML document is served to the client in response to a client TCP/IP request. During or after the client formats and displays the Web page specified by the HTML document, the tracking program begins a software timer to monitor the amount of time the Web page is displayed on the client computer.
> When the user leaves the Web page (for example, by exiting the Web page or "clicking" on a link to another resource on the same or another server), the tracking program sends the monitored time to another computer on the Internet for storage and analysis." ('386 Col. 9 ln. 14-26, Jt. App., Tab D, JA00061).

Thus, even the "simplest form" of the alleged invention must take account of at least two actions taken by a user – (1) opening a web page; and (2) leaving it. Further, the definition of "resource use data" is based upon the notion of "tracking" being done by the tracking program. (see below). In other words, the tracking program captures the resource data, and the very concept of tracking requires monitoring a user's behavior over a period of time. Accordingly, at least two actions have to take place for there to be "tracking" and this requirement is reflected in the correct definition of "resource use data". In light of this clear intrinsic evidence and ordinary meaning, Coremetrics' definition should be adopted.

###### D.      "Client Identifying Indicia" Must Be Able To Link Two Actions To A Single Client Computer

Much like the term discussed above, the term "client identifying indicia" must be able to attribute two events or behaviors to the same client, as is achieved in Coremetrics' proposed definition – "any information that can be used to ascribe two or more events to the same client." (JCCC p. 7). In order to do something that could be called "tracking," the alleged invention has to be able to know that two different actions were both done by the same person, or at least the same computer. Again, in the simplest example, the program must be able to attach "client identifying indicia" like an IP address or a cookie ID, to the resource use data. In turn, "resource use data" must be two different actions, like opening and then closing a web page. NetRatings' definition omits this point and should be rejected.

###### E.      A User Must Activate An Input Device To Be A "User Action"

A "user action" should be defined as "the activation of an input device by a user." (JCCC, p. 8). As shown throughout the '155 patent, the term "user action" clearly contemplates having a user activate an input device, such as a mouse or keyboard. For example, Figure 6 includes a flowchart box which states "Monitor user action such as mouse clicks or keyboard entry." Similarly Fig. 5 includes a flowchart box which states "Initialize and wait for user action – e.g. mouse event."

In contrast, NetRatings' proposed definition – "performance of an action by a user" (JCCC, p. 8) – is no more than a meaningless paraphrase. Under NetRatings' proposed

definition, a user would not need to activate anything in order to perform an action. Indeed, to take NetRatings' definition to an extreme absurdity, a "user action" could have nothing to do with the user's computer at all. Therefore, based on the intrinsic evidence, the Court should adopt Coremetrics' definition.

**F.    The "Tracking Program" And "Executable Program" Must Operate Over Time And On The Client Computer**

Following the plain meaning and intrinsic evidence, Coremetrics proposes the following definition for "tracking program" – "a pre-existing sequence of computational instructions written in a programming language, intended and ready to be run in the client machine, for observing and recording a plurality of selected occurrences over time."[10]  (JCCC, p. 9).  The definition of "tracking program" offered by Coremetrics include two important limitations that NetRatings' definition completely omits:  (a) that the program observes and records the occurrences over time, *i.e.,* not just at a single distinct point in time; and (b) that it must operate on, or is intended to operate on, the client computer.

As the patent specification explains, the tracking / executable program must operate over time:

> "The tracking program downloads to the client, and, after performing any required initialization, determines the current time. The tracking program also determines the current time upon the performance of a predetermined operation on the client computer by a user, such as leaving the HTML document. After calculating the amount of time the user interacted with and displayed the HTML document, i.e., by determining the difference in time values, the tracking program uploads the calculated value to the server . . ." ('386, Col. 5, ln. 53-62)(emphasis added).

> ". . . the tracking program commences a software timer upon the detection of a predetermined user action. When the user performs another predetermined action, the tracking program

---

[10] Coremetrics notes that, while it has not explicitly included the notion of "over time" in the definition of "executable program" it is applicable nonetheless, due to the remainder of the claim language of the claims in which this term appears.  For example, '155 claim 1 recites ". . . an executable program to monitor use of the resource and generate data representing use of the resource by the first client . . ."  Thus, the "executable program" is clearly executing over time as it gathers resource use data.

<u>calculates the amount of time between the predetermined user</u>
<u>actions</u>, and sends this information, along with other available
client information, to the server." ('386, Col. 13, ln. 48-
55)(emphasis added).

"The tracking program monitors the time the information is
displayed and the amount of bits downloaded and automatically
transmits this information back to a server when the user leaves."
('386 Col. 17, ln. 11-14).

Thus, the patent clearly requires that the executable / tracking program is operating on an on-going basis and tracking user actions over a period of time. This is also clearly in accord with the common sense notion of "tracking" – observing the marks or tracks that someone or something makes. By analogy, a hunter could not track the path that an animal took if the hunter could only find one footprint.

The '386 patent Figures 3-7 all show that the "tracking program" or "executable program" must operate on the client computer – not the server. Figure 3 is illustrative:



**Figure 3**

The central box, labeled "client" in the lower left corner, is the user's computer, which interacts with one or more "servers" shown in the figure. Tellingly, the three lower action boxes in the "client" box state: "initialize and start tracking program," ". . . tracking program acquires

identifying indicia . . ." and "tracking program transmits data . . . ." The other figures similarly show the tracking program (also identified as an "applet" in Figs. 4, 6 & 7) as operating on the client computer – not on one of the servers, or any other computers. The patent specification also plainly states: "The tracking program executes on a client machine . . ." ('386 Col. 8, ln. 22, Jt. App., Tab D, JA00060). As such, the definition of both "tracking program" ('386 patent) and "executable program" ('155 patent) must address the requirement that this program is intended to be run on the client computer.

Both of NetRatings definitions fail to include this limitation. NetRatings suggests the following circular definition of "executable program" –"computer program that can be run on a computer." (JCCC, p. 6). NetRatings then suggests the following definition of "tracking program" – "computer readable code that monitors use of a computer." (JCCC, p. 9). These inconsistent and overly broad definitions should be rejected.

### G.     "Computer Usable Medium" / "Computer Readable Medium" Means A Single Storage Device

The similar terms "computer usable medium" and "computer readable medium" appear in the '386 patent and the '637 patent and should be construed the same, namely as "a single computer useable/ readable storage device." (JCCC, p. 10). The terms both appear in claim preambles and describe the claimed object on which certain computer code that practices the allegedly novel method is kept. The key point in dispute here is whether this claim term requires that all of the applicable computer code to perform that method must be stored on a single storage device, as Coremetrics contends, or whether it can be scattered across an unspecified number of different storage devices, as NetRatings contends. The format of the claim and the context in which the terms appear dictate the adoption of Coremetrics' position.

The format of the "apparatus" claims in which these terms appear, such as '386 Claim 13 and '637 Claim 65, supports Coremetrics' position. These claims seem to be intended to cover a situation in which an alleged infringer has saved a copy of allegedly infringing computer software onto a disk, for delivery or resale. Logically, this situation dictates that the computer software must all be saved together, on a single storage device, in order to perform the claimed steps. The

alternative – having the software scattered across as many different storage devices as the

patentee wants to accuse – does not make sense. Taking NetRatings' claimed definition of "one

or more devices on which data may be stored . . ." (JCCC, p. 10) to its extreme, the patentee

could presumably hunt and pick different code fragments from any number of different disks and

claim that, in conjunction, they could operate to carry out the functional requirements of the

claim. This cannot be right.

NetRatings' proposed definition is also belied by the context in which the terms appear.

For example, Claim 65 of the '637 patent requires "[a ]computer readable medium encoded with

one or more computer programs . . ." The '637 patentee clearly understood that he could write

his claim to include "one or more computer programs." NetRatings' implicit suggestion that he

could not have also prepared a claim directed to something like "one or more computer storage

devices" on which those programs were saved, is unsupportable. Accordingly, Coremetrics'

position should be adopted.

**H.    The "Program Code Which, When Executed . . . Causes The Computerized Device" Must Mean That The Entire Method Is Carried Out By One Computer**

In a dispute similar to the one discussed immediately above, NetRatings argues that

certain claim language which plainly requires that a single computer carry out all of the steps of a

method can instead be performed by as many computers as it chooses to identify. The claim

language states:

> "program code which, when executed on a computerized device, causes
> the computerized device to execute, in a computer network comprising
> one or more servers and one or more clients, a method." ('386 Claim
> 13, Jt. App., Tab D, JA00066)(emphasis added).

The plain meaning of this claim phrase dictates adoption of Coremetrics' definition –

"the program code that, when executed on a computer in a network, causes that computer to

perform the method set forth in the claim." (JCCC, p. 11). By its nature, the claim language

shows that the program code is executed on a "computerized device" which causes that particular

computerized device to execute the method described by the remainder of the claim. The fact

that the single computerized device in question is part of a network allows it to do some of the steps required, such as "downloading . . ." and "communicating . . . " However, nothing suggests that the method itself can be performed by multiple "computerized devices" as NetRatings asks. Accordingly, Coremetrics' position should be adopted.

### I.    "Data Representative Of A Plurality Of Preferences Of A User / Plurality Of Interests Of A User"

Here, NetRatings again ignores the plain meaning of a claim phrase and attempts to impermissibly broaden a claim term.  Coremetrics asserts that these phrases mean "information describing two or more items that a user favors over other alternatives" and "information describing two or more items that a user is interested in," respectively.  (JCCC, p. 8).  These definitions simply clarify that "data" is plural and requires two items of information, and that "preferences" and "interests" are both plural.  Rather than accept this straightforward approach, NetRatings seems to want these terms to be able to be a single piece of "information" from which a plurality of preferences or interests "can be determined."  This is not in accord with the plain meaning or the patent specification, nor is it logical, so both of NetRatings' proposed definitions should be rejected.

### J.    "Monitoring Input Device Events"

With this term, NetRatings suggests a definition containing a subtle twist that narrows the claims in which it is found.  Namely, NetRatings proposes the following definition:  "monitoring operations performed using an input device."  (JCCC, p. 9).  In doing so, NetRatings appears to implicitly limit the meaning of "operations" to be only those input device events that the tracking program is able to detect.  This is not what the patent teaches.  As shown in the lower right side of Figure 6, the tracking program must be able to "monitor user actions such as mouse clicks or keyboard entry."  The patent specification also explicitly states that:  "The tracking program may monitor operation of a peripheral input device connected to the client machine, such as a keyboard or mouse . . . ."  ('386 Col. 8, ln. 43-45, Jt. App., Tab D, JA00060).  Thus, Coremetrics' definition – "monitoring operations performed on an input device as they are performed" (JCCC, p. 9) – should be adopted.

## VI.     CONCLUSION

Based on the arguments and evidence provided above, as well as in the JCCC, Coremetrics respectfully requests that the Court adopt the Coremetrics' proposed claim constructions.

*Of Counsel:*

Robert T. Haslam
Nitin Subhedar
Bhanu K. Sadasivan
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, CA  94025
Telephone: (650) 324-7000
Facsimile: (650) 324-0638

Matthew C. Lapple
HELLER EHRMAN LLP
4350 La Jolla Drive, 7th Floor
San Diego, CA  92121
Telephone: (858) 450-8400
Facsimile: (858) 450-8999

Dated: April 17, 2006

168635.1

ASHBY & GEDDES

*/s/ Lauren E. Maguire*

_____
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Ave., 17th Floor
P.O. Box 1150
Wilmington, DE  19899
Telephone:  (302) 654-1888
Facsimile:  (302) 654-2067
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendant Coremetrics, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of April, 2006, the attached **DEFENDANT**

**COREMETRICS' OPENING MARKMAN BRIEF** was served upon the below-named

defendants at the address and in the manner indicated:

John W. Shaw, Esquire                                          <u>HAND DELIVERY</u>
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

Frederick L. Whitmer, Esquire                                 <u>VIA FEDERAL EXPRESS</u>
Brown Raysman Millstein Felder & Steiner LLP
900 Third Avenue
New York, NY  10022

                                        /s/ *Lauren E. Maguire*
                                        _____
                                        Lauren E. Maguire