## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
NETRATINGS, INC.,                                           
                                                            :
                                Plaintiff,
                                                            :
                                                                   Civil Action No. 05-cv-314-GMS
                        vs.                                 :
                                                            :
COREMETRICS, INC.,                                          
                                                            :
                                Defendant.
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## NETRATINGS, INC.'S ANSWERING BRIEF ON CLAIM CONSTRUCTION


John W. Shaw (#3362)                          Frederick L. Whitmer
Karen E. Keller (#4489)                       Seth H. Ostrow
Andrew A. Lundgren (#4429)                    Arianna Frankl
**YOUNG CONAWAY STARGATT**                    **BROWN RAYSMAN MILLSTEIN**
**& TAYLOR, LLP**                             **FELDER & STEINER LLP**
The Brandywine Building                       900 Third Avenue
1000 West Street, 17th Floor                  New York, New York 10022
P.O. Box 391                                  (212) 895-2000
Wilmington, Delaware 19899
(302) 571-6600


Dated: May 15, 2006

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT ..........................................................................................................................2

NETRATINGS' PROPOSED CONSTRUCTIONS SHOULD BE
ADOPTED BY THE COURT AND COREMETRICS'
PROPOSED CONSTRUCTIONS REJECTED ......................................................................2

A.    TERMS FROM THE '510 AND '680 PATENTS .....................................................2

     1.    *local computer use meter/user meter* ........................................................2

     2.    *log of predetermined [machine operation] events* ['510 and '680 patents];
         *log/logging* ['680 patent only] ................................................................4

     3.    *dictionary* ['510 patent only] ..................................................................7

     4.    *installed* .....................................................................................................7

     5.    *identify titles of open windows; reflects a log of titles of
         world wide web pages* ['510 patent only] .................................................8

     6.    *identifies character strings reflecting on-line activity* ['680 patent only] ..............9

B.    TERMS FROM THE '155 AND '386 PATENTS ......................................................10

     1.    *resource* ['155 and '386 patents]; *resource use data* ['386 patent only];
         *tracking program* ['386 patent only]; *embedded* ['386 patent only];
         *executable program* ['155 patent only]; *executable program
         not being part of the resource* ['155 patent only] .................................10

     2.    *client identifying indicia* ['155 patent only] ..........................................13

     3.    *user action(s)* ['155 patent only]; *does not require the active
         participation of a user* ['155 patent only];
         monitoring input device events* ['386 patent only] .................................13

     4.    *data representative of a plurality of preferences of a user;
         data representative of a plurality of interests of a user* ['155 patent only] ..........14

     5.    *monitor interaction through the client computer with* <u>*at least one of the first
         resource and one or more second resources*</u>; *choices being associated with* <u>*at
         least one of the first resource and the one or more second resources*</u> ['386 patent
         only] ...........................................................................................................15

C.    TERMS FROM THE '637 PATENT ..........................................................................18

     1.    *characteristic of a content display; content display; display of content* ..............18

D.    TERMS APPEARING IN CLAIMS ACROSS THE PATENT FAMILIES ...................19

     1.    *Stored/Stores/Storing; Generate/Generates/Generating* ........................19

i

2.    *computer usable medium/computer readable medium* ['386 and '637 patents];
      *program code which, when executed on a computerized device, causes the*
      *computerized device to execute, in a computer network comprising one or more*
      *servers and one or more clients, a method* ['386 patent only] .............................21

E.    APPLICATION OF 35 U.S.C. § 112 (6) TO THE '637 AND '510 PATENTS...............21

      1.    *Means Plus Function Terms* ................................................................21

      2.    "Instructions" Terms........................................................................26

            (a)    Coremetrics Fails to Overcome the Presumption that Exists Because of
                   the Absence of "Means For" Language in the Instructions Claims..........26

            (b)    "Instructions" is a Sufficiently Definite Structure to
                   Avoid Application of Section 112(6).......................................................28

CONCLUSION.....................................................................................................31

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Syntron Bioresearch, Inc.*,
   334 F.3d 1343 (Fed. Cir. 2003)..................................................................................23

*Affymetrix, Inc. v. Hyseq, Inc.*,
   132 F. Supp. 2d 1212 (N.D. Cal. 2001) ..........................................................26, 28, 29, 30

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*,
   73 F.3d 1573 (Fed. Cir. 1996)....................................................................................26

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002)...........................................................................3, 5, 9, 10, 13

*Fonar Corp. v. Gen. Elec. Co.*,
   107 F.3d 1543 (Fed. Cir. 1997)..................................................................................25

*Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*,
   423 F.3d 1343 (Fed. Cir. 2005)..................................................................................21

*Glaxo Group Ltd. v. Apotex, Inc.*,
   376 F.3d 1339 (Fed. Cir. 2004)..................................................................................23

*Inline Connection Corp. v. AOL Time Warner, Inc.*,
   302 F. Supp. 2d 307 (D. Del. 2004)..............................................................................3

*Joao v. Sleepy Hollow Bank*,
   348 F. Supp. 2d 120 (S.D.N.Y. 2004)...........................................................................17

*Johnson Worldwide Assocs. v. Zebco Corp.*,
   175 F.3d 985 (Fed. Cir. 1999)...................................................................................5, 7

*Laitram Corp. v. Rexnord, Inc.*,
   939 F.2d 1533 (Fed. Cir. 1991)..................................................................................27

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
   382 F.3d 1354 (Fed. Cir. 2004)..................................................................................26

*Mas-Hamilton Group v. LaGard, Inc.*,
   21 F. Supp. 2d 700 (E.D. Ky. 1997) ...........................................................................27, 28

*McGinley v. Franklin Sports, Inc.*,
   262 F.3d 1339 (Fed. Cir. 2001)..................................................................................19

*PHT Corp. v. Invivodata, Inc.*, No. 04-60,
      2005 U.S. Dist. LEXIS 9577 (D. Del. May 19, 2005) .................................................. 3

*Pfizer, Inc. v. Teva Pharms.USA, Inc.*,
      429 F.3d 1364 (Fed. Cir. 2005) ...................................................... 2, 6, 10-11

*Phillips v. AWH Corp.*,
      415 F.3d 1303 (Fed. Cir. 2005) ......................................................................... 26

*Rexnord Corp. v. Laitram Corp.*,
      274 F.3d 1336 (Fed. Cir. 2001) ..................................................................... 3, 5, 7

*Rhine v. Casio, Inc.*,
      183 F.3d 1342 (Fed. Cir. 1999) ......................................................................... 15

*SuperGuide Corp. v. DirectTV Enters., Inc.*,
      358 F.3d 870 (Fed. Cir. 2004) ..................................................... 15, 16, 17, 18

*WMS Gaming Inc. v. Int'l Game Tech.*,
      184 F.3d 1339 (Fed. Cir. 1999) ........................................................ 23-24, 25

## STATUTES

35 U.S.C. § 112 (6) .............................................................................................. *passim*

## PRELIMINARY STATEMENT

Plaintiff NetRatings, Inc. ("NetRatings") submits this Answering Brief in further support of its construction of terms from claims of the asserted patents in this action, as fully set forth in the Joint Claim Construction Statement filed on April 3, 2006.[1]  NetRatings demonstrated in its Opening Brief why the constructions it proposed should be the ordered constructions of this Court.  NetRatings demonstrates in this brief that Coremetrics' proposed definitions are repeated invitations to error.

Though giving lip service to the principles of claim construction set forth by the Federal Circuit, Coremetrics repeatedly violates those rules.  Without basis in the claims or intrinsic evidence, Coremetrics frequently imports limitations into the claims.  When it feels that those limitations are insufficient to solve its infringement problem, Coremetrics then proposes constructions that *exclude* specific embodiments of the claimed inventions.  Further still, Coremetrics regularly abandons the specification altogether, employing rank speculation, inference and "common sense" to narrow the scope of claims through manufactured limitations and extraneous detail.  Indeed, many of Coremetrics' proposed constructions don't even qualify as definitions in any meaningful sense.  Rather than defining what a claim term is, Coremetrics inserts in-depth details about how or where the particular claim element is stored in a particular part of a computer, or how it was created.  From a review of Coremetrics' proposed constructions and Opening Brief, one would think that there is no point to ever even having claims.

Ultimately, Coremetrics' definitional contortions are simply predicates for Coremetrics' apparent non-infringement positions, and neither legitimate nor sustainable claim constructions

---

[1]  The asserted patents are U.S. Patent Nos: 5,675,510 (the "'510 patent"); 6,115,680 (the "'680 patent"); 6,138,155 (the "'155 patent"); 6,763,386 (the "'386 patent"); and 6,108,637 (the "'637 patent").  Each asserted patent is annexed as Exhibits A-E to the Joint Appendix of Exhibits being filed herewith (hereinafter references to the Joint Appendix will follow the form: "JA Ex. __, p. __").  NetRatings' Opening Brief will be referred to herein as "NOB."  Coremetrics' Opening Brief will be referred to herein as "COB."

under prevailing law.  For the reasons set forth in NetRatings' Opening Brief, amplified here in the

context of refuting Coremetrics' efforts to confuse and obscure claim term meanings, NetRatings'

constructions should be the Order of this Court.

## ARGUMENT

### NETRATINGS' PROPOSED CONSTRUCTIONS SHOULD BE ADOPTED BY THE COURT AND COREMETRICS' PROPOSED CONSTRUCTIONS REJECTED

A.    **Terms From the '510 and '680 Patents**

    1.    *local computer use meter/user meter*

With Coremetrics' proposed construction of the "local computer use meter" and "user meter"

of the '510 and '680 patents, Coremetrics improperly places a construction on these terms that is

inconsistent with the specification in one way, and confined to only specific embodiments in another

way.  Coremetrics construes these terms as "a device within the client computer that monitors and

records occurrences that cause operating system software, such as Microsoft Windows, to generate

an internal message as a direct result of a call to an operating system function."  COB at 19-20.  The

use of the word "device" in Coremetrics' proposal, which implies hardware, directly contradicts the

description of the invention in the patent specifications, which make clear that the meter is a piece of

software – not a "device."  *See, e.g.,* '680 patent, col. 6, l. 32 – col. 7, l. 36.[2]  That a term cannot be

construed in a manner that would exclude the preferred embodiments is well-settled law.  *See Pfizer,*

*Inc. v. Teva Pharms. USA, Inc.,* 429 F.3d 1364, 1374 (Fed. Cir. 2005) ("A claim construction that

excludes a preferred embodiment . . . is 'rarely, if ever, correct.'") (internal quotations omitted).

The remainder of Coremetrics' construction is improperly confined to a specific embodiment.

Coremetrics does not and cannot show that this limitation is warranted under the law.  Coremetrics

---

[2] Coremetrics' obviously recognizes this, even though its construction states otherwise, when Coremetrics describes the meter in its brief as a "complex piece of software," COB at 20, and as a "software module." COB at 21.

simply points to related details in the specification and forces such details into its proposed construction. As set out by the Federal Circuit, and as recognized by this Court, there are only four ways in which an accused infringer can narrow the scope of the claims, none of which apply here.[3] Indeed, the specification makes clear that the embodiments described are exemplary only. The specifications of the '510 and '680 patents use language such as "according to an embodiment," "illustrates . . . an embodiment according to the invention" and "may be altered in various ways within the basic concept of the invention." '680 patent, col. 12 ll. 7-9; col. 5, ll. 46-47; col. 5, l. 44. *See, e.g., Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1345 (Fed. Cir. 2001) (rejecting argument that claims should be limited to examples in the specification where patentee made clear that invention was capable of other embodiments). As a result, Coremetrics' proposed construction not only includes what is arguably a synonym for the word "events" – "occurrences" – it then proceeds to enumerate various details about what those occurrences cause to happen in an operating system, internal messages, calls to functions, etc. The enumeration of these details serves no definitional purpose, but serves only to throw enough details in to make it arbitrarily more difficult to establish infringement.

NetRatings' proposed construction, on the other hand, correctly accounts for each aspect of the claim language and embodiments. In addition, and contrary to Coremetrics' criticisms (COB at 21), NetRatings construction is fully supported by the intrinsic evidence – beginning with the claim

---

[3] "First [is] . . .if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history . . . Second [is] . . . if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention . . . Third [is] . . . if the term 'chosen by the patentee so deprives the claim of clarity' as to require resort to the other intrinsic evidence for a definite meaning . . . [and] Last, as a matter of statutory authority, a claim term will cover nothing more than the corresponding structure or step disclosed in the specification, as well as equivalents thereto, if the patentee phrased the claim in step - or means-plus-function format." *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366-67 (Fed. Cir. 2002). *See also PHT Corp. v. Invivodata, Inc.,* No. 04-60, 2005 U.S. Dist. LEXIS 9577, at *3-5 (D. Del. May 19, 2005) (setting forth the four ways the presumption of ordinary meaning may be overcome, citing *CCS Fitness*); *Inline Connection Corp. v. AOL Time Warner, Inc.,* 302 F. Supp. 2d 307, 313-15 (D. Del. 2004) (same).

language – which Coremetrics regularly ignores – as well as using both the specification and the file history. Indeed, NetRatings' construction specifies that the "meter" is a "software program," as described in both the specification and the file history. *See* NOB at 14. NetRatings' construction also specifies that the meter is designed to collect information regarding use of other software programs, thus taking into account the "computer use" and "user" aspects of the disputed claim language, and the specification and file history. *See* NOB at pp. 14-15. Finally, NetRatings' construction accounts for the "local" aspect of the claim language in specifying that the meter collects information regarding other software programs that are on the computer on which the meter is installed. *See* NOB at pp. 14-15. By properly accounting for the claim language, NetRatings' construction explains generally what is described by specific examples in the specification. Coremetrics' construction, which excludes the preferred embodiments and limits itself to examples and extraneous details, must be rejected.

2.     *log of predetermined [machine operation] events* ['510 and '680 patents];[4]
       *log/logging* ['680 patent only]

Coremetrics persists in its campaign to unduly limit the claims, in this instance going well beyond described embodiments, with its proposed constructions for the patent terms involving the word "log." For example, Coremetrics argues that the claim term "log" must be construed as *requiring* "two or more time sequential entries," "two or more attributes associated with each entry" and "be saved on the user's hard drive" based on the "teaching of the patent specification." COB at 21. Coremetrics then points to an illustration of a log in the specification and argues that because "this *example* log plainly shows multiple entries . . . and multiple columns," COB at 22 (emphasis added), *all* possible "log" embodiments must have multiple entries and multiple columns. But the

---

[4] The phrase "log of predetermined machine operation events" appears in claim 1 of the '510 patent. The phrase "log of predetermined events" (without being limited to *machine operation* events) appears in claims 1, 4, 10-12, 15, 21 and 22 of the '680 patent.

specification expressly states that the embodiment described is just one example, explaining at one

point that the "entries in the log file will *advantageously* include . . ." '510 patent, col. 2, ll. 29-34.

Similarly, the specification states that the log "*may* use a fixed column format." Thus, it is clear that

the specification is describing examples – not specific limitations that must be imported into the

claims. *Rexnord*, 274 F.3d at 1345.[5]

Coremetrics' attempt to require that the log be stored on a hard drive is similarly misguided.

Initially, there is no reason to specify in the definition where the log is stored. Does the

identification of some set of data as a "log" really depend on where it's stored? Even less reason

exists for limiting that storage location to, very specifically, a "hard drive." The specification never

mentions a hard drive, much less that a "log" is only a "log" if stored on one. Coremetrics adds

these limitations, relying only on its *inferences* about embodiments described as *possible*

embodiments. For example, Coremetrics cites the data compression system described by the '680

patent and argues that "inferentially, unless the log is stored on a hard drive, there is simply no

reason to compress the log to minimize the 'memory resources.'" COB at 23. But the data

compression system is described as a "housekeeping" feature that "the meter application may have."

'680 patent, col. 3, ll. 17-22 (emphasis supplied). Moreover, Coremetrics' *inference* does not follow

from the specification in any event. First, the goal of minimizing "memory resources" can be met by

---

[5] Similarly, Coremetrics relies on a fact that the patent specification at one point refers to "each entry" in
the log rather than "the entry." COB at 22. This, of course, falls far short of the "reasonable clarity,
deliberateness, and precision" required to find that the patentee was providing its own narrower definition of a
log. *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 991 (Fed. Cir. 1999) (rejecting claim that
patentee had acted as his own lexicographer). The flaw in Coremetrics' argument is readily apparent when it
is taken to its logical conclusion; had the patent recited "the entry," Coremetrics would argue that claims
would not cover logs with more than one entry. Thus, according to Coremetrics, should a patentee wish to
claim both logs with only one entry and logs with multiple entries, the patentee must not only draft claim
language covering both – which Coremetrics concedes that NetRatings has done here, as otherwise
Coremetrics would not need to resort to the specification to limit the scope of the claims – but would also
need to describe both embodiments in the specification. This, of course, is exactly what the law does not
require; "a patentee need not describe in the specification every conceivable and possible future embodiment
of his invention." *CCS Fitness*, 288 F.3d at 1366.

minimizing any memory resources, not just hard drive memory. Here, as numerous times elsewhere in its brief, Coremetrics makes blanket statements about the way a particular aspect of computer technology "must" operate, with no support for its assertions. Just because Coremetrics' counsel says 'it must be so,' does not make it so.[6] Second, the optional data compression aspect of the invention discussed in the quote relied on by Coremetrics is elsewhere described in the specification, and in its proper context, as follows:

> According to an additional advantageous feature, the system includes automated file management functions. These functions are needed to keep the system from interfering with the efficient operation of the host computer. Event log files can grow quite large. *Keeping the log as small as possible may be important.* Data compression techniques may be utilized to reduce the size of the event log. In addition, the system according to the invention must maintain as passive a profile as possible. Thus, the automated installation and data transfer programs will reduce the interference with the use of the computer by the user and minimize the impact on any particular user.

'510 patent, col. 4, ll. 52-64; '680 Col. 5, ll. 21-31 (emphasis supplied).

Thus, as shown in the foregoing section, a desirable objective is to keep the log "as small as possible," "reduce the interference with the use of the computer by the user and minimize the impact on any particular user." A construction of the claim terms thus should account for all embodiments of the patent which would meet this stated objective, as NetRatings' proposed construction does – not prohibit them and add extraneous other detail, as Coremetrics' construction would. *Pfizer*, 429 F.3d at 1374 (claim construction should not exclude preferred embodiments).

Moreover, the specification repeatedly refers to various embodiments being described. It is not confining the claimed inventions to one particular embodiment. *See, e.g.,* '680 patent, col. 11, ll. 12-13 ("According to an advantageous embodiment . . ."); col. 11, l. 23 ("a further embodiment . .

---

[6] For instance, Coremetrics states that in order to collected logged activity, the "use meter and the log *must* reside in a long-term memory – namely a hard drive." COB at 24 (emphasis supplied). Yet Coremetrics provides no support for its absolute conclusion – there is certainly nothing in the patents that supports it, nor does Coremetrics find the support of its expert, or of any treatise or technical source. Such empty conclusions by Coremetrics should be rejected.

."); and col. 11, l. 49 ("Another embodiment . . ."). This makes plain that the specification simply describes a subset of the "various ways" the patented inventions can be embodied. *Rexnord*, 274 F.3d at 1345. Coremetrics' proposed constructions would jettison from the claimed inventions embodiments identified in the specification, in contradiction of established principles of claim construction.

For each of the foregoing reasons, and as set forth in NetRatings' Opening Brief, NetRatings' proposed constructions of "log/logging" and the "log of predetermined events [machine operation events]" should be adopted.

### 3.   *dictionary* ['510 patent only]

Coremetrics states that the patent provides a "plain definition" for this term. COB at 27. The patent does no such thing. What the patent does describe is what the dictionary can be used for ("to interpret the raw data provided by the event log files"). This is no more a definition than "may be used to write on" defines a "desk." In putative support for its limited construction, Coremetrics states that its construction is "perfectly consistent" with the patent specification. COB at 27. That is not the standard for narrowing claim terms by adding descriptive, but extraneous matter. It is not nearly enough to just be *consistent* with the patent – there must be a clear and unambiguous statement that a specific definition is intended. *Johnson Worldwide*, 175 F.3d at 991 (patentee only acts as own lexicographer where the alleged definition is set forth with "reasonable clarity, deliberateness and precision"). In this case, there is no such statement and Coremetrics' construction should be rejected.

### 4.   *installed*

Coremetrics intellectual dishonesty shines through in its arguments for its proposed construction of the term "installed." Coremetrics criticizes NetRatings' construction by arguing that it does not contain the concept of permanence Coremetrics' contends – without support – is required.

Yet, Coremetrics' own construction does not accomplish this purportedly necessary goal. Coremetrics' construction is "resident on the hard drive of, and ready for execution by, the computer." COB at 26. This construction contains no more of a permanent aspect than NetRatings' construction. In actuality, Coremetrics' argument is a red-herring. What Coremetrics is really trying to accomplish is to restrict the software program that performs the monitoring to installation in a particular component of a particular type of computer.[7] Coremetrics may believe that limitation serves its non-infringement positions, but the limitation is not supported by the intrinsic evidence. Coremetrics' construction should accordingly be rejected.

5.    *identify titles of open windows; reflects a log of titles of world wide web pages* ['510 patent only]

Coremetrics' proposed construction of these terms misses the entire point of these limitations – limitations which were added to the claims during prosecution and explained to the patent examiner in the context of explaining one of the primary objectives of the invention of the '510 patent. Specifically, the applicant for the '510 patent stated:

> The meters monitor the use of personal computers and log the titles of the active or top most window. This creates a log of events which reflects what software is receiving the attention of the computer processor. The title of the open window will reflect the title of any world wide web page that a user is viewing. **In this manner the computer use meter captures and identifies any world wide web pages which are being used by the user.** The log from a plurality of community of these meters are transferred to a central processing station which can process and analyze the use habits of the users. This information is very valuable to anyone who is interested in the nature and extent of computer use and access to the world wide web. In this manner for the first time access to the world wide web can be correlated with demographics of the users. As has been recognized by the Examiner, there has been a long felt need for such information. This need is satisfied by the invention.

---

[7] Coremetrics attempts to support its absolutist construction by reference to a section in the specification which describes an optional feature of the invention wherein the "computer use meter and its supporting software *may* from time to time undergo system updates." COB at 26 (emphasis supplied). First, the use of the word "may" makes it clear that this is not a required aspect of the invention. Second, even if this were considered a required aspect of the invention, the result would be a construction which included the concept of 'capable of being updated' or something along those lines. But Coremetrics' construction does not incorporate this concept at all.

JA Ex. F, at JA00088-89 (emphasis supplied).

Coremetrics' construction ignores this important, clearly stated objective of the patented invention. Rather, Coremetrics' proposed construction, "sets forth the full text that appears in the title bars of open windows," would include the identification of any text in a title bar of an open window – not necessarily that which would accomplish the objective of identifying the window, and thus, identifying what web pages users are visiting. NetRatings' constructions, "contains characters identifying open windows" and "reflects a record of characters useful in identifying world wide web pages" get to the real crux of the claim terms – that of *identifying* the windows and web pages.[8] They are also consistent with ordinary meaning, as explained in NetRatings' Opening Brief. Accordingly, NetRatings' constructions should be adopted by the Court.

### 6.    *identifies character strings reflecting on-line activity* ['680 patent only]

Coremetrics' proposed construction, "sets forth the character sequences that were intercepted by the use meter while being sent to a communication port or entered into an edit box," is the archetypal example of a defendant trying to narrow claim language just to avoid infringement. In one sense, the construction grabs details from a specific example from the specification of the patent, but fails to provide support for limiting the construction to those details. *CCS Fitness*, 288 F.3d at 1366 (accused infringer cannot "narrow a claim term[] . . . simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history"). Moreover, Coremetrics' construction is not definitional – it describes an example of *how* and *where* the strings are entered and collected, not of *what* they are. NetRatings' construction, "identifies a group of characters that reflect activity performed online," reflects the fact that the disputed term is not complicated and that the ordinary meaning of the term should control. Coremetrics argues that

---

[8] Oddly, Coremetrics criticizes NetRatings' construction for precisely this reason. Coremetrics argues that NetRatings' construction would encompass that which would "correspond to" or "can be interpreted to determine the windows that are open." COB at 28. Indeed, that is exactly the point, as clearly explained by the applicant in the file history.

this construction is too broad "because the patent specification only identifies two very particular kinds of character strings." COB at 25.[9] But Coremetrics has its burdens mixed up – it is Coremetrics that must show that there is a reason to narrow the ordinary meaning of character strings. *CCS Fitness*, 288 F.3d at 1366 (accused infringer has the burden of overcoming "heavy presumption" in favor or ordinary meaning in order to justify narrowing claims). NetRatings' construction is true to the specification examples *and* the claim language and should be adopted by the Court.

**B.    Terms From the '155 and '386 Patents**

    **1.**    *resource* ['155 and '386 patents]***; resource use data*** ['386 patent only]***; tracking program*** ['386 patent only]***; embedded*** ['386 patent only]***; executable program*** ['155 patent only]***; executable program not being part of the resource*** ['155 patent only]

       With respect to the term "resource use data," Coremetrics stays true to form in attempting to impose an unduly narrow construction on the claims. Coremetrics' construction that "resource use data" can only result from "two or more actions taken by a user," COB at 33, excludes numerous examples of resource use data described in the '386 patent specification that do not result from "two or more actions taken by a user." Its construction should therefore be rejected.[10] *See, e.g.,* '386 patent, col. 4, ll. 55-62 (the tracking program monitors many different things which may be singular instances and may not be a user "action" at all, such as "mouse events, keyboard events," "selections or links," and "the amount of data downloaded by the client"). "A claim construction that excludes a preferred embodiment is rarely, if ever, correct." *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1374

---

[9]  Here, again, Coremetrics confuses examples of how the character strings are collected with what the character strings are. Only the latter is at issue here.

[10]  In this case, Coremetrics does not identify or discuss its own construction of the term "resource." Coremetrics' construction is "a file, such as a web page or ad banner, that is located on a server and that is distinct from a tracking program or an executable program." *See* Joint Claim Construction Chart, dated April 3, 2006 (hereinafter "JCCC"), p. 6. Coremetrics' construction is unduly narrow in excluding the possibility that the resource being monitored might be something other than a file or might even be another tracking program or executable program.

(Fed. Cir. 2005) (rejecting as "improper" the accused infringers' proposed construction where it would exclude a preferred embodiment).

Coremetrics argues that the terms "tracking program" and "executable program" should include a requirement of observing and recording occurrences *over time*. COB at 35-36. This limitation is totally extraneous to the claim language and there is no basis for its addition. Coremetrics also argues that the programs must operate on client computers. COB at 36. NetRatings does not dispute this. Rather, NetRatings recognizes that this aspect of the patented inventions is addressed elsewhere in the claims. Adding such a limitation is both surplusage and inconsistent with established claim construction principles. Coremetrics' constructions, which build in other aspects of the claims, should be rejected.[11]

With respect to the terms "embedded" and "executable program not being part of the resource," Coremetrics argues that these terms are opposites of one another. From this, Coremetrics implies that this constitutes a difference between the '386 and '155 patents. COB at 31. Coremetrics is wrong. In fact, the terms are not mutually exclusive but, rather, as explicitly described in the '386 and '155 patents, share a common aspect: the ability to obtain the tracking or executable program through *a link* (or reference) to another network resource. In the context of the '386 and '155 patent specifications, the program is considered embedded in a resource, such as a Web page or HTML file, when it is contained within the resource or, as in the following examples, referenced through a link:

> In order to achieve the above-described and other objects and advantages, a tracking program is embedded in a file which is downloaded from a server to a client. The tracking program need not originate from the same server that sent the file, and may be obtained, for example, **via an embedded URL that points to a different server**.

'155 patent, col. 4, ll. 42-47; '386 patent, col. 4, ll. 47-52 (emphasis supplied).

---

[11] Coremetrics also argues that its construction is supported by "common sense" and an analogy to a hunter tracking animal paths. COB at 36. Whether this is common sense is debatable; that these are inappropriate bases on which to construe patent claims for an invention in the computer science context is not.

In one embodiment of the present invention **[an] HTML document** is stored in a server running an HTTP service and **contains** text and **one or more first embedded URLs for pointing to one or more graphical images located on a server, the images being embedded inside the HTML document using an HTML <IMG> tag to specify the source URL for an image.** The HTML document also contains a second embedded URL for pointing to a first executable program that runs on a server, **the first executable program being embedded inside the HTML document using an HTML <IMG> tag to specify the source URL for the program. A second executable program is also embedded in the HTML document by using a third URL for pointing to the second executable program.**

'155 patent, col. 5, ll. 18-34; '386 patent, col. 5, ll. 22-37 (emphasis supplied).

The foregoing specification references demonstrate that a program or other resource, such as a graphical image, is clearly considered *embedded* in the resource ("file") even though the program or graphical image is not actually *in* the resource, but rather comes from another server and is obtained "via an embedded URL that points to a different server." *See also* Declaration of Dr. Benjamin Goldberg, dated May 14, 2006 (hereinafter "Goldberg Decl."), ¶¶ 11-12. Similarly, the program may still be obtained through a reference to an address (or link) specified in the resource although the "executable program [is not] part of the resource." For example, in claim 1 of the '155 patent, the executable program is not part of the resource. Both claims 29 and 30, which depend from claim one and thus must contain the limitations of claim 1, including that the executable program is not part of the resource, expressly claim the embodiment described in the excerpted section of the patents' specification above, where the program is embedded in the resource through a "URL that points to a different server." *See* '155 patent, claims 29 and 30.[12] *See also* Goldberg Decl. ¶¶ 11, 13. Thus, the

---

[12]  Claims 29 and 30 of the '155 patent read:

> 29. The method of claim 1, wherein **the executable program is locatable at a first address on the second server**, and wherein the step of **downloading the executable program to the first client comprises downloading the executable program in response to a specification of the first address by the first client.**

> 30. The method of claim 29, wherein **the resource corresponds to a file and the first address is embedded in the file.**

(emphasis supplied).

"link" aspect of one embodiment of the invention of the '386 patent (where a tracking program is embedded in a resource through the link) is also in one embodiment of the invention of the '155 patent (where an executable program is not part of the resource but is obtained through an address link). Unlike NetRatings' construction, Coremetrics' construction fails to take account of these two indisputable aspects of the two patents. Coremetrics' construction must accordingly be rejected.

      2.      ***client identifying indicia*** ['155 patent only]

Coremetrics' construction of "client identifying indicia" includes a wholly unsupported limitation requiring that this information must be able to be used to "ascribe two or more events to the same client." There is simply no basis for this "two or more" limitation and, not surprisingly, Coremetrics does not offer any. Coremetrics' construction should accordingly be rejected. *CCS Fitness*, 288 F.3d at 1367 (refusing to narrow claims based on specification where accused infringer "has not shown that anything in the specification or prosecution history overcomes the 'heavy presumption' that [the claim term] carries its ordinary meaning"). Coremetrics' proposed construction may be a non-infringement theory, but it is not a legitimate claim construction.

      3.      ***user action(s)*** ['155 patent only]***; does not require the active participation of a user*** ['155 patent only]***; monitoring input device events*** ['386 patent only]

Although identifying all three of the foregoing terms as requiring construction, Coremetrics only addresses "user action" and "monitoring input device events" in its Opening Brief. With respect to "user action," Coremetrics construction complicates a very straightforward term – one which hardly required construction at all – by adding the concept of "activation." Coremetrics' addition is simply extraneous verbiage, does not facilitate an understanding of the claim term (already plain on its face), may confuse the fact finder, and is certainly not required by anything in the intrinsic evidence.[13] Coremetrics complains that NetRatings' construction is just paraphrase that

---

[13] The term is used only once in the entirety of the patent, and in connection with the tracking program – not user actions. '155 patent, col. 18, ll. 30-31.

does not account for how the user action relates to a user computer. This misses the fundamental point that the term truly did not need additional Court amplification.[14] NetRatings' construction reflects the simplicity of the term and the fact that the context of the user action is already accounted for in the remainder of the claim language in which the term appears. Either NetRatings' construction should be adopted, or the term should be left intact as not requiring construction.

With respect to "monitoring input device events," Coremetrics argues that NetRatings' construction is too narrow. Coremetrics' disingenuous argument is flatly contradicted by its own construction. The parties' respective definitions for "monitoring input device events" follow:

NetRatings: "monitoring operations performed using an input device"

Coremetrics: "monitoring operations performed on an input device **as they are performed**." JCCC at 9 (emphasis supplied).

Clearly, it is not NetRatings that takes too narrow an approach to the disputed claim term. Indeed, the emphasized language reflects yet another example of Coremetrics' efforts to narrow claim scope by incorporating a modifying phrase, in this case an element of temporality that is simply not present in either the relevant claim language or supported by the intrinsic evidence. Coremetrics' construction should be rejected.

4. ***data representative of a plurality of preferences of a user; data representative of a plurality of interests of a user*** ['155 patent only]

Coremetrics suggests that the dispute between the parties with respect to the foregoing claim terms is whether "data" refers to at least two items of information. That mischaracterizes the nature

---

[14] Coremetrics began this process, identifying hundreds of different terms as requiring construction. Many of those terms consisted of straightforward, readily understood words (such as "user action"), or words with clear ordinary meanings in the computer science context (such as "generate" and "store"). Without Coremetrics' strained and unduly narrow approach to these terms, no construction would be needed. Yet Coremetrics did not even bother to address in its Opening Brief some of the very terms it pressed for the Court to construe, such as: Java, encrypt, "does not require active participation by a user," "monitoring details of choices made by a user," "begin executing when the beginning of a display of the content is ascertained," and "stop executing when the end of a display of the content is ascertained."

of the disagreement between the parties. The real dispute concerns whether the data "describes" the preferences or interests explicitly, or whether the data is, as the claim requires, data which is "representative" of that information. Coremetrics' construction reads "representative" out of the claim language by limiting the construction to data that must actually describe the preferences or interests, not simply be "representative" of that information. The claim's use of the term "representative" makes clear that the data does not need to specify the actual preferences or interests themselves, but need only represent such things. NetRatings' construction accurately relates the "representative" aspect of the claim language and should be adopted.

> 5. ***monitor interaction through the client computer with <u>at least one of the first resource and one or more second resources</u>; choices being associated with <u>at least one of the first resource and the one or more second resources</u>*** ['386 patent only]

With respect to the foregoing phrases from the '386 patent, in short, the parties dispute whether the underlined language in this phrase requires ***two*** resources, as Coremetrics incorrectly contends, or ***one or more*** resources, as NetRatings contends. NetRatings' construction, as will be shown here, is the correct and, in fact, the only plausible interpretation of the claim language.[15]

In support of its construction, Coremetrics cites to the *SuperGuide Corp. v. DirectTV Enters., Inc.* case as being dispositive. Coremetrics' reliance is misplaced. In *SuperGuide*, the Federal Circuit addressed several issues applicable to the resolution of the disputed claim language. First, the Federal Circuit confirmed that "the phrase 'at least one of' means 'one or more.'" *SuperGuide Corp. v. DirectTV Enters., Inc.*, 358 F.3d 870, 886 (Fed. Cir. 2004) (citing to *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999)). Thus, in the context of the present dispute, it is clear that the disputed phrases "<u>at least one of</u> the first resource and one or more second resources" and "<u>at least one of</u> the first resource and the one or more second resources" could be rewritten and must be

---

[15] NetRatings notes that Coremetrics incorrectly states that NetRatings is arguing that the disputed phrases should be construed as *Markush* groups. That is not NetRatings' contention.

understood as "one or more of the first resource and one or more second resources" and "one or more of the first resource and the one or more second resources." This does not end the dispute of course. As the Federal Circuit noted in *SuperGuide*, and equally applicable now, "[t]he issue here is what does 'at least one of' modify?" *SuperGuide*, 358 F.3d at 886.

In *SuperGuide*, the Federal Circuit analyzed the phrase "at least one of a desired program start time, a desired program end time, a desired program service, and a desired program type." *SuperGuide*, 358 F.3d at 884. Importantly, the Federal Circuit viewed each item in the list as a category "because each consists of more than one value." *SuperGuide*, 358 F.3d at 886 n.9.[16] The Court went on to explain, relying on standard grammatical usage rules, that because the list of categories was separated by the modifier "and," the patent required that the invention contain at least one of each category. In other words, the phrase "at least one of" modified each separate category in the list. *SuperGuide*, 358 F.3d at 886. In the present case, however, the '386 patent does not claim "at least one of" a list of categories, each category being capable of having more than one value. Rather, the patent claims "at least one of" one unique item and another set of items.

> 1. In a computer network comprising one or more servers and one or more clients, a method of monitoring interaction through a first client of the one or more clients with **a first resource** obtained by the first client from a first server of the one or more servers, the method comprising:
>
> downloading **the first resource** from the first server to the first client,
>
> downloading a tracking program from a server of the one or more servers to the first client, wherein the downloading of **the first resource** causes the downloading of the tracking program;
>
> executing the tracking program on the client computer to monitor interaction through the client computer with **at least one of the first resource and one or more second resources**, the one or more second resources having been obtained by the first client from a server of the one or more servers as a result of interaction through the

---

[16] Specifically, the Federal Circuit wrote: "We note that SuperGuide characterizes the four claimed categories as "alternative criteria," but because each consists of more than one value, i.e., "a desired program start time" comprises many possible start times, they are more aptly called categories." *SuperGuide*, 358 F.3d at 886 n.9.

first client with **at least one of the first resource and a second resource of the one
or more second resources**;

'386 patent, claim 1 (emphasis supplied).

As evident from the language of the claim, **the first resource** in the disputed phrase is a

specific defined item, having one value.  Because "the first resource" has only one value, there cannot

be "one or more" of the first resource – there is *only one* first resource.  Thus, it is not possible for the

phrase "at least one of" to modify each of the items in the list individually; the phrase "at least one of"

must modify the entire list (both "the first resource" and "one or more second resources") collectively.

*See also Joao v. Sleepy Hollow Bank*, 348 F. Supp. 2d 120, 124-126 (S.D.N.Y. 2004) (distinguishing

*SuperGuide* where grammatical construction of list preceded by "at least one" and including

conjunctive "and" to require at least one of each item in list would result in nonsensical phrase clearly

not intended by patentee, and instead construing claim as a disjunctive list).

This grammatically and logically correct understanding accords with NetRatings' proposed

construction, and is consistent with the embodiments described in the '386 patent, which make it

clear that in some embodiments one resource may be monitored and in other embodiments, multiple

resources may be monitored.   For instance, the '386 patent states: "an object of the present invention

is to provide a method for tracking the use and interaction of a user with **a** resource downloaded from

a server on a network."  '386 patent, col. 4, ll. 12-14 (emphasis supplied).   The '386 patent also

provides:

> Still yet another object of the present invention is to provide means for
> creating a database of user profiles containing details of individual user interaction
> with and use of **network resources** including, for example, Network IDs (known as
> "IP address") and client IDs (known as "cookies") that have accessed **particular
> resources**, the amount of time spent by users interacting with and/or using **particular
> resources**, and details of choices created by individual users within **a particular
> resource**.

'386 patent, col. 4, ll. 33-42 (emphasis supplied).

17

For the foregoing reasons, Coremetrics' proposed construction, which is at odds with the rationale of the *SuperGuide* case and excludes specific embodiments described in the patent, cannot be the correct one. NetRatings' constructions, which set forth the appropriate interpretation of the disputed terms, should be adopted by the Court.

## C.  Terms From the '637 Patent

### 1.  *characteristic of a content display; content display; display of content*

Coremetrics makes the clearly erroneous argument that the term "characteristic" is indefinite and thus does not provide a construction for the term. In making this argument, Coremetrics does not actually explain why the term is purportedly indefinite. Rather, Coremetrics simply points to a back and forth between the applicant for the '637 patent and the USPTO. Examiner, which resulted in the claims at issue being allowed, and states that the Examiner "made a mistake." COB at 13. What evidence, what support does Coremetrics bring to bear on this issue? None.

The fact is that during prosecution of the '637 patent, the issue of whether the term characteristic was indefinite was raised by the Examiner and then *expressly overcome* by the applicant through argument. During prosecution of the '637 patent, the Examiner rejected then claim 11 (incorrectly identified by the Examiner as 12) as being indefinite and stating that the applicant should define the "characteristic" in "characteristic of the content display should be defined (e.g. position, or shape, or color …)." JA Ex. M, at JA00144. In the applicant's response, however, applicant argued – and did not amend the claim at issue – that the "language is not indefinite, as the Examiner is apparently contending, simply because Applicant has not recited in Claim 11 a list of characteristics that can be monitored (which list may unduly limit the scope of claim)." JA Ex. N, at JA00160. In other words, by identifying some specific "characteristics" which could be monitored, many others might be deemed to be excluded. The Examiner was persuaded by this argument and accordingly withdrew the objection in the next Office Action. JA Ex. O, at JA00190.

Coremetrics argues that evidencing the indefiniteness of the term is the fact that the applicant did not spell out the meaning of the term in applicant's response, nor make any revisions to the claims. COB at 13. Indeed, these things are true, and all the more reason why Coremetrics' argument should be rejected. First, applicant did not make an effort to define the term in its response because it was clear to both the applicant and the Examiner what a characteristic was, as shown in the Examiner's specific identification of several types of characteristics that the applicant might specify. *See* JA Ex. M at 144 (Examiner indicating examples of specific types of characteristics as position, shape, color). *See also* Goldberg Decl. ¶ 14 (one of ordinary skill in the art would understand the meaning of the term "characteristic" as used in the claims of the '637 patent). Moreover, the fact that the applicant did not make amendments in response to Examiner's argument simply indicates that applicant, consistent with its argument to the Examiner, did not believe any changes were required. That the Examiner withdrew the objection in the next Office Action shows that Examiner agreed, and accepted the applicant's argument. Coremetrics' "mistake" theory should be summarily dismissed.[17] If anything, the Examiner's explicit conclusion that the claim is definite, after considering this issue, merits deference by the Court. *See, e.g., McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1353 (Fed. Cir. 2001) (an "especially heavy" burden applies for a party seeking a result contrary to an issue specifically considered by an examiner).

**D.    Terms Appearing in Claims Across the Patent Families**

**1.    *Stored/Stores/Storing; Generate/Generates/Generating***

As though someone was suggesting otherwise, Coremetrics opens its argument regarding the terms "store" and "generate" by stating that each of the terms "must mean different things." COB at

---

[17] Coremetrics also attempts to argue that NetRatings' construction is too vague. The fact is that NetRatings' construction is the same definition found in standard dictionaries in common usage at the time the patent was filed. NetRatings relied on such sources because the term "characteristic" is a common term, with an ordinary meaning that has no unique connotations in the context of the '637 patent. If anything, the list of words used to define characteristic ("a distinguishing attribute, element, trait, quality or property") just goes to show that the choice of the one word characteristic was a good, succinct one. *See* NOB at 27.

29. NetRatings agrees that these terms mean different things. What NetRatings does not agree with is the comparative approach Coremetrics takes to construing these terms. Coremetrics tries to justify its very specific and unjustifiably narrow constructions of the terms by insinuating that it is necessary to distinguish them from each other. The parties' constructions of generating and its variants follow:

NetRatings: "creating"

Coremetrics: "creating **and holding in temporary memory (RAM)**."

Coremetrics only justification for this added limitation: "if something is 'generated' in a computer, it must be held somewhere." JCCC at 5 (emphasis supplied). Coremetrics offers declaration testimony from its expert, David Klausner, to support its construction. COB at 29. But Mr. Klausner's statements and the extraneous limitation added by Coremetrics regarding what happens to generated data are simply not pertinent to the issue of what "generate" means. *See* Goldberg Decl. ¶ 9 ("the term generating is unrelated to where the created data may be stored"). On the contrary, Mr. Klausner merely opines on what may happen to data that is generated – this is not a definition. *See* Declaration of David Klausner in Support of Coremetrics, Inc.'s Opening Claim Construction Brief, dated April 17, 2006 (hereinafter "Klausner Decl."), ¶ 12. Moreover, even in so far as what it does speak to, at most, Coremetrics' construction – and Mr. Klausner's statements regarding what happens to generated data – simply accounts for one possibility. *See* Goldberg Decl. ¶ 9 ("Data that a computer generates may subsequently be placed in various locations (e.g. in registers in the CPU, in RAM, on a network, etc.).").

Coremetrics' proposed construction of "store" and its variants suffers from the same defects, in that they arbitrarily limit the location of where something may be stored to a "hard drive." Coremetrics argues, citing to its expert Mr. Klausner, that this limitation is warranted because "storing" "requires a deliberate and more permanent way of saving something." COB at 29.

However, while "storing" may imply an objective of making something available for later use, the term does not suggest or require any specific duration or location. *See* Goldberg Decl. ¶ 10.

Coremetrics cannot provide any basis in the intrinsic evidence for why the terms "generate" and "store" should be construed in the limited manner they propose because there is none. Accordingly, Coremetrics' proposed constructions of these terms should be rejected and NetRatings' constructions adopted by the Court.

> **2.      *computer usable medium/computer readable medium*** ['386 and '637 patents]; ***program code which, when executed on a computerized device, causes the computerized device to execute, in a computer network comprising one or more servers and one or more clients, a method*** ['386 patent only]

Coremetrics attempts to limit the terms "computer usable/readable medium" to require that all the code for performing the method described to be on a single storage device. But yet again, Coremetrics takes its position with no support from the intrinsic or extrinsic evidence, and without consideration for the legal precedent – all of which clearly supports NetRatings' construction. *See, e.g., Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1350 (Fed. Cir. 2005) ("'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'"). Coremetrics takes the same approach with respect to the term "program code which, when executed on *a computerized device*, causes the computerized device to execute, in a computer network comprising one or more servers and one or more clients, a method" (emphasis supplied). JCCC at 11 (emphasis supplied). Coremetrics' baseless constructions should be rejected.

**E.      Application of 35 U.S.C. § 112 (6) to the '637 and '510 Patents**

    **1.      *Means Plus Function Terms***

With respect to those terms from the '637 patent that the parties agree are subject to means-plus-function treatment (see JCCC at 14-30), Coremetrics argues that the only structure disclosed in

the '637 patent for performing the means claims is a "Java Applet." COB at 9, JCCC at 14.[18]

Coremetrics also takes the position that NetRatings has not identified the structure for the means-plus-

function claim elements at issue. Neither of Cormetrics' arguments is correct and each is addressed in

turn below.

With respect to Coremetrics' argument that the only structure disclosed in the '637 patent is a

"Java applet," explicit language and examples in the specification contradict this position. Indeed, the

very sections quoted by Coremetrics make clear that the reference to a "Java applet" is an example

only. For instance, Coremetrics quotes from the following section:

> In a particular embodiment, **the monitoring instructions are part of a computer program** that also includes instructions for displaying the content. **Illustratively**, such a computer program **can be** an applet written in the Java programming language.

'637 patent, col. 11, ll. 59-63 (emphasis supplied).[19] This excerpt indicates that the applet (which is

just one embodiment of the invention) *could be* written in the Java programming language (hence, a

"Java applet"), but also may certainly be written in other languages.[20] The following, different

section of the specification, conveniently omitted by Coremetrics, leaves no doubt:

> When the invention is used with a computer network or to monitor display of content by a computer system, **aspects of the invention can be implemented as one or more computer programs that can be executed by a computer to achieve the**

---

[18] This is Coremetrics' position with respect to most of the means-plus-function claim elements. Coremetrics does not address the other means-plus-function claim terms in its Opening Brief. For the reasons set forth by NetRatings in NetRatings' Opening Brief, NetRatings' identification of function and structure for these claims is the appropriate one and should be adopted by the Court.

[19] Similarly, the sections of the file history quoted by Coremetrics also drive home the point that the Java applet was just one example of the structure:

> As described in Applicant's specification at page 22, lines 3-18, aspects of the invention **can be** implemented, **for example**, as one or more computer programs, written in the Java programming language.

JA Ex. Q, at JA00224 ('637 patent, Response to Office Action, dated Oct. 22, 1999, p. 12) (emphasis supplied).

[20] Elsewhere in the specification, the patentee explains that an applet is simply a "small application program." '637 patent, col. 12, ll. 16-17.

22

> **functionality of that aspect**.  Generally, **such computer programs can be implemented using any appropriate computer programming language**.  However, when an aspect of the invention is used with a computer network that includes computers of many different types (such as the Internet), **the computer programming language is preferably one that can be executed by any type of computer** (i.e., the computer programming language is platform independent). **The Java programming language**, developed by Sun Microsystems, Inc. of Mountain View, Calif., **is one such computer programming language**.  Below, some aspects of the invention are described, **for purposes of illustration**, as implemented in the Java programming language. **Again, however, none of the aspects of the invention are limited to such implementation**.

'637 patent, col. 11, ll. 38-56 (emphasis supplied).

Thus, the patent clearly indicates that the structure for performing the means-plus-function elements is computer instructions which may be in the form of a computer program, but the patent does not mandate a specific type of computer program or computer programming language.[21]  *See also* Goldberg Decl. ¶ 16 (identified structure includes but is not limited to Java applets).

As for Coremetrics' criticisms that NetRatings did not identify the structure for the means-plus-function claim elements, Coremetrics is wrong.  NetRatings did precisely what Federal Circuit precedent calls for in the context of the '637 patent, that is, identified the structure as computer code to perform a particular function, which function is disclosed in the claims and elsewhere in the specification.  *See WMS Gaming Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1349 (Fed. Cir. 1999) (where the "disclosed structure is a computer, or microprocessor, programmed to carry out an

---

[21]  In the context of discussing the identification of structure for the means-plus-function elements, Coremetrics reiterates throughout its Opening Brief its position that the descriptions in the '637 patent are inadequate and that the respective claims are "indefinite, nonenabled and invalid for failure to disclose the best mode." COB at 9; JCCC at 14-15. Notwithstanding that Coremetrics' is wrong (*see* Goldberg Decl. ¶ 16 (description in '637 patent is sufficient to allow one of ordinary skill to build the claimed system)), its position is really not relevant to the issue of *what the structure is*. Coremetrics apparently would have the Court make a declaration in the *Markman* context that the claims at issue are invalid, but totally bypassing any showing by Coremetrics sufficient to meet the high burden of proof required for invalidity determinations. *See, e.g., Glaxo Group Ltd. v. Apotex, Inc.,* 376 F.3d 1339, 1348 (Fed. Cir. 2004) ("[An alleged infringer] has the burden of showing invalidity by clear and convincing evidence."); *Abbott Labs. v. Syntron Bioresearch, Inc.,* 334 F.3d 1343, 1356 (Fed. Cir. 2003) (burden on accused infringer to prove "by clear and convincing evidence" that the written description requirement of 35 U.S.C. § 112 was not met).

algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.").

By way of example, NetRatings' set forth the following for the "means for determining the duration of the display of the content" of claim 17 of the '637 patent:

> **Function:** determining the duration of the display of the content
>
> **Structure:** A set of computer instructions as described in the specification sections cited below, which can be embodied in one or more computer programs, which cause one or more computer systems to perform the recited function, and which can be implemented using any appropriate computer language, and all structural equivalents of such set of computer instructions.
>
> **Specification citations:** Col. 7, ll. 66- col. 8, ll. 5; Col. 8, ll. 29-37; Col. 10, ll. 58- Col. 11, ll. 2; Col. 11, ll. 9-14, 38-67Col. 12, ll. 9-36; Col. 13, ll. 17-21; Col. 13, ll. 35-40; Col. 14, ll. 27-31; Col. 16, ll. 13-38; Col. 17, ll. 11-13; ll. 21-22; ll. 29-34; ll. 39-55; Col. 12, ll. 1-9, Col. 23, ll. 1-9; Col. 25, ll. 38-45; Figs. 3B, 5C, 6D.

JCCC at 20.

As shown here, NetRatings identifies the structure disclosed in accordance with *WMS Gaming*: a set of computer instructions which cause a computer system to perform the recited function, with reference to the specification sections that set forth the disclosed algorithm. One example of the disclosed structure NetRatings' identified for the means element above is a set of computer instructions which cause a computer system to perform the steps described with reference to Figure 3B and column 13 of the patent specification:

> As shown in FIG. 3B . . . a set of monitoring instructions (which can be embodied, for example, in a computer program) are also transferred to the content display site 302. . . As explained in more detail below, **the monitoring instructions cause the client computer at the content display site 302 to monitor the display of the content to produce monitoring information regarding the manner in which the content is displayed**.

'637 patent, Fig. 3B.

> A monitoring method according to the invention can also determine the duration of the content display. For example, the duration of the content display can be determined as **the amount of time that the computer program for displaying the content executed, as indicated by time stamps--ascertainable, for example,**

**using a method that exists as part of the Java language--associated with a predefined beginning and end of execution of the program**.

'637 patent, col. 13, ll. 51-58 (emphasis supplied).[22]  The structure illustrated in these cited excerpts thus includes a microprocessor programmed to determine the duration of display of an element by: 1) ascertaining the time at which execution of the program begins and 2) ascertaining the time at which execution of the program ends.  This is at least as specific as the disclosure in *WMS Gaming*, which held that a figure illustrating numbers in proximity to rotational positions on a wheel specified the algorithm by which the numbers were assigned to the respective rotational positions.  *WMS Gaming*, 184 F.3d at 1347-48, 1349.  The Federal Circuit in *WMS Gaming* made no mention of programming languages, source code, or any of the other features that Coremetrics claims to be missing from the '637 patent.[23]  *See WMS Gaming,* 184 F.3d at 1349 and n.4 (structure identified as "**a microprocessor programmed to perform the algorithm illustrated in Figure 6**) (emphasis supplied).

For the foregoing reasons, and as further set forth in NetRatings' Opening Brief, NetRatings' identification of structure for each means element identified in the Joint Claim Construction Chart should be adopted by the Court.

---

[22]  There are multiple examples in the specification for each identified means element.  NetRatings perhaps could have quoted, for each such example, the specification text in the Joint Claim Construction Chart, as Coremetrics seems to suggest.  However, NetRatings believed that such lengthy quotations were unnecessary and would not be helpful to the Court.

[23]  With respect to Coremetrics' complaints regarding the absence of source code from the '637 patent specification, it should be noted that the Federal Circuit has explicitly held that a software patent need not contain source code to meet enablement or best mode requirements.  "This is because, normally, writing code for such software is within the skill of the art, not requiring undue experimentation, once its functions have been disclosed. It is well established that what is within the skill of the art need not be disclosed to satisfy the best mode requirement as long as that mode is described. Stating the functions of the best mode software satisfies that description test.  We have so held previously and we so hold today."  *Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543, 1549 (Fed. Cir. 1997).  *See also* MPEP S. 2106(V)(A)(2) ("Applicants should be encouraged to functionally define the steps the computer will perform rather than simply reciting source or object code instructions"); 2106.01(citing *Fonar*).

2.    *"Instructions" Terms*

Coremetrics uses considerable space in its Opening Brief addressing its argument that within claims 2, 4, 6, 8, 12, 14, 16, 18, 21 and 29-33 of the '637 patent, the "instructions" elements should receive section 112(6) treatment. Coremetrics' argument is flawed in at least two respects. First, Coremetrics barely acknowledges the applicable presumption that claims not drafted with "means for" language are not to be construed under section 112(6). Second, even absent the presumption, "instructions" are sufficiently definite structure to avoid application of section 112(6).

(a)    **Coremetrics Fails to Overcome the Presumption that Exists Because of the Absence of "Means For" Language in the Instructions Claims**

As a matter of law, a claim that is not drafted to include the term "means" is presumptively not within the scope of Section 112(6). *Phillips v. AWH Corporation*, 415 F.3d 1303, 1311 (Fed. Cir. 2005); *Lighting World, Inc. v. Birchwood Lighting*, Inc., 382 F.3d 1354, 1358 (Fed. Cir. 2004). As such, the "instructions" claims are presumptively not means-plus-function claims, an important procedural point that Coremetrics understandably dismisses. Thus, while Coremetrics argues that *Athletic Alternatives, Inc. v. Prince Manufacturing, Inc.*, 73 F.3d 1573 (Fed. Cir. 1996) requires that the "instructions" claims be construed as means-plus-function claims even if both constructions are equally tenable in view of the intrinsic and extrinsic evidence, the opposite is true.[24] Arguing that its interpretation of the claims as means claims is as plausible as an interpretation that they are not means claims can hardly be adequate to rebut the presumption – indeed, if two interpretations are equally possible, the interpretation that is consistent with the presumption should control. *See Affymetrix, Inc. v. Hyseq, Inc.*, 132 F. Supp. 2d 1212, 1232 (N.D. Cal. 2001) ("When, as here, the

---

[24] Significantly, the Court in *Athletic Alternatives* was <u>not</u> addressing the issue of whether a claim came within the scope of Section 112(6). Rather, the issue was which of two competing constructions for the term "between" should be adopted, each of which found relatively equal support in the intrinsic and extrinsic evidence. 73 F.3d at 1581. As such, neither construction had the benefit of a legal presumption that would have tipped the balance one way or the other, thus requiring the Court to choose the narrower construction.

'means for' language is absent from a claim, the accused infringer has the burden of overcoming the presumption against application of § 112, P 6").

Similarly misplaced are Coremetrics' citations to the Manual of Patent Examining Procedure and *Laitram Corp. v. Rexnord, Inc.* Coremetrics cites *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533 (Fed. Cir. 1991), for the proposition that the "'recitation of some structure in a means plus function element does not preclude the applicability of section 112, ¶ 6.'" COB at 18. And, Coremetrics cites the Manual of Patent Examining Procedure for the proposition that "[i]f 'the element is set forth, <u>at least in part</u>, by the function it performs . . .' then §112 ¶ 6 is usually applicable." *Id. quoting MPEP* §2181 at 2100-177 (emphasis added by Coremetrics). Yet both *Laitram* and the quoted MPEP section are dealing with claims *drafted to include the term "means"* and thus presumptively within Section 112(6). *See Laitram*, 939 F.2d at 1535-36 (construing "means for joining" and thus defining the structure recited as "some structure in *a means plus function element*").[25]

Coremetrics has not met its burden of overcoming the presumption that the "instructions" claims are not means-plus-function claims and, accordingly, the 112(6) should not be applied to those claims.[26]

---

[25] MPEP § 2181 at 2100-177:

"A claim limitation will be interpreted to invoke 35 U.S.C. 112, sixth paragraph, if it meets the following 3-prong analysis:

(A) the claim limitations must use the phrase "means for" or "step for;"

(B) the "means for" or "step for" must be modified by functional language; and

(C) the phrase "means for" or "step for" must not be modified by sufficient structure, material or acts for achieving the specified function. . .

With respect to the second prong of this analysis . . . [i]t must be clear that the element in the claims is set forth, at least in part, by the function it performs as opposed to the specific structure, material, or acts that perform the function."

[26] Coremetrics also attempts to support its position by arguing that the term "means" and "instructions" are used interchangeably in the '637 patent, relying on *Mas-Hamilton Group v. LaGard, Inc.*, 21 F. Supp. 2d 700 (E.D. Ky. 1997), for the proposition that where means is used "interchangeably" with a similarly generic term, claims incorporating the "interchangeable" term should be construed as means-plus-function claims. COB at 15. The facts of *Mas-Hamilton*, however, make clear that Coremetrics' argument is specious. The *Mas-*

27

     (b)    **"Instructions" is a Sufficiently Definite Structure to
Avoid Application of Section 112(6)**

Even absent the presumption against application of 112(6), "instructions" is a sufficiently

definite structure and for this reason Coremetrics' argument that the "instructions" claims are means-

plus-function claims should be rejected.

The case of *Affymetrix, Inc. v. Hyseq, Inc.*, 132 F. Supp. 2d 1212 (N.D. Ca. 2001), is on point.

In *Affymetrix*, the Court was asked to construe the following claim:

> A computer program product that identifies an unknown base in a
> sample nucleic acid sequence, comprising:
>
> [1] computer code that receives a first set of signals . . . ;
>
> [2] computer code that receives a second set of signals . . .;
>
> [3] computer code that performs a comparison . . .;
>
> [4] computer code that generates . . . ; and
>
> [5] a computer readable medium that stores said computer codes.

*Affymetrix*, 132 F. Supp. 2d at 1232.

As in the present case, the defendant in *Affymetrix* argued that "claiming 'computer code'

followed by the function performed by the computer code still subjects these claim terms to 35 U.S.C.

§ 112, P 6." *Id.* at 1231. Rejecting the defendant's argument, the *Affymetrix* Court held that section

112(6) "does not apply to the terms recited in the form, 'computer code that [performs x function].'"

---

*Hamilton* Court pointed to several factors in determining that "lever moving means" and "lever moving
element" were used "interchangeably." First, the Court found that "lever moving element" had no understood
meaning in the art. *Mas-Hamilton Group*, 21 F. Supp. 2d at 724. In contrast, "instructions" has a well-
understood meaning in the art – as articulated by **Coremetrics'** expert, "instructions" means computer code.
Klausner Decl. at ¶ 11. Second, the *Mas-Hamilton* Court determined that the terms in that case were
interchangeable based on *the patentee's admissions*. *Mas-Hamilton Group*, 21 F. Supp. 2d at 724. The facts
of the *Mas-Hamilton Group* distinguish it from the present circumstances, and *Mas-Hamilton Group* is
therefore inapposite. Coremetrics also points to the file history for the '637 patent to argue that the examiner
was using the terms "instructions" and "means" interchangeably. However, the examiner's shorthand
references to facilitate his discussion of claim terms other than "instructions" is inadequate to prove what the
examiner believed the term "instructions" meant.

*Id.* The Court reasoned that, in addition to the presumption against application of 112(6) because of the absence of "means for" language, (1) the Federal Circuit has held that sufficient structure is recited "when the claim terms identify a type of structure that performs the stated function," and (2) the Court found that "'computer code' is not a generic term, but rather recites structure that is understood by those of skill in the art to be a type of device for accomplishing the stated functions." *Id.* at 1232.[27]

The circumstances of the present case are virtually identical to *Affymetrix.* There can be no doubt that the "instructions" specified in the '637 patent are equivalent to the "computer code" of the claim in the *Affymetrix* case. Indeed, Coremetrics' expert states as much in his declaration: "An 'instruction' is a statement written in a computer programming language that tells a computer to do something." Klausner Decl. ¶ 11.[28] *See also* Goldberg Decl. ¶ 15 ("'instructions' as used in the claims of the '637 patent are computer statements to be executed by a CPU or other form of microprocessor"). Technical sources available at the time of filing of the '637 patent further confirm this. *See, e.g., IBM Dictionary of Computing* (George McDaniel ed., 10th Ed. 1993) ("*IBM*") at A131 (a "computer program" is a "sequence of instructions suitable for processing by a computer"), (App. Ex. 5)[29]; *IBM* at A086 ("code" is "instructions written for a computer") (App. Ex. 13)[30]; *The New IEEE Standard Dictionary of Electrical and Electronics Terms* (Christopher J. Booth ed., 5th Ed. 1993) ("*IEEE*") at A053 (a "computer instruction" is "a statement in a programming language, specifying an operation to be performed by a computer and the addresses or values of the associated

---

[27]  The Court also noted its disagreement with the defendant's argument that "computer code lacks any structure because it consists of data with no physical dimensions." According to the Court, adopting such a view "would subject every software patent and many electronics patents to § 112, P 6." *Affymetrix,* 132 F. Supp. 2d at 1232.

[28]  The defendant's expert in the *Affymetrix* case made a similar statement: "'computer code' is a type of device for programming a computer." *Affymetrix,* 132 F. Supp. 2d at 1232.

[29]  App. Exs. 1-12 were submitted on April 17, 2006 with NetRatings, Inc.'s Opening Brief on Claim Construction.

[30]  Appendix of Exhibits to NetRatings, Inc.'s Claim Construction Brief, App. Exs. 13-16, is submitted herewith.

operands" and "loosely, any executable statement in a computer program"), at A054 (a "computer program" is a "sequence of instructions suitable for processing by a computer") (App. Ex. 9). A slightly more modern source (1997), *Microsoft*, defines "code" as simply "program instructions." *Microsoft Press Computer Dictionary* (3rd Ed. 1997) ("*Microsoft*") at A103 (App. Ex. 16).[31]

Based on the foregoing, *Affymetrix* should control and Coremetrics' argument that the "instructions" claims of the '637 patent should receive means-plus-function treatment should be rejected.

---

[31] *See also McGraw-Hill Dictionary of Scientific and Technical Terms* (Sybil P. Parker ed., 5th Ed. 1994) ("*McGraw-Hill*") at A098 ("code" is "the binary and other machine languages used in digital computers") (App. Ex. 14), and *IEEE* at A092 ("code" is "computer instructions and data definitions expressed in a programming language or in a form output by an assembler, compiler or other translator") (App. Ex. 15).

## CONCLUSION

For all the reasons stated above, NetRatings requests that the disputed claim terms be construed in the manner proposed by NetRatings in the Joint Claim Construction Chart.

Dated: May 15, 2006                         Respectfully submitted,

                                            /s/ KAREN E. KELLER
                                            John W. Shaw (#3362)
                                            Karen E. Keller (#4489)
                                            Andrew A. Lundgren (#4429)
                                            **YOUNG CONAWAY STARGATT
                                            & TAYLOR, LLP**
                                            The Brandywine Building
                                            1000 West Street, 17th Floor
                                            P.O. Box 391
                                            Wilmington, Delaware  19899
                                            (302) 571-6600

                                            Frederick L. Whitmer
                                            Seth H. Ostrow
                                            Arianna Frankl
                                            **BROWN RAYSMAN MILLSTEIN
                                            FELDER & STEINER LLP**
                                            900 Third Avenue
                                            New York, New York 10022
                                            (212) 895-2000

                                            Attorneys for Plaintiff NetRatings, Inc.

916061

31

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on May 15, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such document is available for viewing and downloading to the following counsel of record:

> Steven J. Balick, Esquire
> Ashby & Geddes
> 222 Delaware Avenue, 17th Floor
> Wilmington, DE 19801

I further certify that on May 15, 2006, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated.

### BY FEDERAL EXPRESS

> Robert T. Haslam, Esquire
> Heller & Ehrman LLP
> 275 Middlefield Rd.
> Menlo Park, CA 94025

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_/s/ Karen E. Keller (#4489)_
John W. Shaw (#3362)
Karen E. Keller (# 4489)
Andrew A. Lundgren (#4429)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899
(302) 571-6600
alundgren@ycst.com

Of Counsel:
BROWN RAYSMAN MILLSTEIN
ELDER & STEINER LLP
Seth H. Ostrow
Frederick L. Whitmer
Arianna Frankl
Steven S. Rubin
900 Third Avenue
New York, New York 10022
(212) 895-2000