LEXSEE 2005 U S DIST LEXIS 9577

PHT CORPORATION, Plaintiff, v. INVIVODATA, INC., Defendant. PHT CORPORATION, Plaintiff, v. CRF, INC., Defendant. PHT CORPORATION, Plaintiff, v. ETRIALS WORLDWIDE, INC. Defendant.

Civil Action No. 04-60 GMS, Civil Action No. 04-61 GMS, Civil Action No. 04-821 GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2005 U.S. Dist. LEXIS 9577

May 19, 2005, Decided

**PRIOR HISTORY:** PHT Corp. v. Invivodata, Inc., 2005 U.S. Dist. LEXIS 6495 (D. Del., Apr. 15, 2005)

**COUNSEL:** [*1] For PHT Corporation, Plaintiff: Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Invivodata Inc., Defendant: David Ellis Moore, Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE; Brian Rosenthal, Cecilia H. Gonzalez, Vandana Koelsch, Pro Hac Vice.

For Invivodata Inc., Counter Claimant: David Ellis Moore, Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE; Brian Rosenthal, Cecilia H. Gonzalez, Pro Hac Vice.

For PHT Corporation, Counter Defendant: Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For CRF Inc., Defendant: David Ellis Moore, Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE; Victor H Polk, Jr., Pro Hac Vice.

For CRF Inc., Counter Claimant: David Ellis Moore, Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE; Victor H Polk, Jr., Pro Hac Vice.

For eTrials Worldwide, Inc., Defendant: Julia Heaney, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM**

**I. INTRODUCTION**

On January 28, 2004, PHT Corporation ("PHT") filed separate actions [*2] for patent infringement against Invivodata, Inc. ("Invivodata") and CRF, Inc. ("CRF"). On July 7, 2004, PHT filed a patent infringement action against eTrials Worldwide, Inc. ("eTrials"). PHT alleges that products manufactured and sold by Invivodata, CRF and eTrials (collectively, the "defendants") infringe U.S. Patent No. 6,095,985 (the "'985 patent"). The '985 patent is directed to a portable health monitoring system. This technology is particularly useful in the field of medicine and health tracking, including assessing trends in health, and the diagnosing and monitoring of medical conditions.

On April 19, 2005, the court held a consolidated *Markman* hearing to assist it in construing the disputed language of the asserted claims. This Memorandum sets forth the court's interpretation of the disputed claim terms.

**II. STANDARD OF REVIEW**

Claim construction is a task reserved to the court. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370, 388-90, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996); *Phillips Petroleum Co. v. Huntsman Polymers Corp.,* 157 F.3d 866, 870 (Fed. Cir. 1998). When construing a claim term, [*3] the court should focus on "what one of ordinary skill in the art at the time of the invention would have understood the term to mean." *Markman,* 52 F.3d at 986. In making its determination, the court must "first look to the intrinsic evidence of the record, including the claims of the patent, the written description, and the

prosecution history," because it "is the most significant source of the legally operative meaning of the disputed claim language." *Vitronics Corp. V. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996).

It is well settled that the starting point in a claim construction analysis is the claims themselves. *Id.* Generally, there is a "heavy presumption" that claim terms carry their ordinary meaning as understood by one of ordinary skill in the art. *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed Cir. 2002); *see Vitronics,* 90 F.3d at 1582. In this regard, pertinent art "dictionaries, encyclopedias and treatises . . . are objective resources that serve as reliable sources of information on the established meanings that would have been attributed to the terms of the claims by those [*4] of skill in the art." *Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1202-03 (Fed. Cir. 2002). However, the written description and the prosecution history "'must be examined in every case to determine whether the presumption of ordinary and customary meaning is rebutted." *Texas Digital,* 308 F.3d at 1204. A patentee may rebut the presumption of ordinary and customary meaning in four ways. *See CCS Fitness,* 288 F.3d at 1366-67. First, the patentee, acting as his own lexicographer, may clearly set forth a special definition of a claim term in the patent specification or file history. *Id.* at 1366. Second, the patentee may distinguish a term from prior art on the basis of a particular embodiment, by expressly disclaiming subject matter, or by describing a particular embodiment as important to the invention. *See id.* at 1367. Third, the patentee may rebut the presumption if he has chosen a term that "'deprive[s] the claim of clarity' as to require [the court to] resort to the other intrinsic evidence for a definite meaning." *Id.* (quoting *Johnson Worldwide Assocs., Inc. v. Zebco Corp.,* 175 F.3d 985 (Fed. Cir. 1999)). [*5] Last, if the claim is a step-or means-plus-function claim, it will only cover the "corresponding structure or step disclosed in the specification, as well as equivalents thereto." *CCS Fitness,* 288 F.3d at 1367.

If the meaning of a disputed claim term is clear from the intrinsic evidence "that meaning, and no other, must prevail." *Key Pharms. v. Hercon Lab. Corp.,* 161 F.3d 709, 716 (Fed. Cir. 1998); *see Vitronics,* 90 F.3d at 1583. That is, the court may not consider extrinsic evidence, such as expert testimony. A court only may consider extrinsic evidence when the meaning of a claim term remains "genuinely ambiguous" after examining the intrinsic record. *See Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.,* 132 F.3d 701, 706 (Fed. Cir. 1997). With these standards in mind, the court turns to its analysis of the disputed claim terms of the '985 patent.

**III. DISCUSSION**

The parties submitted a joint claim chart to the court, setting forth the disputed claims of the patent: independent claim 22, dependent claims 29-30, independent claim 34, and dependent claims 36-40. The court will address each of the [*6] disputed claims in turn.

**A. Claim 22**

Claim 22 of the '985 patent is directed to a portable personal health monitor that consists of four components: a data logger, a time base, a data storage unit, and a data transmission device. Claim 22 provides:

A portable personal health tracker comprising:

(a) a data logger that collects and records *subjective data* from a subject regarding the subject's psychological condition and subjectively observed physiological condition;

(b) a time base which tracks a time of recording of the data;

(c) a data storage unit in which the data is stored with reference to the time base such as to provide a chronological health history of the subject; and

(d) *a data transmission device capable of connecting directly to a communication network* to allow transmission of data to a destination site from points of access to the network that are remote to the destination site, *wherein each of the components of the health tracker is part of a single, unified portable unit* that may be used by an ambulatory patient.

The parties dispute the meanings of the emphasized terms or phrases. The court will address each of these terms and phrases in [*7] turn.

1. Subjective Data

The specification of the '985 patent explains that "the term 'subjective' data will refer to that data which is input by the patient to the data logger, regardless of whether that data pertains to the patient or the patient's environment, and whether or not the information is objective or factual, such as medication dosage or consumption of a particular food." '985 patent, col. 5, ll. 40-45.

Noting that patentees may act as their own lexicographers, see, e.g., *Abbott Labs. v. Novopharm Ltd.,* 323 F.3d 1324, 1330 (Fed. Cir. 2003), Invivodata and CRF ask the court to give the term "subjective data" the meaning expressly provided in the patent specification -- namely, "data which is input by the patient to the data logger, regardless of whether that data pertains to the subject or the subject's environment, and whether or not the information is objective or factual." n1

Case 1:05-cv-00314-GMS   Document 72-2   Filed 05/15/2006   Page 3 of 10

Page 3
2005 U.S. Dist. LEXIS 9577, *

n1 eTrials believes that it is not necessary to construe the term "subjective data," but does not oppose the construction offered by Invivodata and CRF.

[*8]

PHT agrees that the patentees acted as their own lexicographers with respect to the term "subjective data," noting that the patentees plainly ascribed a meaning other than its ordinary meaning as the specification makes clear. (D.I. 39, at 7.) n2 Despite this agreement, PHT argues that a narrower definition should control. In particular, PHT contends that although the definition of "subjective data" provided in the specification is very broad, claim 22 provides an additional limitation on the type of "subjective data" that can be entered into the data logger. According to PHT, claim 22 requires the subjective data to be data "regarding the subject's psychological condition and subjectively observed physiological condition." (*Id.* at 8.) Thus, "subjective data," as used in the '985 patent, means "data input by the patient." (*Id.* at 7.) The court disagrees.

n2 PHT and the defendants have filed the same claim construction briefs in each of the three above-captioned cases. For convenience, the court will cite to the 04-60 case docket.

[*9]

"Patent law permits the patentee to choose to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning." *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1342 (Fed. Cir. 2001). A patentee acts as his own lexicographer when he "clearly set[s] forth an explicit definition for a claim term." *Johnson Worldwide Assocs. v. Zebco Corp.,* 175 F.3d 985, 990 (Fed. Cir. 1999). That is, when a patentee acts as his own lexicographer, the statement in the specification must have sufficient clarity "to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term." *Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.,* 262 F.3d 1258, 1268 (Fed. Cir. 2001).

In the present case, PHT acted as its own lexicographer in clearly setting forth the meaning of the term "subjective data." PHT agrees, but then asks the court to limit the definition of "subjective data" based on the remaining claim language. n3 PHT misses the mark. While the scope of the "subjective data" covered in [*10] claim 22 may be limited by the other language in the claim, that is an issue the court need not determine to construe this term. The only issue before the court is the meaning of the term "subjective data" and, as previously stated, PHT acted as its own lexicographer. Accordingly, the court will construe the term "subjective data" to mean "data which is input by the patient to the data logger, regardless of whether that data pertains to the patient or the patient's environment, and whether or not the information is objective or factual, such as medication dosage or consumption of a particular food." n4

n3 The court finds this proposition interesting, especially in light of the fact that PHT maintains that Invivodata and CRF "attempt improperly to read a limitation from the specification into the claim." (D.I. 39, at 8.) According to PHT, the definition of "subjective data" in the specification is "very broad." (*Id.*) This is the very definition that Invivodata and CRF propose. Thus, the court does not understand how Invivodata and CRF are attempting to improperly read a limitation from the specification into the claim.

[*11]

n4 Further support for the court's interpretation lies in claim 14, which also contains the term "subjective data." PHT contends that "subjective data" as used in claim 14 does not include a limit on the type of subjective data that can be collected from the subject. (D.I. 39, at 8.) PHT's argument fails, however, because "interpretation of a disputed claim term requires reference not only to the specification and prosecution history, but also to other claims. The fact that [the court] must look to other claims using the same term when interpreting a term in an asserted claim mandates that the term be interpreted consistently in all claims." *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1579 (Fed. Cir. 1995). Accepting PHT's argument would require the court to interpret "subjective data" differently in claim 22 than in claim 14, and would be contrary to law.

2. Data Transmission Device Capable of Connecting Directly to a Communication Network

The parties dispute the construction of the phrase "capable of connecting directly." The defendants contend that this term [*12] should be construed so that "connecting directly" means that the data transmission device "can be connected to a communication network without requiring a separate unit (such as a computer or modem)

Case 1:05-cv-00314-GMS   Document 72-2   Filed 05/15/2006   Page 4 of 10

Page 4
2005 U.S. Dist. LEXIS 9577, *

between the data transmission device and the network." The defendants further contend that PHT's proposed construction is "overly broad and impermissibly recaptures claim scope that was disclaimed during prosecution in order to obtain allowance of the claims." (D.I. 40, at 17); *see Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.,* 214 F.3d 1302, 1308 (Fed. Cir. 2000).

In response, PHT asserts that the phrase should be construed so that "capable of connecting directly" means that the data transmission device "is capable of transmitting data from the data logger to a communication network site without the data being processed by or accessed on an intervening computer." According to PHT, Claim 22 only excludes an intervening computer. It does not exclude the possibility a device located between the data logger and communications network, such as an external modem. (D.I. 45, at 4 n.6.) PHT argues that its construction is supported by the specification and prosecution [*13] history of the patent, noting that the preferred embodiment expressly includes an external modem. (D.I. 39, at 10-11.) PHT further argues if the court adopts the defendants proposed construction then claim 22 would not cover the preferred embodiment, and "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct.'" *Id.* (quoting *Globetrotter Software, Inc. v. Elan Computer Group, Inc.,* 362 F.3d 1367, 1381 (Fed. Cir. 2004)).

PHT correctly states the law of the Federal Circuit. Indeed, an interpretation that excludes the preferred embodiment "require[s] highly persuasive evidentiary support." *Elekta,* 214 F.3d at 1308. The defendants, however, contend that this *is* the "rare case" in which the evidence shows that the asserted claims do not cover the preferred embodiment. *See* Transcript of *Markman* hearing, dated April 19, 2005 ("Tr."), at 23-24; *Elekta,* 214 F.3d at 1308. According to the defendants, PHT disclaimed coverage of the preferred embodiment with unambiguous claim amendments and prosecution history statements, pointing out that "arguments made during [*14] prosecution regarding the meaning of a claim term are relevant to the interpretation of that term in every claim of the patent absent a clear indication to the contrary." *Southwall Techs., Inc.,* 54 F.3d at 1579.

Here, the examiner rejected certain claims during prosecution as being obvious in light of U.S. Patent No. 5,128,552 (the "Fang patent"). In response, the applicants cancelled some of the original claims, amended claims, and distinguished the Fang patent. Specifically, the applicants amended claim 22, adding the "data transmission device capable of connecting directly to a communication network" limitation. The applicants also asserted that their invention was different from the Fang patent. The defendants argue that the applicants' asserted distinctions compel the court to adopt their proposed construction. The court disagrees.

After reading the prosecution history, the court is not convinced that the applicants "disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Texas Digital Systems, Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1204 (Fed. Cir. 2002) [*15] (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1324 (Fed. Cir. 2002). For example, the applicants told the patent examiner that "[a] particularly useful feature [in regard to portability] is the construction of the monitor to allow direct access to a communications network without requiring connection via a separate unit, such as a personal computer." (D.I. 42 Ex. C, at 11.) While the court could consider this statement as a possible disclaimer of an external modem, the applicants further explained the difference between their invention and the Fang patent, stating:

> Fang provides no suggestion of a handheld unit, and certainly does not suggest the use of a data transmission device with a handheld unit that allows direct connection from the unit to a communication network. *Without such direct connection capability, a user would have to download the data to a separate processor before it could be transmitted to a remote destination site. This would require the user to carry, in addition to the monitor itself, a portable computer (or other portable processing unit), or to simply wait until he or she reaches a place where a computer* [*16] *with a modem (not to mention the appropriate software) is available.*

(*Id.* at 12) n5 (emphasis added). The emphasized language from the prosecution history describes direct connection capability in relation to downloading data to a separate processor. That is, the applicants told the patent examiner that without the direct connection capability of their invention a user would have to carry a portable computer. Thus, the applicants used the direct connection capability to distinguish their invention over the Fang patent, because the Fang patent teaches a personal health monitor that includes a programmable computer, or laptop computer, while the '985 patent teaches a personal health monitor that is "truly ambulatory" and does not require the data to be downloaded to a separate processor. (*Id.* at 11.) At most, the court finds that the disclaimer issue is arguable. As such, the court cannot say

that the applicants "used words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Texas Digital,* 308 F.3d at 1204. Accordingly, the court will construe the phrase "capable of connecting [*17] directly" to mean "capable of connecting without requiring a separate data processor." The court, therefore, construes the phrase "data transmission device capable of connecting directly to a communication network" to mean "a device that transmits data and is capable of connecting to a communication network without requiring a separate data processor."

> n5 The applicants made these comments with respect to claim 1. However, as noted by the defendants and the applicants, claim 22 is similar to claim 1 in that it contains the "capable of connecting directly" limitation. (D.I. 40, at 18 n.6.)

3. Wherein Each of the Components of the Health Tracker is Part of a Single, Unified Portable Unit

The defendants propose that the court construe the phrase "wherein each of the components of the health tracker is part of a single unified portable unit" to mean "the data logger, time base, data storage unit and data transmission device are all included within a single, unified portable unit." The defendants contend that they [*18] have construed the phrase in accordance with its plain and ordinary meaning because "for the components of the health tracker to be 'part of' a single unit, they must be physically included within the unit." (D.I. 40, at 20.) The defendants further contend that during prosecution the patent applicants excluded from claim 22 devices using a component that is not physically included within the unit, such as an external modem. (*Id.*) According to the defendants, the applicants added the claim limitation at issue "as a key distinguishing feature over the prior art." (*Id.* at 21.)

PHT proposes that the court construe the phrase to mean "wherein the health tracker's components are combined into a unit which is capable of being carried by a patient." PHT asserts that, as with the "capable of connecting directly" limitation, the defendants' construction seeks to exclude the preferred embodiment of the invention, or an external modem combined with a telecommunications driver. (D.I. 39, at 13.) PHT further asserts a health tracker combined with an external modem is a single, unified, portable unit that is capable of being carried by a patient. (*Id.*)

The parties do not disagree that [*19] the data logger, time base, data storage unit, and data transmission device are the components of the health tracker. Thus, the court need not construe the phrase "wherein each of the components of the health tracker." The parties' dispute concerns whether the phrase "part of a single, unified portable unit" means that the components must be "included" within a single, unified portable unit or that the components can be "combined" into a single, unified portable unit. As previously stated, the defendants' maintain that a construction in which all of the components are "physically included" within the unit is compelled, relying on the "part of a single unit" language of the phrase. (D.I. 40, at 20.) The court disagrees, based on the plain and ordinary meaning of the term "unified." The plain and ordinary meaning of the term "unified" is "made into a coherent group or whole." Webster's Third New International Dictionary 2499 (1993). The meaning of "unified" is broad, in that a component not physically included within the unit can be combined with components that are physically included within the unit to form "a coherent group or whole." The '985 patent specification also supports a [*20] broad construction. For example, in the preferred embodiment of the invention "the monitor connects directly to a modem (when used without a data logger), or can be connected to a serial data port on the subjective data logger which, in turn, connects to a modem. In the preferred embodiment an external modem is used. . . . " (Col. 5, 11. 4-9.)

The defendants also contend that the prosecution history compels the court to construe the phrase so that the data transmission device "is included within the portable unit." (D.I. 40, at 21.) The defendants maintain that the applicants disclaimed a data transmission device that is not within the portable unit when they described the handheld unit as being "'a single, unified handheld unit that includes an on-board communication device, such as a modem.'" (*Id.* at 20.) The court is not persuaded. As previously discussed, the court will not find a disclaimer unless the applicants have "used words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Texas Digital,* 308 F.3d at 1204. The court cannot agree that the word "includes," in the statement that the defendants cite, represents [*21] a clear disavowal of the applicants' preferred embodiment.

Lastly, the plain and ordinary meaning of "portable" is "capable of being carried." Webster's Third New International Dictionary 1768. The court, therefore, will construe the phrase "wherein each of the components of the health tracker is part of a single, unified portable unit" as "wherein each of the components of the health tracker is a part of a coherent group or whole that is capable of being carried."

**B. Claim 29**

Claim 29 is dependent on claim 22 and reads as follows:

> A portable personal health tracker according to claim 22 further comprising a

2005 U.S. Dist. LEXIS 9577, *

tactile input device on which the subject may write and the subject's writing is detected, said tactile input device generating a *digitized representation of the detected writing*.

The parties dispute the meaning of "digitized representation of the detected writing." The defendants contend that this term should be limited to a subject's handwriting, and proposes that the term be construed as "digital data that represents the subject's handwriting." (D.I. 41, at 30-31.) According to the defendants, the specification supports their construction because it [*22] differentiates between any input on a touch-sensitive screen by a pen and handwriting. Additionally, the specification "makes clear that 'writing' refers not to any record of tactile input by a subject, but instead specifically to the subject's handwriting." (*Id.* at 32.)

Conversely, PHT requests the court to adopt a broad construction of the term. PHT proposes that the term means "a digital record of a pattern created on a tactile input device of the health tracker." (D.I. 39, at 14.) PHT asserts that the defendants' proposed limitation is not justified by the specification or the prosecution history. The court agrees. However, the court also concludes that PHT's proposed construction is too broad.

The patent specification describes the writing as follows:

> Shown in FIG. 20A is a message screen of the subjective data logger in which a space is provided where the patient may write a message to a person who reviews his or her database records, such as a reviewing physician. In the preferred embodiment, the message is transmitted as bit-mapped data, such that . . . when displayed by the recipient, it appears in the handwriting of the patient. Although software is available [*23] which could be used to convert the message into characters, the handwriting itself may be of use to a reviewing physician in assessing the patient's medical condition and in establishing the authenticity of the record.

(Col. 26, 11. 44-55.) As previously discussed, there is a "heavy presumption" that a claim term carries its ordinary and customary meaning. *CCS Fitness,* 288 F.3d at 1366. Here, the ordinary meaning of the term "writing" is broad: "letters or characters formed on a surface that serve as visible signs of ideas, words or symbols." Webster's Third New International Dictionary 2641 (1993). While accused infringers may rebut the "heavy presumption" to limit a claim term, they "cannot do so simply by pointing to the preferred embodiment." *CCS Fitness,* 288 F.3d at 1366. Moreover, "where a specification does not require a limitation, that limitation should not be read from the specification into the claims." *Intel Corp. v. United States Int'l Trade Comm'n,* 946 F.2d 821, 836 (Fed Cir. 1991) (citation omitted). In addition, "just as the preferred embodiment itself does not limit claim terms, . . . mere inferences drawn [*24] from the description of an embodiment of the invention cannot serve to limit claim terms." *Johnson Worldwide,* 175 F.3d at 992.

Here, the defendants merely point to the preferred embodiment and state that nothing in the claim suggests that it covers anything but handwriting. However, neither the claim nor the specification require that the term "writing" be limited to "handwriting." Indeed, the specification explains that software is available that can convert the message into characters. (Col. 26, 11. 51-52.) Thus, the patent postulates that a "digitized representation of the detected writing" can include more than just a subject's handwriting. Accordingly, the court will construe the phrase "digitized representation of the detected writing" as having its plain and ordinary meaning -- specifically "digital data that represents the subject's writing." n6

> n6 The phrase "digitized representation of the subject's writing" in claim 30 should be construed consistently with the term "digitized representation of the detected writing" in claim 29. *See Southwall Techs.,* 54 F.3d at 1579. Thus, for the reasons stated above, the court construes the term "digitized representation of the subject's writing" to mean "digital data the represents the subject's writing."

[*25]

**C. Claim 34**

Claim 34 is directed to a personal health tracking system and provides:

A personal health tracking system comprising:

(a) a portable unit having a data logger that collects and records *subjective data* n7 from a subject regarding the subject's psychological condition and subjectively observed physiological condition;

(b) a time base of the portable unit which tracks a time of recording of the data;

(C) a data storage location remote from the portable unit in which the data is stored with reference to the time base such as to provide a chronological history of the subject's psychological condition; and

(d) a *data transmission device of the portable unit* that transmits data to the data storage location via a *digital data network.*

The parties dispute the meaning of the emphasized phrases. The court will address each phrase in turn.

> n7 The term "subjective data" in this claim should be construed consistently with the term "subjective data" in claim 22. Accordingly, for the reasons stated in Section III.A.1., *supra,* the court construes "subjective data" to mean "data which is input by the patient to the data logger, regardless of whether that data pertains to the patient or the patient's environment, and whether or not the information is objective or factual, such as medication dosage or consumption of a particular food."

[*26]

1. Data Transmission Device of the Portable Unit

PHT, Invivodata, and CRF's proposed constructions for this phrase are similar to their proposed constructions for the phrase "data transmission device capable of connecting directly" in claim 22. eTrials proposes that the court construe the phrase to mean "a device that transmits data and is included within the portable unit." n8 Invivodata and CRF have also proposed a construction that is consistent with their proposed construction of the term "part of a single, unified portable unit."

> n8 eTrials' proposed construction does not include a direct connection between the data transmission device and the network for two reasons: (a) claim 34 does not explicitly cite the "direct connection" requirement; and (b) when the patent applicants compared claim 34 to claim 1 (which contains similar language to claim 22), they told the patent examiner that the data transmission devices of the two claims are different. (D.I. 40, at 27 n.11.) eTrials, however, states that "to the extent the court is inclined to construe claims 22 and 34 to require a direct connection, Etrials believes that the construction urged by invivodata and CRF should be adopted." (*Id.*)

[*27]

The court has already construed the phrase "data transmission device" and the phrase "part of a single, unified portable unit." As previously stated, the court should construe claim terms consistently. *See Southwall Techs.,* 54 F.3d at 1579. The court, therefore, will construe the term "data transmission device" consistent with its construction of that term in claim 22 to mean "a device that transmits data." The court will not construe the term "data transmission device" as used in claim 34 to include a direct connection, as claim 34 does not include the "direct connection" requirement. In addition, the court will construe the term "of the portable unit" consistent with the phrase "part of a single, unified portable unit" in claim 22 to mean "part of a coherent group or whole that is capable of being carried." Thus, the court will construe "data transmission device of the portable unit" to mean "a device that transmits data and is part of a coherent group or whole that is capable of being carried."

2. Digital Data Network

The parties' dispute over the term "digital data network" centers on whether the term, as used in the claims of the '985 patent includes or excludes [*28] a telephone network. Noting that "where claims use different terms, those differences are presumed to reflect a difference in the scope of the claims," see *Forest Labs. v. Abbott Labs.,* 239 F.3d 1305, 1310 (Fed. Cir. 2001), the defendants contend that under the principles of claim differentiation the claims make clear that a digital network and a telephone network are two different things. (D.I. 40, at 28.) The defendants point to three different claims to support their claim differentiation argument: (1) unasserted dependent claim 46; (2) unasserted dependent claim 47; and (3) claim 1. Claims 46 and 47 depend from claim 43, which is directed to a personal health tracking system that includes a "communication network" limitation. The communication network of claim 46 comprises a "public telephone network," while the communication network of claim 47 comprises a "digital data network." n9 The defendants maintain that because the dependent claims comprise different "communication networks," the patent uses the term "digital data network" to mean something other than a telephone network. (*Id.*) With respect to claim 1, the defendants contend that the applicants argued [*29] patentability to the patent examiner by stating that claim 34 is limited to a "digital data network," whereas claim 1 recites a broader "communication network." According to the defendants, if the court accepted PHT's construction then the "digital data network" of claim 34 would be superfluous -- that is, the "digital data network" would be the same as the "communication network" recited in claims 1 and 22. (04-821 D.I. 42, at 12-13.)

Case 1:05-cv-00314-GMS   Document 72-2   Filed 05/15/2006   Page 8 of 10

Page 8
2005 U.S. Dist. LEXIS 9577, *

n9 Claim 46 reads:

> A personal health tracking system according to claim 43 wherein the communication network comprises a public telephone network and the portable unit comprises a modem that is directly connectable to the telephone network.

Claim 47 reads:

> A personal health tracking system according to claim 43 wherein the communication network comprises a digital data network and the portable unit is connectable directly to the data network a local data network access connection.

The defendants further contend that their proposed construction is supported [*30] by the specification because the specification "expressly distinguishes between a telephone network and the 'alternative,' a data network." (*Id.* at 12.) The defendants reason that if a data network, as used in the '985 patent, included a telephone network, "there would be no need for the applicants to describe the use of a 'combination of a telephone network and a data network,'" as is recited in the specification.

PHT asserts that its construction is correct because the patent describes transmitting information from the health tracker to a central database using various types of networks. (D.I. 39, at 18.) In addition, PHT asserts that a telephone network "can be a data network," providing two examples: (1) telephone communications carried over computer networks utilizing a voice over Internet protocol ("VoIP") system, or system that converts standard telephone audio into digital data so it can be sent over a computer network; and (2) digital information transmitted over traditional telephone lines using digital subscriber line ("DSL") technology. (*Id.*) According to PHT, "so long as the network is capable of transmitting digital data, the network is a digital data network, [*31] even if. . . [it] is also capable of transmitting telephone communications." (*Id.*)

PHT asserts that although "digital data network" and "telephone network" may have different meanings in claims 46 and 47, it does not follow that the terms are mutually exclusive. (D.I. 45, at 7.) PHT further asserts that "although telephone networks typically utilize digital data networks, not all digital data networks are telephone networks." (*Id.*) Lastly, PHT points to claim 39, which depends from claim 34, and is directed to "[a] personal health tracking system . . . wherein the connection device comprises a modem that is connectable directly to a public telephone network." (Col. 31, ll. 46-48.) PHT maintains that because claim 39 is encompassed by claim 34, the "digital data network" recited in claim 34 cannot exclude the "public telephone network" of claim 39. (D.I. 45, at 7.)

The court is persuaded by PHT's argument that, as used in the '985 patent, the term "digital data network" does not exclude a telephone network. The plain meaning of the term "digital data network" is "a network that transmits digital data." As PHT correctly asserts, a telephone network is a network that transmits [*32] digital data, for example, through a VoIP system or DSL technology. Thus, the plain and ordinary meaning of "digital data network" includes a telephone network. In addition, while the terms "digital data network" and "telephone network" in claims 46 and 47 have a different meaning, the court agrees with PHT that none of the language recited in those claims suggests that the terms are mutually exclusive.

The specification does not rebut the presumption that the plain and ordinary meaning of "digital data network" applies. The patent applicants have not acted as their own lexicographers, as they have not clearly set forth a definition of "digital data network" in the specification or prosecution history. *See CCS Fitness,* 288 F.3d at 1366; *Johnson Worldwide,* 175 F.3d at 990. The specification does provide that the preferred embodiment uses "some combination of a telephone network and a data network." (Col. 5, ll. 23-24.) As previously discussed, the defendants contend that the description of the preferred embodiment "expressly" distinguishes a telephone network from a digital network in the specification. The court does not agree. The language cited [*33] by the defendants to support their contention may be limiting. However, it is improper to read a limitation from the specification into the claim, especially when, as here, the specification does not expressly or implicitly limit the scope of the invention to a digital data network that excludes a telephone network. *See Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 904, 908 (Fed. Cir. 2004). for example, the specification states that "those skilled in the art will recognize that there is a variety of means to transfer data from site to site." (Col. 5, ll. 29-31.) This statement certainly contemplates the use of a telephone network that transmits digital data.

Lastly, the prosecution history does not support the conclusion that the patentees distinguished the term "digital data network" from the prior art on the basis that a telephone network was excluded, disclaimed a tele-

phone network, or described an embodiment that excluded a telephone network as important to the invention. As previously stated, the defendants contend that the difference between claim 1 and claim 34 that the applicants referred to is that claim 1 is directed to a broad "communication network, [*34] " while claim 34 is limited to a "digital data network." Again, the court disagrees and concludes that the applicants distinguished claim 34 from claim 1 by adding a limitation to what the "data transmission device" could do. In other words, when describing the amendments to claim 1, the applicants stated that the claim was amended "to specify that the handheld device includes a data transmission device that is capable of connecting directly to a communication network," thereby broadly defining "data transmission device." When distinguishing claim 1 from claim 34, however, the applicants told the patent examiner that claim 34 is "similar to claim 1, but is limited to a data transmission device that transmits data to a remote data storage location via a digital data network," thereby limiting the properties of the "data transmission device." (*See* D.I. 42 Ex. C, at 13.) Thus, the statements that the applicants made during prosecution do not support a construction of "digital data network" different from its plain and ordinary meaning. The court, therefore, construes "digital data network" to mean "a network that transmits digital data." n10

> n10 The court will construe the term "digital data network" in claim 37 consistently with its construction of "digital data network" in claim 34. Thus, for the reasons stated above, the court construes the term "digital data network" in claim 37 to mean "a network that transmits digital data."

[*35]

### D. Claim 36

Claim 36 provides:

A personal health tracking system according to claim 34 wherein the digital data network comprises a *public data network.*

As with the term "digital data network," the parties dispute whether the term "public data network" includes or excludes a telephone network. Both PHT and the defendants rely on the same arguments set forth for the construction of "digital data network." Because the court has already construed the term "digital data network," and a "public data network" is a subset of the "digital data network," the court will construe "public data network" to mean "a publicly accessible network that transmits digital data."

### E. Claim 38

Claim 38 is directed to a personal health tracking system and reads:

A personal health tracking system according to claim 34 wherein the data transmission device comprises a *connection device* that facilitates connection to the data network. The parties dispute the term "connection device." At the *Markman* hearing, the parties agreed to the following construction of this term: "a device, including but not limited to a modem, that facilitates connection of the portable unit to the data network. [*36] " Accordingly, the court will construe the term "connection device" to mean "a device, including but not limited to a modem, that facilitates connection of the portable unit to the data network."

### F. Claims 39 and 40

Claims 39 and 40 depend from claim 38 and are directed to limitations regarding the "connection device." Claim 39 reads:

A personal health tracking system according to claim 38 *wherein the connection device comprises a modem that is connectable directly to a public telephone network.*

Claim 40 reads:

A personal health tracking system according to claim 38 *wherein the connection device is connectable directly to a local data network access connection.*

In both claims, the parties' dispute centers on the phrase "connectable directly." The court, therefore will construe these claims together. The court has already construed the phrase "capable of connecting directly" in claim 22 to mean "capable of connecting without requiring a separate data processor." In order to construe claim terms consistently, as it should, the court concludes that "connectable directly" means "capable of connecting without requiring a separate data processor." Accordingly, [*37] the phrase "wherein the connection devices comprises a modem that is connectable directly to a public telephone network" in claim 39 is construed to mean "the connection device includes a modem which can connect to a public telephone network without requiring a separate data processor." The phrase "wherein the connection device is connectable directly to a local data network access connection" in claim 40 is construed to mean "the connection device can connect to a local point of access without requiring a separate data processor."

### IV. CONCLUSION

For the reasons stated, the claim terms of the '985 patent shall be construed as set forth in the court's Order of this same date.

Dated: May 19, 2005

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that, as used in the asserted claims of U.S. Patent No. 6,095,985 (the "'985 patent"),

1. The term "subjective data" in claim 22 and claim 34 is construed as "data which is input by the patient to the data logger, regardless of whether that data pertains to the patient or the patient's [*38] environment, and whether or not the information is objective or factual, such as medication dosage or consumption of a particular food;"

2. The phrase "data transmission device capable of connecting directly to a communication network" in claim 22 is construed as "a device that transmits data and is capable of connecting to a communication network without requiring a separate data processor;"

3. The phrase "wherein each of the components of the health tracker is part of a single unified portable unit" in claim 22 is construed as "wherein each of the components of the health tracker is a part of a coherent group or whole that is capable of being carried;"

4. The phrases "digitized representation of the detected writing" in claim 29 and "digitized representation of the subject's writing" in claim 30 are construed as "digital data that represents the subject's writing;"

5. The phrase "data transmission device of the portable unit" in claim 34 is construed as "a device that transmits data and is part of a coherent group or whole that is capable of being carried;"

6. The term "digital data network" in claim 34 and claim 37 is construed as "a network that transmits [*39] digital data;"

7. The term "public data network" in claim 36 is construed as "a publicly accessible network that transmits digital data;"

8. The phrase "a connection device that facilitates connection to the data network" in claim 38 is construed as "a device, including but not limited to a modem, that facilitates connection of the portable unit to the data network;"

9. The phrase "wherein the connection device comprises a modem that is connectable directly to a public telephone network" in claim 39 is construed as "the connection device includes a modem which can connect to a public telephone network without requiring a separate data processor;"

10. The phrase "wherein the connection device is connectable directly to a local data network access connection" in claim 40 is construed as "the connection device can connect to a local point of access without requiring a separate data processor."

Dated: May 19, 2005

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE