IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NETRATINGS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-314-GMS |
| | ) | |
| COREMETRICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT COREMETRICS, INC.'S ANSWERING MARKMAN BRIEF

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
Ashby & Geddes
222 Delaware Ave., 17th Floor
P.O. Box 1150
Wilmington, DE 19899
Telephone: (302) 654-1888
Facsimile: (302) 654-2067
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendant Coremetrics, Inc.*

*Of Counsel:*

Robert T. Haslam
Nitin Subhedar
Bhanu K. Sadasivan
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, CA 94025
Telephone: (650) 324-7000
Facsimile: (650) 324-0638

Matthew C. Lapple
HELLER EHRMAN LLP
4350 La Jolla Drive, 7th Floor
San Diego, CA 92121
Telephone: (858) 450-8400
Facsimile: (858) 450-8999

Dated:    May 15, 2006

**TABLE OF CONTENTS**

I.    INTRODUCTION...................................................................................1

II.   NETRATINGS' ERRONEOUS CLAIM CONSTRUCTION
      METHODOLOGY...............................................................................1

III.  NETRATINGS' DIVERSIONARY ATTACK THAT COREMETRICS
      DESIGNATED TOO MANY TERMS SHOULD BE IGNORED......................4

IV.   NETRATINGS' ERRONEOUS CLAIM CONSTRUCTION PROPOSALS...................4

      A.   NetRatings Is Unable to Explain or Define the '637 Patent Claim
           Terms......................................................................................5

           1.   NetRatings Has Not Identified Corresponding Structure.......................5

           2.   The Only Arguable Corresponding Structure is the
                Unexplained Generic Java Applet...............................................7

           3.   The "instructions for" Claim Elements Are Functional .......................8

           4.   The Term "Characteristic of a Content Display" Is Indefinite...........10

      B.   The '510 and '680 Patents................................................................11

           1.   NetRatings' Dictionary-based Definition of "Log" Should be
                Rejected...............................................................................11

           2.   The Term "Installed" Connotes Permanence .................................12

           3.   "identify titles of open windows"; reflects a log of world
                wide web pages"; and "identifies character strings reflecting
                on-line activity".....................................................................13

      C.   The '386 and '155 Patents...............................................................14

           1.   The "tracking program" and "executable program" Must
                Operate Over Time.................................................................14

           2.   NetRatings' Attempt to Change the Word "And" into "Or" In
                "at least one of the first resource and one or more second
                resources" Should be Rejected..................................................15

           3.   NetRatings' Definition of "resource" Is Incorrect .........................18

           4.   "data representative of a plurality of preferences of a user";
                "data representative of a plurality of interests of a user" ...............19

           5.   "Monitoring Details of Choices Made by a User" ..........................19

6.    NetRatings' Confusion Over "embedded" and "not being part of the resource" ................................................................................................20

7.    The "Java Programming Language" ................................................................20

8.    NetRatings' Definition of "user action" Is a Meaningless Paraphrase ........................................................................................................21

V.    TERMS ACROSS PATENTS ................................................................................................22

A.    "Computer Usable Medium" and "Program Code which, when Executed on a Computerized Device, Causes the Computerized Device to Execute, in a Computer Network Comprising One or More Servers and One or More Clients, a Method." ........................................22

VI.    CONCLUSION ................................................................................................................23

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Affymetrix, Inc. v. Hyseq, Inc.,*
  132 F.Supp.2d 1212 (N.D. Cal. 2001) ...................................................................8, 9, 10

*Edward Miller & Co. v. Bridgeport Brass Co.,*
  104 U.S. 350 (1881) .....................................................................................................17

*Harris Corp. v. Ericsson, Inc.,*
  417 F.3d 1241 (Fed. Cir. 2005) .....................................................................................5

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,*
  381 F.3d 1111 (Fed. Cir. 2004) ...................................................................................16

*Insituform Technologies, Inc. v. CAT Contracting, Inc.,*
  99 F.3d 1098 (Fed. Cir. 1996) .....................................................................................22

*McKesson Information Solutions LLC v. TriZetto Group, Inc.,*
  --F. Supp. 2d --, 2006 WL 892193 (D. Del., April 5, 2006)......................................6, 7, 9, 10

*North American Vaccine, Inc. v. American Cyanamid Co.,*
  7 F.3d 1571 (Fed. Cir. 1993) .......................................................................................22

*Novo Nordisk of North America, Inc. v. Genentech, Inc.,*
  77 F.3d 1364  (Fed. Cir. 1996) ....................................................................................17

*Phillips v. AWH Co.,*
  415 F.3d 1303 (Fed. Cir. 2005) ..............................................................................1, 2, 3

*SuperGuide Corp. v. DirecTV Enterprises, Inc.,*
  358 F.3d 870 (Fed. Cir. 2004) ................................................................................17, 18

*Texas Digital Systems, Inc. v. Telegenix, Inc.,*
  308 F.3d 1193 (Fed. Cir. 2002) .....................................................................................1

*Unique Concepts, Inc. v. Brown,*
  939 F.2d 1558 (Fed. Cir. 1991) .............................................................................16, 17

*WMS Gaming, Inc. v. Int'l Game Tech.,*
  184 F.3d 1339 (Fed. Cir. 1999) .....................................................................................5

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **Coremetrics** | Defendant Coremetrics, Inc. |
| **NetRatings** | Plaintiff NetRatings, Inc. |
| **'637 patent** | U.S. Patent No. 6,108,637 |
| **'510 patent** | U.S. Patent No. 5,675,510 |
| **'680 patent** | U.S. Patent No. 6,115,680 |
| **'386 patent** | U.S. Patent No. 6,763,386 |
| **'155 patent** | U.S. Patent No. 6,138,155 |
| **112(6)** | 35 U.S.C. § 112, paragraph 6 |
| **JCCC** | The Joint Claim Construction Chart filed by the parties on April 3, 2006, and attached as Exhibit 2 to the Declaration of David Klausner In Support Of Coremetrics, Inc.'s Opening Claim Construction Brief |
| **Jt. App.** | Joint Appendix filed by Plaintiff and Defendant, accompanying the Opening Markman Briefs |
| **File History** | The prosecution history of any given patent before the U.S. Patent & Trademark Office |
| **MPEP** | Manual of Patent Examining Procedure |
| **Klausner ¶ __, Ex. __** | Declaration Of David Klausner In Support Of Coremetrics, Inc.'s Opening Claim Construction Brief (with paragraph or exhibit cite) |
| **Sadasivan Decl.** | Declaration of Bhanu K. Sadasivan In Support Of Defendant Coremetrics' Opening Markman Brief |
| **NR Brief, p. __** | NetRatings, Inc.'s Opening Brief On Claim Construction (with page cite). |

## I.     INTRODUCTION

The claim construction positions advanced by NetRatings, and the arguments in support thereof that are set forth in NetRatings' opening claim construction brief, are fundamentally flawed.  Throughout its brief, NetRatings follows a discredited claim construction methodology in which it looks first to dictionaries for a broad general definition rather than to the teachings of the intrinsic evidence – i.e., the patent claims, the patent specification and the patent prosecution history.  By following this method, NetRatings proposes overbroad definitions that are completely divorced from the patents and that, if adopted, will result in granting NetRatings rights over technology far in excess of anything that any of the alleged inventors even arguably conceived.  As explained below, this flawed method permeates NetRatings' constructions and mandates that they be rejected.

## II.     NETRATINGS' ERRONEOUS CLAIM CONSTRUCTION METHODOLOGY

NetRatings' proposed approach to claim construction systematically results in error, because it violates the methodology mandated by the Federal Circuit's recent *en banc* decision in *Phillips v. AWH Co.*, 415 F.3d 1303 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1332 (2006).  In *Phillips*, the Court emphasized that the intrinsic record -- comprised of a patent's specification, claims and file history -- enjoys primacy as the proper starting point for the claim construction process.  *Id.* at 1351.  Yet, rather than following *Phillips*, NetRatings asks the Court to employ the claim construction method of *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), which was *expressly rejected* by the *Phillips* court.  Namely, NetRatings invites this Court to start its analysis by looking first to a broad dictionary definition for each claim term, and it then suggests that the broad dictionary definition should be rejected or modified only if the patent specification is expressly inconsistent with that definition.[1]  In urging the use of this erroneous approach, NetRatings inverts the respective roles that the intrinsic evidence and dictionaries are supposed to play in determining the "ordinary meaning" of a given claim

---

[1]  For example, on page 16 of its brief, NetRatings states that "NetRatings' proposed definition is fully in accord with the ordinary meaning of the words 'log' (a record) and 'predetermined' (decide/determine beforehand)."  NetRatings then offers a long string cite to dictionary definitions.  Finally, NetRatings argues that "With respect to the terms log/logging, those terms mean 'record/recording,' consistent with the patent and the ordinary meaning of the words."  (NR Brief, p. 16).

term and elevates abstract dictionary definitions above the patent specification itself. If this methodology were to be followed and NetRatings' dictionary-based definitions adopted, the result will be a gross distortion of the scope of the claims of the patents-in-suit to encompass technology that the patentees never actually invented.

Indeed, the *en banc Phillips* court expressly criticized the *Texas Digital* approach to claim construction that NetRatings now advocates:

> "In effect, the Texas Digital approach limits the role of the specification in claim construction to serving as a check on the dictionary meaning of a claim term if the specification requires the court to conclude that fewer than all of the dictionary definitions apply, or if the specification contains a sufficiently specific alternative definition or disavowal. That approach, in our view, improperly restricts the role of the specification in claim construction."

415 F.3d at 1320 (internal citations omitted). The *Phillips* court also explained why relying upon a dictionary, in the first instance, to develop claim constructions routinely leads to error:

> "The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent. Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent. Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification."

*Id.* at 1321. *Phillips* then explains the "disconnect" that often exists between dictionary definitions and patent term definitions:

> The patent system is based on the proposition that claims cover only the invented subject matter. . . . The use of a dictionary definition can conflict with that directive because the patent applicant did not create the dictionary to describe the invention. Thus, there may be a disconnect between the patentee's responsibility to describe and claim his invention, and the dictionary editors' objective of aggregating all possible definitions for particular words."

*Id.* at 1321. Moreover, *Phillips* warns against the dangers of the claim construction approach that NetRatings now wants this Court to use:

> ". . . too often [the *Texas Digital*] line of cases has been improperly
> relied upon to condone the adoption of a dictionary definition entirely
> divorced from the context of the written description. The problem is that
> if the district court starts with the broad dictionary definition in every
> case and fails to fully appreciate how the specification implicitly limits
> that definition, the error will systematically cause the construction of the
> claim to be unduly expansive.

*Id.* at 1321. In the same paragraph, the *Phillips* court also explains how to avoid the risk of systematic

overbreadth in claim construction:

> The risk of systematic overbreadth is greatly reduced if the court instead
> focuses at the outset on how the patentee used the claim term in the
> claims, specification and prosecution history, rather than starting with a
> broad definition and whittling it down."

*Id.* at 1321.

Coremetrics has followed the approach required by *Phillips* in arriving at its proposed

constructions, firmly anchoring its proposed definitions in the claims, the specifications and the

prosecution histories of the patents-in-suit. In its Opening Markman brief, Coremetrics explained the

context of the terms in the claims themselves, walked the Court through the key passages of the patent

specification, and, where helpful, quoted portions of the prosecution history. In doing so, Coremetrics

followed the teaching of *Phillips*, which, in quoting *Vitronics*, re-emphasized the importance of looking to

intrinsic evidence in claim construction:

> "claims 'must be read in view of the specification, of which they are a
> part.' As we stated in Vitronics, the specification 'is always highly
> relevant to the claim construction analysis. Usually it is dispositive; it is
> the single best guide to the meaning of a disputed term.'"

*Id.* at 1315 (internal citations omitted).

As explained in both Coremetrics' Opening Markman Brief and the argument below, in every

case, NetRatings argues for broad dictionary definitions and gives short shrift to the intrinsic evidence. In

other words, NetRatings largely ignores the "single best guide to the meaning of a disputed term."

Accordingly, NetRatings' discredited claim construction methodology, and the flawed definitions it

produces, should be rejected.

### III. NETRATINGS' DIVERSIONARY ATTACK THAT COREMETRICS DESIGNATED TOO MANY TERMS SHOULD BE IGNORED

In several parts of it brief, NetRatings makes a diversionary, and ultimately irrelevant, attack on the number of claim terms that Coremetrics designated as needing construction. (NR Brief, p. 1, 3). First, the fact that Coremetrics used the meet-and-confer process to narrow the number of claims needing construction -- from over 300 initially to 26 in the end -- demonstrates that Coremetrics did <u>exactly</u> what the Court envisioned in the process outlined in the Court's Rule 16 Scheduling Order. Coremetrics used the process, including multiple meet-and-confer sessions with NetRatings, to narrow the number of terms needing construction and to sharpen the issues to be presented to the Court.

Second, NetRatings conveniently fails to mention in its brief that, as of the time that Coremetrics provided its initial list of claim terms needing construction, NetRatings had not identified the specific patent claims that it contends are infringed by Coremetrics. Given this, Coremetrics had no choice but to assume that NetRatings was asserting *all* 183 patent claims across all five of the patents-in-suit, and Coremetrics was thus forced to make a more expansive initial designation of terms than it otherwise would have made. After NetRatings reduced the number of asserted claims slightly, leaving 105 claims in issue, Coremetrics was able to reduce the number of terms to be construed and was further able to reduce the list as the parties met and conferred. Thus, on a proportional basis, Coremetrics has done far more work to narrow the issues for claim construction than NetRatings has.

Accordingly, the Court should ignore NetRatings' attack on the number of terms that Coremetrics designated for construction. If anything, the focus should be placed on the fact that NetRatings decided to present over one hundred allegedly infringed claims to this Court instead of identifying representative claims and selecting a more reasonable number of claims for consideration.

### IV. NETRATINGS' ERRONEOUS CLAIM CONSTRUTION PROPOSALS

Time and again, the erroneous "dictionaries first" claim construction method urged by NetRatings has led it to propose claim constructions that are completely divorced from the patent specification. As a result, the definitions proposed by NetRatings are consistently overbroad and simply incorrect. Accordingly, and for the reasons explained more fully below, Coremetrics respectfully requests that the

Court reject the claim constructions advanced by NetRatings.

**A.    NetRatings Is Unable to Explain or Define the '637 Patent Claim Terms**

As Coremetrics explained in its Opening Markman Brief, NetRatings is unable to provide clear or understandable definitions for the terms found in the '637 patent claims, including the various means-plus-function clauses found therein.  This systematic failure encompasses three main issues:  (a) NetRatings' failure to identify corresponding structure for its means-plus-function claim elements; (b) NetRatings' inability to counter the strong intrinsic evidence that the claims that use "instructions for" language should be governed by 35 U.S.C. 112, paragraph 6; and (c)  NetRatings' failure to provide a definition that places any understandable limits on the indefinite term "characteristic of a content display."

**1.    NetRatings Has Not Identified Corresponding Structure.**

In its Opening Brief, NetRatings again fails to identify what exactly it is that comprises the corresponding structure for the means-plus-function clauses found in the claims.  As discussed below, the corresponding structure for a means-plus-function element in the context of computer software is the particular algorithm described in the specification for performing the recited function.  Yet, NetRatings appears incapable of identifying any algorithm as corresponding to each of the means-plus-function elements found in the claims of the '637 patent.  This failure is not surprising, because as discussed in Coremetrics' Opening Brief, there *is* no algorithm disclosed in the '637 patent.[2]  But NetRatings' failure to point to a corresponding algorithm also highlights the fact that its proposed claim construction is necessarily incorrect.

NetRatings cites *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999), (NR Brief, p. 32) for the main proposition for which that case stands, namely that the corresponding structure of a means-plus-function claim element for a computer-implemented invention is the algorithm that is described in the patent specification.  *Accord, Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241, 1249 (Fed. Cir. 2005).  Yet, having cited this proposition, NetRatings has no choice but to immediately ignore it:

---

[2] This lack of a corresponding algorithm renders the '637 patent claims nonenabled and indefinite. (Coremetrics Opening Markman Brief, p. 11-12)

there simply is no specific algorithm disclosed in the '637 patent specification, so NetRatings does not cite to one. And because of this, NetRatings naturally cannot link up an algorithm disclosed in the specification to each of the means-plus-function elements, nor does it even attempt to do so. Instead, NetRatings inexplicably returns to the use of functional language, suggesting that the corresponding structure for the function called out in the claim element is some unspecified, unknown and abstract "computer instructions" for performing that function. (JCCC p. 15-29); (NR Brief, p. 32). NetRatings concludes by offering a string cite to the specification and inviting the Court to go hunting through the patent on its own to find the allegedly corresponding structure.

In a recent decision, another judge in this district considered, and rejected, a proposed claim construction very similar to that which NetRatings now asserts. In *McKesson Information Solutions LLC v. TriZetto Group, Inc.*, --F. Supp. 2d --, 2006 WL 892193 (D. Del., April 5, 2006), Judge Robinson considered several means-plus-function elements in a patent for software to detect errors in numerical codes used for submitting medical claims to insurance companies. There, the patent claims included a "means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database." *Id.* at *5, n.2. The patentee argued, through expert reports, that "regarding the various 'means for' elements in the claims, the [patent-in-suit] discloses software or a combination of software and hardware as the structure that performs the functions corresponding to these elements." *Id.* at *4. The *McKesson* court unambiguously rejected this proposed construction:

> "However, [patentee's expert] never articulates what specific algorithms
> are disclosed in the [patent in suit] corresponding to the 'means for
> determining' limitations. The court has found that merely stating
> 'software' is insufficient structure for these limitations . . . .
> Furthermore, in the charts attached to his expert report relating to the
> 'means for determining' limitations, [patentee's expert] discusses only
> the function of the accused devices. Because [patentee's expert] does not
> identify the structure in the patent, he necessarily can not, and does not,
> compare that disclosed structure to the structure in the accused
> products."

*Id.* The McKesson court went on to explain in a footnote that if "software" was the corresponding structure to a function in a means-plus-function limitation, the patentee either should have "specifically

described" the software by stating the "specific algorithm disclosed in the specification" or should have

identified some software which could perform the stated function that was known to those of skill in the

art at the time the patent was filed. *Id.* at *5, n.3.

The parallels between *McKesson* and the present case are remarkable. Here, NetRatings'

proposed structure for each of the '637 means-plus-function limitations, while more verbose that

McKesson's proposed structure, is just as insufficient and suffers from precisely the same flaw:

> "A set of computer instructions as described in the specification sections
> cited below, which can be embodied in one or more computer programs,
> which cause one or more computer systems to perform the recited
> function, and which can be implemented using any appropriate computer
> language, and all structural equivalents of such set of computer
> instructions." (JCCC p. 14).

Nowhere in this paragraph does NetRatings say what the steps of the algorithm are that

supposedly perform the claimed function, nor does NetRatings identify any previously known software to

perform the function. Instead, NetRatings falls back on functional terms, *i.e.*, it refers to "instructions"

that perform a certain task. This is nearly identical to the way that McKesson used the term "software."

Accordingly, NetRatings' proposed claim construction cannot be correct and must be rejected.

## 2. The Only Arguable Corresponding Structure is the Unexplained Generic Java Applet

As discussed above and in Coremetrics' Opening Markman Brief, NetRatings' inability to

identify an actual algorithm for the means-plus-function elements of the '637 patent claims is not

surprising, because the '637 patent does not disclose any clear algorithm. Indeed, the only arguable

"structure" that the '637 patent does disclose is the use of a generic, unexplained Java Applet. The '637

patent does not disclose the source code that comprises that Java Applet, does not disclose the manner in

which the "monitoring" is to be conducted, and does not disclose the order in which the largely

unidentified, preexisting Java methods are to be arranged within the Java Applet. Simply, put, the only

thing that the patent is clear about, and repeatedly emphasizes, is that this "empty shell" Java Applet is

what can be used -- in a manner never specified -- to somehow contain and deliver the "monitoring

instructions" of the alleged invention:

"The 'monitoring instructions' of <u>such an applet</u> may be no more than an instruction that causes an indication that <u>the applet</u> has executed to be stored or transferred to an appropriate network site." ('637, Col. 13, ln. 37-40, Jt. App., Tab B, JA00026)(emphasis added).

"When the monitoring method is implemented by <u>an applet written in Java</u>, the time stamp can be obtained using a method that exists as part of the Java language." ('637, Col. 17, ln. 11-13, Jt. App., Tab B, JA00028)(emphasis added).

 "The instructions identify the location ("image") at the content provider site of <u>an applet (a small application program) called 'AdInsert' that includes further instructions which, when executed perform a monitoring method according to the invention, as well as cause the content to be displayed</u>. (The steps that can be implemented in such a monitoring method are discussed further below). Upon receipt of the request by the http daemon at the content provider site, <u>the AdInsert applet</u> is transferred to the requesting content display site and begins executing." ('637, Col. 12, ln. 15-24, Jt. App., Tab B, JA00025) (emphasis added).

Thus, the patent is clear that nearly all meaningful action must be carried out through the use of this unspecified and unexplained Java Applet. Similarly, the prosecution history supports the conclusion that the Java Applet should be used to perform all "monitoring." (October 22, 1999 Response to Office Action, p. 12, Jt. App., Tab Q, JA00224)(emphasis added). Accordingly, the only arguable "structure" that is disclosed that corresponds to the means-plus-function elements is an unexplained, generic Java Applet, the details and algorithmic contents of which are never specified and which accordingly remain unknown. Thus, the Court should adopt Coremetrics' proposed claim constructions for all of the means-plus-function claim elements.

### 3.     The "instructions for" Claim Elements Are Functional

NetRatings' Opening Brief does nothing to address the overwhelming intrinsic evidence presented by Coremetrics showing that the "instructions for" claim elements of the '637 patent should be governed by 112(6). The only thing that NetRatings does is cite a case from another district, *Affymetrix, Inc. v. Hyseq, Inc.*, 132 F.Supp.2d 1212 (N.D. Cal. 2001), for the proposition that the term "computer code" is not governed by 112(6). NetRatings then argues by analogy that the term "instructions" should be treated similarly. This position should be rejected for two reasons: (a) *Affymetrix* and the present case are far different on the facts, primarily because the *Affymetrix* defendant did not present anything like the

overwhelming intrinsic evidence before this Court; and (b) the logic of *Affymetrix* has been rejected in this district, as evidenced by the *McKesson* case in which the term "software," by itself, was found not to connote structure.

*Affymetrix* and the present case are very different on the facts and evidence presented. In *Affymetrix*, the defendant argued that the term "computer code" was a functional term that should be construed under 112(6), but it "failed to provide any evidence or case law to support the proposition that 'computer code' is a generic term." *Id.* at 1232.. Instead, the *Affymetrix* defendant only cited cases in which application of 112(6) was already presumed because the term means had been used. *Id.* at 1231. Yet, despite this utter lack of evidence or case law showing the functional nature of the claim term "computer code," the *Affymetrix* court still considered the issue presented a "close question." *Id.* at 1231.

In stark contrast, Coremetrics has offered substantial evidence that the term "instructions" should be governed by 112(6). *First*, the context of the terms "means" and "instructions" in the '637 patent claims shows that the terms are interchangeable. As illustrated in Coremetrics' Opening Markman Brief, some claim elements -- such as those found in claims 11 and 57 -- are virtual duplicates, except for the fact that the term "instructions" has been swapped in for the term "means." (Coremetrics Opening Markman Brief, p. 14-17). *Second*, both the patentee and the '637 patent Examiner treated the terms "means for" and "instructions for" as interchangeable during prosecution of the patent. In fact, the patent examiner even went so far as to state that some of the "instructions for" claims were allowed because they contained allegedly novel "means for" elements.[3] (Coremetrics Opening Markman Brief, p. 16-17, JA 00232). *Third*, the "instructions" claims cannot be structural because one of ordinary skill in the art would not, by the nature of the word, know what structure the patentee sought to claim.[4] *Fourth*, the

---

[3] Tellingly, NetRatings even uses the terms interchangeably in its Opening Markman brief. When it cannot explain what the corresponding structure for a given means-plus-function element is, NetRatings resorts to statements such as "The structure for this element is a set of computer instructions implemented on a computer system as described in the specification sections cited by NetRatings in row 27 of Table 2." (p. 35). Notably, however, NetRatings still cannot say what those "instructions" look like or the specific algorithm that they are supposed to be implementing.

[4] As the record stands at the time of filing of this brief, Coremetrics has submitted expert testimony supporting this point, while NetRatings has submitted no evidence on how this term would be understood by one of skill in the art.

limitations of all of these claims derive solely from the functional expressions following the terms "means" or "instructions," not from those terms themselves. This is emphasized by the fact that the patentee's arguments for patentability all focused on functional, not structural, differences with the prior art. Thus, unlike the *Affymetrix* court, this Court has overwhelming and uncontested evidence supporting a decision that the "instructions for" claim elements must be governed by 112(6).[5]

Moreover, although NetRatings makes the hyperbolic claim that "[t]his conclusion is fully supported by the case law," NetRatings cites only the *Affymetrix* case rather than any Federal Circuit decision or other case from this District. Yet, as the recent decision in the *McKesson* case makes clear, this District has already once declined to accept the *Affymetrix* court's conclusion. Specifically, the *McKesson* court rejected the argument that "software," without the recitation of an algorithm implemented by that software, constituted corresponding structure. Thus, it would be incorrect and inconsistent with the *McKesson* decision to hold that the amorphous term "instructions" can somehow connote specific structure. Accordingly, this Court should hold that the "instructions for" elements in the '637 patent are controlled by 35 U.S.C. 112(6).

### 4.    The Term "Characteristic of a Content Display" Is Indefinite

As demonstrated in Coremetrics' Opening Brief, the term "characteristic of a content display" is indefinite. NetRatings' arguments in its Opening Brief make no headway toward clarifying the meaning of this term. Instead, NetRatings' brief identifies certain "specific types of characteristics that one might expect to be associated with a content display." (NR Brief, p. 27). After oddly identifying "position" as a possible characteristic three times, NetRatings offers other suggested "characteristics" related to whether, how much of, or how long a display can be seen on a computer screen by a user. (NR Brief, p. 27). Yet, these examples merely emphasize the indefiniteness of this term, because NetRatings' proposed definition is not limited to the enumerated examples. This was exactly the point that the '637 patent examiner was trying to make, when he rejected as indefinite all claims that use the meaningless term "characteristic"

---

[5] For brevity's sake, Coremetrics does not repeat all of the evidence and argument that it presented in its Opening Markman Brief. However, Coremetrics refers the Court to pages 14 -18 of its Opening Markman Brief and to paragraph 11 of Mr. Klausner's Declaration.

and suggested that the applicant instead identify what it is that the alleged invention was supposed to be monitoring, *e.g.*, "position, shape, color." (Office Action, 3/3/99, p. 2; JA 00144). The patentee refused to make that change, and NetRatings must now live with that decision.

Despite NetRatings' description of certain things as qualifying as a "characteristic of a content display," it unequivocally rejects the use of these things as part of the definition of "characteristic." Instead, NetRatings would rather have the Court interpret this word as "a distinguishing trait, quality or property." As this proposed definition makes abundantly clear, NetRatings would like the word "characteristic" to mean absolutely any and every trait, quality or feature of anything that can be seen on a computer screen. If this construction were to be adopted, the Court would be conferring upon NetRatings a patent claim that is infinitely broader than anything the alleged inventors of the '637 patent even arguably conceived and that is entirely unsupported by the specification of the patent. After all, there can be no question that the '637 patent specification does not disclose *any* way to monitor *every* change in *every* possible aspect of a display on a computer monitor. NetRatings' vague and overbroad construction does not, and would not, provide a person of ordinary skill in the art with an understanding of what the patent does cover, and what it does not. Further, because the patent itself does not define this term, and because the '637 patent examiner found the term to be indefinite, the term "characteristic of a content display" should be found indefinite by this Court.

**B.     The '510 and '680 Patents**

     **1.     NetRatings' Dictionary-based Definition of "Log" Should be Rejected**

As with virtually all of its proposed constructions, NetRatings' definition of "log" is clearly based upon a dictionary definition and is completely divorced from the '510 / '680 patent specifications. Nowhere is this more clear than in the fact that NetRatings devotes the majority of its argument on this term to abstract dictionary definitions, spending virtually no time on the actual teachings of the patent specification and paying no attention to the other intrinsic evidence. (NR Brief, p. 16). At best, NetRatings suggests that its proposed definition for "log" is "consistent" with the dictionary-based definition that it offers. (NR Brief, p. 16). Yet, once again, NetRatings here makes the critical error of assuming that the "ordinary meaning" of the word "log" can -- or should -- be determined from a

dictionary, rather than from the patent itself. And as a result, NetRatings' definition is significantly overbroad -- so broad, in fact, that if it were adopted by the Court, it will give NetRatings property rights over a vast swath of technology that the '510 / '680 patentees never invented.

When the *proper* claim construction methodology is employed to the term "log," the result is the definition set forth in Coremetrics' Opening Brief. Specifically, a "log of predetermined events" must: (a) have two or more time sequential entries of pre-selected events; (b) have two or more attributes associated with each entry; and (c) be saved on the user's hard drive. The fact that NetRatings' proposed definition completely ignores these key aspects of the "log" as disclosed by the inventors themselves only further proves how erroneous that definition actually is. Accordingly, NetRatings' definition should be rejected and Coremetrics' definitions should be adopted.

### 2.    The Term "Installed" Connotes Permanence

In accordance with both the teachings of the patent specification and common parlance, the term "installed" as applied to a computer software program suggests a permanence that is simply not captured in NetRatings' dictionary-based definition. As the '510 patent specification states:

> "The computer use meter and its supporting software may from time to time undergo system updates. These updates are intended to add features to the software and to correct any system bugs. * * * * The data transfer program, delivered on whatever medium, may first check for any outstanding software upgrades. If one is scheduled, then software will automatically be transferred to the panelist's computer." ('510, Col. 3, ln. 6-16, Jt. App., Tab A, JA00007).

This passage illustrates the need for the computer use meter to be "upgraded" to add features and fix bugs. If the computer use meter was not "installed" on the hard drive of the user's computer, but was instead downloaded each and every time that it was used, this passage would make no sense; after all, the most up-to-date and bug-free version of the computer use meter could always be downloaded. Coremetrics' definition addresses this inherent property of the term "installed," and it is also consistent with the manner in which the notion of "installing" computer software is ordinarily understood by us all (i.e., as requiring the step of saving the program to the hard drive of one's computer).

In its struggle against this patent-specification-based and common sense conclusion, NetRatings' offers a quote of the '510 patent that is misleading because it is taken entirely out of context.

Specifically, NetRatings' Brief argues:

> "To the contrary, the patents state that installation would ideally be that which does not require the user to have 'to take any additional action for the system to operate efficiently,' and 'will reduce the interference with the use of the computer by the user and minimize the impact on any particular user.'" (NR Brief, p. 18).

Remarkably, however, NetRatings fails to quote the sentence immediately before the quoted text, which states: "<u>After an initial installation process</u>, the system may be completely passive." ('510 Col. 3 ln. 41-42). In other words, the computer use meter can only "reduce the interference with the use of the computer by the user" because it has already gone through "an initial installation process." If anything, this argues *against* NetRatings' claim construction, because it suggests that installation requires a "process" -- *i.e.*, steps that do not need to be repeated. Once that process is completed, the computer use meter can then operate inconspicuously on the user's computer. In order to accomplish this, the only logical place for the computer use meter to be located once it is installed is on the user's hard drive. Therefore, Coremetrics' definition is correct.

### 3. "identify titles of open windows"; reflects a log of world wide web pages"; and "identifies character strings reflecting on-line activity"

The definitions that NetRatings proposes for these above phrases illustrate, in stark terms, how relying first upon dictionary definitions, rather than the intrinsic evidence, necessarily leads to overbroad claim construction. Through its various definitions, NetRatings appears to be trying to capture any and every method by which the general Internet-browsing habits of a person can be captured. This is clearly incorrect, because the patent does not, and cannot, claim the generic "idea" of tracking a person's browsing habits. Instead, the '510 and '680 patents describe and claim a *particular* way to watch what a user types and/or which computer software the user runs:

> "The system according to the invention may advantageously collect child Window information for commercial on-line service providers and user application. Window titles of these applications' child Windows generally hold useful descriptions of the activity at that moment." ('510 Col. 4, ln. 12-16, Jt. App. Tab A, JA00007).

> "In addition, it is an object of the invention to monitor and log certain external communications. The local meter application will <u>monitor strings of characters sent to a communication port such as a modem</u>. The system may be set to

monitor for certain predetermined character strings and log certain information upon occurrence of such strings. <u>If for example, the system detects a "http:" string, then the system will recognize that what follows should be the remainder of a Universal Resource Locator (URL) for a hypertext protocol site on the Internet's World Wide Web. If the local meter application identifies a URL, it will intercept and log the full URL.</u>" ('680, Col. 2, ln. 41-52, Jt. App., Tab C, JA00042)(emphasis added).

"In the Windows operating system, each displayed window is made up of a number of display elements. The display elements include inter alia edit boxes and buttons. <u>According to a preferred feature, the content of edit boxes may be examined.</u> If the content is consistent with a predetermined criteria, the content will be logged. <u>For example, it is assumed that, if the content of an edit box is consistent with the syntax of a URL, then the window corresponds to an internet browser program. Logging the content of the edit box will be indicative of the user's access of documents on the internet.</u>" ('680, Col. 11 ln. 51-61, Jt. App., Tab C, JA00047)(emphasis added).

While the patentees may be entitled to claim the system that they have described (assuming all other requirements for patentability are met), the patentees are simply not allowed to claim something that they have not invented, as NetRatings is attempting to do here. Therefore, the Court should adopt Coremetrics' definitions of these phrases.

**C.    The '386 and '155 Patents**

**1.    The "tracking program" and "executable program" Must Operate Over Time**

When the correct claim construction methodology is applied and the intrinsic record is given its proper role, the definition of "tracking program" and "executable program" necessarily have to include the concept of these programs performing their functions *over a period of time*. NetRatings' proposed definitions completely lose this concept, in all likelihood because NetRatings starts with generic dictionary definitions for the pertinent terms and tries desperately not to waver from them.

The patent specification makes clear, however, that the tracking / executable program must operate over time:

> "The tracking program downloads to the client, and, after performing any required initialization, determines the current time. <u>The tracking program also determines the current time upon the performance of a predetermined operation on the client computer by a user, such as leaving the HTML document. After calculating the amount of time the user interacted with and displayed the HTML document, i.e., by determining the difference in time values,</u> the tracking program uploads

14

the calculated value to the server . . ." ('386, Col. 5, ln. 53-62)(emphasis added).

". . . the tracking program <u>commences a software timer upon the detection of a predetermined user action. When the user performs another predetermined action, the tracking program calculates the amount of time between the predetermined user actions</u>, and sends this information, along with other available client information, to the server." ('386, Col. 13, ln. 48-55)(emphasis added).

"The tracking program monitors <u>the time</u> the information is displayed and the amount of bits downloaded and automatically transmits this information back to a server when the user leaves." ('386 Col. 17, ln. 11-14) (emphasis added).

Thus, the patent clearly requires that the executable / tracking program operates on an on-going basis and tracks user actions over a period of time. This is also clearly in accord with the common sense notion of "tracking" – observing the marks or tracks that someone or something makes over time. To use a simple analogy, something that operates at only a single moment in time -- such as a camera that takes a single picture -- cannot be said to be "tracking" anything; two or more pictures (or a continuous video stream) of a given item are required to "track" its changes over time. A similar analysis applies with regard to the "executable program," which the claims say must perform the task of "monitoring." Accordingly, the Court should adopt Coremetrics' claim construction for these terms.

**2.      NetRatings' Attempt to Change the Word "And" into "Or" In "at least one of the first resource and one or more second resources" Should be Rejected**

With regard to the claim phrase "at least one of the first resource and one or more second resources," NetRatings continues to try to run away from the word "and." Specifically, NetRatings wants the Court to interpret the phrase as *either* the first *or* the second resource. This is incorrect for at least four reasons: (a) the patentees could have written the claim using the word "or," but did not; (b) construing the phrase the way NetRatings suggests will effectively delete portions of the claim language; (c) patent claims are not required to cover, and often do not cover, the entirety of the alleged invention disclosed in the patent specification; and (d) the Federal Circuit has offered clear guidance rejecting the argument that NetRatings is asserting. Therefore, the Court should interpret the claim as written and

15

construe this phrase as requiring interaction with at least two distinct resources.[6]

First, if the patentees wanted the claim to read as NetRatings now argues, there was nothing to stop them from writing it that way. In other words, if the alleged inventors intended the claim to read: "at least one of: [A] the first resource and [B] one or more second resources," then the patent attorneys who wrote the claim obviously could have written it using such language. They did not. Further, if NetRatings thought that the claim was incorrectly issued, or confusing, there was nothing to stop NetRatings from applying for a reissue or a reexamination of the patent. They did not. So, NetRatings is stuck with the way in which it was written and should not be allowed to re-draft the claims now, during litigation.

Second, if the clause is construed the way NetRatings suggests, the reference to the "one or more second resources" effectively becomes meaningless. Under NetRatings' proposal, infringement could exist even if the tracking program never did anything at all with the second resource. To put it another way, if the tracking program does not have to monitor interaction with both the first resource and at least one second resource, then why does the second resource matter and why was it mentioned in the claim at all? If NetRatings' construction is correct, then everything about the "one or more second resources" could have been dropped when the patent was written, and the claims could have simply read: "executing the tracking program on the client computer to monitor interaction through the client computer with the first resource." This is not what the claims say, nor is it what the claims mean. The Court should not accept NetRatings' invitation to drop intentionally included limitations from a claim, because doing so is contrary to well-settled law. *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1120 (Fed. Cir. 2004) ("All claim terms are presumed to have meaning in a claim")(rejecting an interpretation which read the term "operatively" out of the phrase "operatively connected," noting that if the term "operatively" is unnecessary and superfluous, "the patentee could have as easily used the term 'connected' alone"); *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed. Cir. 1991) ("All the limitations of a claim must be considered meaningful").

---

[6] Coremetrics notes that, in its Opening Brief NetRatings seems to have dropped its assertion, made during the meet and confer process, that this phrase is a "*Markush*" group.

Third, NetRatings asks the Court to change "and" into "or" based upon "examples from the specification where what is being monitored are multiple resources or a single resource." (NR Brief, p.26). This argument is fallacious. Patent law is replete with examples of claims that cover less than what the patent specification describes. The claims, not the specification, set forth the boundaries of the invention. "While claims are to be interpreted in light of the specification, all that appears in the specification is not necessarily within the scope of the claims and thus entitled to protection. What is not claimed, even though disclosed as part of the 'invention,' cannot be enjoined." *Novo Nordisk of North America, Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1369 (Fed. Cir. 1996). Indeed, subject matter disclosed in the specification, but not claimed, is dedicated to the public. *Unique Concepts*, 939 F.2d at 1562-63 (citing *Edward Miller & Co. v. Bridgeport Brass Co.*, 104 U.S. 350, 352 (1881)). As *Unique Concepts* articulates, a patentee should not be allowed to avoid a claim limitation by pointing to the specification disclosing an alternative that lacks that limitation, and thereby interpret the claim contrary to its plain meaning. 939 F.2d at 1562. "Such a result would encourage an applicant to escape examination of a more broadly-claimed invention by filing narrow claims and then, after grant, asserting a broader scope of the claims based on a statement in the specification of an alternative never presented in the claims for examination." *Id.* So, even if there are examples in the '386 patent specification showing the monitoring of only one resource, that is <u>not</u> what the claim language says and it is not what the patentees have claimed as their alleged invention.

Fourth, in *SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870 (Fed. Cir. 2004), the Federal Circuit addressed the interpretation of a similar phrase and rejected a construction of the sort that NetRatings advocates here. In that case, the lower court construed the phrase "at least one of ... and . . ." to mean "at least one of each desired criterion; that is, at least one of a desired program start time, a desired program end time, a desired program service and a desired program type. The phrase does not mean one or more of the desired criteria but at a minimum one category thereof." *Id.* at 885. On appeal, SuperGuide argued that the phrase "at least one of" modifies the entire list of categories. DirecTV, by contrast, argued that the phrase "at least one of" modified each category in the list, *i.e.*, one or more values in each category were required. Agreeing with DirecTV and affirming the lower court's

construction, the Federal Circuit explained:

> "The phrase 'at least one of' precedes a series of categories of criteria, and the patentee used the term 'and' to separate the categories of criteria, which connotes a conjunctive list. A common treatise on grammar teaches that "an article of a preposition applying to all the members of the series must either be used only before the first term or else be repeated before each term. Thus, '[i]n spring, summer, or winter' means 'in spring, in summer, or in winter.' Applying this grammatical principle here, the phrase 'at least one of' modifies each member of the list, *i.e.*, each category in the list."

*Id.* at 886. The '386 patent's use of the "at least one of . . . and" should be similarly limited.

Accordingly, the Court should reject NetRatings' litigation-inspired re-drafting of this claim element and adopt Coremetrics' proposed definition.

### 3. NetRatings' Definition of "resource" Is Incorrect

Continuing to follow its erroneous "dictionary definitions first" approach, NetRatings argues that the definition of the term "resource" could be "boiled down to 'things that can be used.'" (NR Brief, p. 20). NetRatings then suggests that, due to the context of the term in the patent, it is willing to modify the definition to be "a computer program or data" and to include examples, "such as in the form of a Web page or part of a Web page, images, an ad banner, or an interactive game." (NR Brief, p. 20). Essentially, NetRatings would have the Court incorrectly interpret "resource" to be something such as "things that a computer can use," or "parts of things that a computer can use."

NetRatings then attacks Coremetrics for including in its definition concepts that are both supported in the patent specification and by common sense. (NR Brief, p. 20, n. 15). First, Coremetrics included in its definition a requirement that the resource is distinct from the "tracking program"/"executable program" that is called out in other limitations of the claim. As the patent makes obvious, the same computer file cannot be both the "resource" and the "tracking program" at the same time – they are two distinct elements, even though it is possible that one is nested inside the other: "The tracking program may be <u>part of</u> a larger program that performs other operations . . ." ('386 Col. 4, ln. 52-53). Second, the patent clearly says that the resource is in the form of a "file": "a tracking program is embedded in a file which is downloaded from a server to a client." ('386 Col. 4, ln. 48-49). Third, it is

equally clear that the resource must be something that was downloaded from a server, and cannot be, in contrast, a file that the user creates on the client computer. This is demonstrated by the language of claim 1 itself: "downloading the first resource from the first server to the first client." ('386 Claim 1). Therefore, Coremetrics' claim construction is firmly based upon the intrinsic evidence, not dictionary definitions, and should be adopted.

4.    **"data representative of a plurality of preferences of a user"; "data representative of a plurality of interests of a user"**

These terms should be construed to mean "information describing two or more items that a user favors over other alternatives," and "information describing two or more items that a user is interested in," respectively. In its Opening Brief, NetRatings incorrectly argues that these terms should mean "information from which a user's preferences can be determined" and "information from which a user's interests can be determined." As an initial matter, NetRatings' proposed construction ignores the obvious fact that the phrases themselves both call for a "plurality" of things. Thus, the data must represent two or more things.

NetRatings' definition is also incorrect because it leaves entirely unclear what the "information" is from which the preferences or interests "can be derived." Indeed, the fact that NetRatings' proposal requires that some additional step can or must be carried out in order to finally learn the things that the user prefers or is interested in also demonstrates that the definition is incorrect. Put another way, if the phrase is construed as "information" from which something "can be determined" then the patent presumably must explain how that determination should be made. The patent does not, however, contain any such explanation or disclosure. This means that either NetRatings construction is wrong, or patent claims using these phrases are not enabled and are insufficiently described. Therefore, Coremetrics' proposed definitions are the only ones that makes sense in the context of the intrinsic evidence and should be adopted by the Court.

5.    **"Monitoring Details of Choices Made by a User"**

In a way similar to the phrases discussed above, this phrase should be construed to mean "monitoring two or more aspects of two or more selections made by a user." (JCCC p. 10). Again, in its

definition, NetRatings ignores the plain fact that both the terms "details" and the term "choices" are plural. The patent attorneys who wrote this phrase could have written it as "monitoring one or more details about each choice made by a user." They did not, and NetRatings must now live with that decision. Accordingly, NetRatings should be limited to the plain meaning of this phrase and Coremetrics' proposed construction should be adopted.

### 6.    NetRatings' Confusion Over "embedded" and "not being part of the resource"

As explained in Coremetrics' Opening Brief, NetRatings has confused and avoided the differences between something being "embedded" and something "not being part of the resource." The term "embedded" should be construed to mean "entirely contained or encapsulated within," while the phrase "not being part of a resource" should be interpreted to mean "all of the pre-existing computational instructions of the 'executable program' are found entirely outside of the 'resource'." (JCCC, p. 9, 7 respectively).

Following its "dictionaries first" approach, NetRatings offers vague and broad definitions for these terms and then backs them up with questionable support. For example, in its footnote 17, NetRatings offers an interpretation of a quote from the prosecution history of the '952 patent that is simply unsupported: "where the 'URL (i.e., the address) of a tracking program is embedded in a resource, such as a Web page,' the tracking program is considered to be embedded in the resource." (NR Brief, p. 21, n. 17). There is nothing in the text of the prosecution history surrounding the quote to support the conclusion that NetRatings draws – that the embedding of a URL means that the "tracking program is considered to be embedded in the resource." NetRatings seems to be willing to make this logical leap without support. But, as explained in Coremetrics' Opening Markman Brief, the concept of an embedded URL, without more, is properly identified as "not being part of the resource." Because NetRatings has confused these concepts, and instead put forward broad and vague dictionary definitions, its claim construction proposal should be rejected.

### 7.    The "Java Programming Language"

NetRatings' definition of "Java programming language" is simply inexplicable. After arguing for

most of its brief that terms should be entitled to their "ordinary meaning," NetRatings takes the

unsupportable position that this term, which is a registered trademark of Sun Microsystems used to

identify a particular computer language,[7] is not actually limited to the language that Sun has released

under that name. Instead, NetRatings seems to be asking the Court to construe "java programming

language" as any language that is "largely platform independent" and which is "capable of being used on

many different client computers." (NR Brief, p. 22). As a result, NetRatings argues that programming

languages from Sun's competitors, such as Microsoft's "C#" language, should be included in this

definition. (NR Brief, p. 22; n. 18).

Even the extrinsic evidence that NetRatings cites does not support its position. For example, the

"javaworld" website that NetRatings cites states, in part, that: "C#'s most intriguing facets are its

differences from Java, not its similarities. This section (and much of Part 2 of this series) covers features

of C# that Java implements differently or entirely lacks." App. Ex. 12, A069-82. Thus, because

NetRatings' construction is not supported by either the patent specification or NetRatings' own extrinsic

evidence, it should be rejected.

### 8.    NetRatings' Definition of "user action" Is a Meaningless Paraphrase

NetRatings' definition of "user action" provides nothing more than a paraphrase of the term and

by doing so, divorces the term from the patent claims and specification. NetRatings' definition of

"performance of an action by a user" does not link the "action" to anything that the computer, or the

"executable program," can track or identify in any way. For example, under NetRatings' definition, a

user's decision to pick her keyboard up and move it from the left side of the desk to the right side of the

desk would be a "user action," but there would be no way for the "executable program" to know that the

keyboard had been moved. Thus, NetRatings' construction cannot be correct.

On the other hand, Coremetrics' definition does account for this concept. Under Coremetrics'

definitions, a "user action" is "the activation of an input device by a user." (JCCC, p. 8). The

---

[7]   A copy of Sun Microsystems Inc.'s U.S. Trademark Registration No. 2178784, for the word
mark "JAVA" is submitted as Exhibit 1 to the Supplemental Sadasivan Declaration in Support of
Coremetrics' Answering Markman Brief.

specification has ample support for the concept that the executable program must be able to track when a user clicks a mouse or types on a keyboard, *i.e.*, engages in an action that the computer can recognize. ('155 Col. 13, ln. 25-50). Thus, Coremetrics' definition should be adopted.

## V.    TERMS ACROSS PATENTS

### A.    "Computer Usable Medium" and "Program Code which, when Executed on a Computerized Device, Causes the Computerized Device to Execute, in a Computer Network Comprising One or More Servers and One or More Clients, a Method."

These terms, as explained in Coremetrics' Opening Markman Brief, should be construed as limited to one computer usable medium and to one computerized device completing the entire claimed method. As with much of the rest of its brief, NetRatings turns to generalities on this point, rather than focus on the context of the patent specification. The Federal Circuit has explained that the term "a," like any other term, must be considered in the context of the patent specification and can be either plural or singular:

> "While it is generally accepted in patent parlance that 'a' can mean one or more, there is no indication in the patent specification that the inventors here intended it to have other than its normal singular meaning."

*North American Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1575-76 (Fed. Cir. 1993)(internal citations omitted). *See, Insituform Technologies, Inc. v. CAT Contracting, Inc.*, 99 F.3d 1098, 1105-06 (Fed. Cir. 1996)(construing claim terms "a cup" and "the cup" to a single cup, based on claim context and specification's failure to describe use of more than one cup in claimed process). The reason for NetRatings' failure is easily understood – there is nothing in the '637 patent suggesting that the various claimed "instructions" can be scattered across more than one "computer usable medium" or that the '386/'155 patents suggest that the claimed method could be carried out by more than one client computer. Indeed, the suggestion that a tracking program that is supposed to track the behavior of a user of a client computer can actually be located on multiple computers is flatly contradicted by the figures of the '386 and '155 patents, which show that the tracking program runs on <u>a particular client computer</u>. (*See, e.g.*, Figure 3). Accordingly, Coremetrics' proposed claim constructions for these terms should be adopted.

## VI.    CONCLUSION

Based on the arguments and evidence provided above, in Coremetrics' Opening Markman Brief, and in the JCCC, Coremetrics respectfully requests that the Court adopt Coremetrics' proposed claim constructions.

ASHBY & GEDDES

/s/ Lauren E. Maguire
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Ave., 17th Floor
P.O. Box 1150
Wilmington, DE  19899
Telephone:  (302) 654-1888
Facsimile:  (302) 654-2067
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Defendant Coremetrics, Inc.*

*Of Counsel:*

Robert T. Haslam
Nitin Subhedar
Bhanu K. Sadasivan
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, CA  94025
Telephone: (650) 324-7000
Facsimile: (650) 324-0638

Matthew C. Lapple
HELLER EHRMAN LLP
4350 La Jolla Drive, 7th Floor
San Diego, CA  92121
Telephone: (858) 450-8400
Facsimile: (858) 450-8999

Dated:  May 15, 2006

169468.1

23

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of May, 2006, the attached **DEFENDANT COREMETRICS' ANSWERING MARKMAN BRIEF** was served upon the below-named defendants at the address and in the manner indicated:

Josy W. Ingersoll, Esquire
John W. Shaw, Esquire
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

<u>HAND DELIVERY</u>

Frederick L. Whitmer, Esquire
Brown Raysman Millstein Felder & Steiner LLP
900 Third Avenue
New York, NY  10022

<u>VIA ELECTRONIC MAIL</u>

*/s/ Lauren E. Maguire*
_____
Lauren E. Maguire